FILED

2018 Dec-04  AM 09:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **ERICH HALBERT, SHERRI HALBERT)** | |
| **AND JOHN HALBERT** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **CASE NO.: 2:18-cv-00615-AKK** |
| ) | |
| **CREDIT SUISSE, AG AND JANUS** ) | |
| **INDEX & CALCULATION SERVICES,** ) | **JURY TRIAL DEMANDED** |
| **LLC** ) | |
| ) | |
| **Defendants.** ) | |

## FIRST AMENDED COMPLAINT

Erich, Sherri, and John Halbert respectfully submit the following Complaint

pursuant to Federal Rules of Civil Procedure 8, 9, and 15 against Defendants

Credit Suisse, AG ("Credit Suisse") and Janus Index & Calculation Services, LLC

("Janus").  On February 2–5, 2018, the Halberts invested in Credit Suisse's

*VelocityShares Daily Inverse VIX Short Term* exchange traded note ("XIV")

through their TD Ameritrade account.  The Halberts did not know that Credit

Suisse was materially misrepresenting the true value of XIV.  Credit Suisse failed

to update the value until after the markets closed on February 5, 2018.  XIV lost

almost all value in overnight trading, costing the Halberts a significant portion of

their nest egg.  Credit Suisse then announced an acceleration event, essentially terminating trading in the XIV, locking in the Halberts' losses.

The facts of this case are being litigated in a class action pending in the Southern District of New York.

## PARTIES

1.      Erich Halbert is an adult resident of Shelby County, Alabama.[1]

2.      Sherri Halbert is an adult resident of Shelby County, Alabama.

3.      John Halbert is an adult resident of Lee County, Alabama.

4.      Credit Suisse is a Swiss corporation with its principal American place of business in New York, New York.

5.      Janus is a Delaware limited liability company with its principal place of business in Denver, Colorado.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over these claims because the dispute is between citizens of different states and the matter in controversy exceeds $75,000. 28 U.S.C. § 1332(a).  The Court may also exercise federal question jurisdiction because the case implicates the federal securities laws.  28 U.S.C. § 1331.

---

[1] To the extent not expressly set forth herein, the Halberts incorporate by reference the factual allegations found in paragraphs 1–19 and 50–269 of that document herein by reference.  *See Set Capital LLC, et al., v. Credit Suisse, et al.,* 1:18–cv–02268–AT–SN Doc. 82 (Attached hereto as Exhibit 1).

7.     This Court is the proper venue of this action because a substantial part of the events or omissions giving rise to the claim occurred in this district and a substantial part of the damages occurred in this district.

## **FACTUAL ALLEGATIONS**

8.     The Volatility Index ("VIX") is a calculation which reflects the implied volatility of the S&P 500 Index at various points along the volatility forward curve.

9.     Investors may invest in the forward volatility of the S&P 500 Index through trading futures on the VIX Index ("VIX Futures"). The S&P 500 VIX Short-Term Futures Index models the outcome of holding long positions in VIX futures. This serves as an indicator of investors' exposure to the maturity of future contracts on the VIX Index.

10.    Credit Suisse created the XIV as an instrument that was designed to provide the opposite return of the VIX.

11.    The XIV was registered with the SEC pursuant to the federal securities laws of the United States.

12.    Despite not being tied to a company with earnings, sales, or profits, XIV was traded like a stock. It could be bought, sold, or sold-short anytime the market was open, including pre-market and after market time periods. The notes were liquid and easily-tradeable. The notes were available for trade to

3

unsophisticated investors even those without an options account.  Indeed, as Credit Suisse was aware, less than 1/5th of the outstanding notes were held by institutional investors.

13.     The XIV's trading prices are determined by supply and demand, just like other exchange-traded securities.  Credit Suisse was supposed to calculate and publish an estimate of the value of XIV called the "Intraday Indicative Value" every fifteen seconds throughout the day.  Credit Suisse also calculates and publishes a "Closing Indicative Value" at the end of each day.

14.     Janus was responsible for calculating and disseminating the Intraday Indicative Value.

15.     Credit Suisse collected a daily investor fee on XIV's assets which generated millions of dollars for Credit Suisse each year.

16.     On January 29, 2018, Credit Suisse issued a pricing supplement (No. VLS ETN-1/A48) with the SEC pursuant to Rule 424(b)(2) and in conjunction with (i) the Registration Statement No. 333-218604-02, (ii) a prospectus supplement dated June 30, 2017 and (iii) a prospectus dated June 30, 2017.  These documents together comprised a prospectus (the "Prospectus"), which offered 16,275,000 Inverse VIX Short ETNs at a denomination and stated principal amount of $10 each.

17.    At the same time this pricing supplement was issued, Credit Suisse dumped over 16 million new notes on the market despite knowing even a modest volatility spike would destroy XIV.  The Halberts bought the notes at issue in February, after this release.  At this time, it had been over a year and a half since the last VIX spike.  Put differently, a spike was unavoidable and overdue.  Credit Suisse knew this, yet issued these Notes to profit off of the Halberts and others like them.

18.    The Prospectus's risk section discloses the following with regards to Credit Suisse's trading activity:

> Trading and other transactions by us, our affiliates, or third parties with whom we transact, in securities or financial instruments related to the ETNs and the applicable underlying Index may impair the value of your ETNs.

> We expect to hedge our obligations relating to the ETNs by purchasing or selling short the underlying futures, listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or other instruments linked to the applicable underlying Index, certain exchange traded notes issued by Credit Suisse, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, and adjust the hedge by, among other things, purchasing or selling any of the foregoing, at any time and from time to time, and to unwind the hedge by selling any of the foregoing, perhaps on or before the applicable Valuation Date. We, our affiliates, or third parties with whom we transact, may also enter into, adjust and unwind hedging transactions relating to other securities whose returns are linked to the applicable underlying Index. Any of these hedging activities may adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the

price of the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures — and therefore the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. It is possible that we, our affiliates, or third parties with whom we transact could receive substantial returns with respect to these hedging activities while the value of your ETNs decline or become zero. Any profit in connection with such hedging activities will be in addition to any other compensation that and our affiliates receive for the sale of the ETNs, which may create an additional incentive to sell the ETNs to you.

We, our affiliates, or third parties with whom we transact may also engage in trading in the underlying futures, or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or instruments whose returns are linked to the applicable underlying Index, certain exchange traded notes issued by Credit Suisse, or the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures for our or their proprietary accounts, for other accounts under our or their management or to facilitate transactions, including block transactions, on behalf of customers. Any of these activities could adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-thecounter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures — and, therefore, the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. We may also issue, and we, our affiliates, or third parties with whom we transact may also issue or underwrite, other ETNs or financial or derivative instruments with returns linked to changes in the level of the applicable underlying Index or the underlying futures or

listed or over-thecounter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures. By introducing competing products into the marketplace in this manner, we, our affiliates, or third parties with whom we transact could adversely affect the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date.

19.   The Prospectus disclosed that Credit Suisse had the option or obligation to accelerate the XIV "if, at any point, the Intraday Indicative Value is equal to or less than twenty percent (20%) of the prior day's Closing Indicative Value."

20.   The active XIV Pricing Supplement represented that Credit Suisse would publish an estimate of the current economic value of XIV notes every 15 seconds based on real time VIX futures prices.

21.   These statements are materially false and misleading because they failed to disclose that Credit Suisse was actively manipulating the XIV by liquidating its holdings in various financial products to avoid a loss.   It also failed to disclose that Credit Suisse was manipulating the XIV to the detriment of investors.  Further, during a critical hour on February 5, 2018, Credit Suisse stopped updating the estimate of the current economic value of the XIV, resulting in a material misrepresentation of its true economic value.  Credit Suisse's statements were also false because it failed to disclose that the Intraday Indicative Value was not an accurate gauge of the XIV's economic value.  As a result,

Defendants' statements about the XIVs were false and misleading and lacked a reasonable basis.

22.    Despite actively betting against XIV, Credit Suisse continued offering millions of additional notes to the market.  Credit Suisse sold these notes at a premium despite knowing that these notes would crater when volatility next spiked.  At the time of the collapse, the shares were worth approximately $1.9 billion.

23.    Credit Suisse knew when it sold these notes that all of the risk of the inevitable collapse was on the investors.  It bore no risk whatsoever.

24.    In the year before the collapse, the trading value of the notes had consistently increased due to low volatility in the stock market.  The defendants knew, or should have known that increase in price had attracted unsophisticated investors like the Halberts.  Credit Suisse took no steps to prevent unsophisticated investors from purchasing the notes or otherwise ensuring that they had seen the prospectus.

25.    At the closing bell on February 5, 2018, 4 pm eastern time, the XIV was trading at $99.  This value was inflated by Credit Suisse's and Janus's manipulation of the Intraday Indicative Value.  This inflation led to the XIV's collapse.

26.     Credit Suisse stopped updating the value of the XIV at 4:10 at a time the value of the underlying VIX futures were rapidly changing.  From 4:10–5:09, Credit Suisse, through its agent Janus, represented to the public that the economic value of the notes was approximately $24.70 but knew, or should have known, that the actual value of the notes was between $4.22 and $4.40.

27.     Defendants knew, or should have known, that its S&P Index was not updating every 15 seconds to "apply[] real time prices of the relevant VIX futures contracts" as it promised to do in the offering documents and pricing supplements. Defendants took no steps to warn investors or prevent the harm that arose from its failure.

28.     By 4:15 p.m., the VIX Futures prices were up 96% from the day before.  Credit Suisse knew by 4:15 when this number was posted that XIV's closing indicative value would likely decline by 96% from the previous day, leading to an acceleration event.

29.     The change in these futures' value was visible to institutional and sophisticated market-participants but was invisible to individual and unsophisticated investors like the Halberts.  Individual investors continued to buy XIV at inflated values.  Sophisticated investors—fleeing from the inevitable wrath to come—started selling XIV.

30.     By 4:30, the trading price dropped to $70.01.  By 4:45, the price dropped to $42.81 per share.

31.     At 5:10, the Intraday Indicative Value began updating again, showing a value of $4.22 per share.

32.     By 6:28, the price was $10.16 per share, a drop of 89.74% of its closing value in only two-and-a-half hours.

33.     The next morning, Credit Suisse announced an Acceleration Event which would end trading on the XIV by February 20, 2018.

34.     Credit Suisse was not obligated to end trading on the XIV but it had a perverse economic incentive to do so.  The notes were a liability to Credit Suisse. By redeeming the notes it sold at a premium for pennies on the dollar of their value hours earlier, Credit Suisse realized an enormous profit.

35.     This value was significantly less than the historic value at which Credit Suisse had been compelled to redeem shares through ordinary trading.

36.     The collapse was triggered by trading in VIX futures which caused the futures price to increase by 46% between 4:00 and 4:15.  This increase is at least 8 times the expected increase given the 13% rise in the VIX price in the same time period.  This massive spike was due to the previously mentioned liquidity issues in the VIX futures market due to volatility in the market.  Credit Suisse was

able to raise the price of VIX futures through hedging far more cheaply than it could have redeemed the notes.

37.    The increase was caused by heavy trading in March VIX futures contracts.  Before 4 pm, the average VIX futures price increased 34.5% from the previous day.  By 4:09, the price was more than 80% over the prior day's closing value.  It was at this convenient moment that the Intraday Indicative Value stopped updating.

38.    On information and belief, this sudden rise in value was caused by Credit Suisse's hedging activities.  On information and belief, Credit Suisse engaged in this activity for the purpose of causing an Acceleration Event.  Credit Suisse did not inform investors of its intention before engaging in this activity.

39.    Credit Suisse was actively betting on the XIV to fail.  It designed the XIV to fail.  Credit Suisse failed to disclose to investors that it offered the notes with the intent to profit at their expense through hedging activities.  While the January supplement says that there "may" be conflicts of interest between the Defendants and the investors, it fails to disclose Credit Suisse knew for certainty that there would be a conflict of interest the moment volatility spiked again.

40.    Credit Suisse knew or should have known that hedging in times of high volatility would cause the notes to crash.  There was insufficient liquidity to

allow this activity.  Credit Suisse did nothing to disclose the risk posed by the liquidity threat or otherwise protect investors like the Halberts.

41.     Had Credit Suisse and Janus updated the indicative value every fifteen seconds as promised, a liquidation event likely would not have occurred because the closing indicative value would have only been 77% of the previous days' value.  If the XIV notes had survived, the notes would have appreciated in value in February and March.  Instead, Credit Suisse redeemed notes for pennies on the dollar.

42.     On information and belief, Janus and Credit Suisse had manipulated or failed to update the Intraday Indicative Value on occasions other than February 5, 2018 but these manipulations were not noticed until the collapse.

43.     Despite holding a significant amount of short-volatility financial products, including VIX Futures, Credit Suisse announced that it experienced no trading losses in the XIV.

44.     By contrast, investors in the Notes lost approximately $1.8 billion.

45.     Had Credit Suisse not accelerated the Notes, the value of the Notes would have recovered.  Within a month, the value would have risen to $30.88, over five times the price Credit Suisse redeemed the notes for.

46.     The Halberts were not as lucky as Credit Suisse.  Between February 2–5, 2018, the Halberts bought 5,590 shares of XIV for $631,618.40.  These notes

were purchased in the Northern District of Alabama. The Halberts bought these notes on the understanding that Credit Suisse was a reputable company that would stand behind the securities, provide accurate market information, and otherwise carry out its duties as the issuers of XIV notes. The Halberts also believed the notes to be traded in an efficient market that was not being actively manipulated by Credit Suisse. The Halberts sold their notes on February 5–6, 2018, after the collapse for pennies on the dollar. Credit Suisse was not obligated to end trading on the XIV but it had a perverse economic incentive to do so. The notes were a liability to Credit Suisse. By redeeming the notes it sold at a premium for pennies on the dollar of their value hours earlier, Credit Suisse realized an enormous profit.

47.     By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Bank's interests in, and plans for, XIV. When the truth about XIV was revealed to the market, the price of XIV declined significantly. This decline removed the inflation from the price of XIV securities, causing real economic loss to investors who had purchased XIV notes during the Class Period.

48.     The Halberts were damaged by Defendants' fraudulent scheme to artificially inflate and/or maintain the price of XIV and the subsequent decline in the value of the notes when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

49.     Defendants actively mislead the Halberts and others through their fraudulent schemes.  Credit Suisse artificially affected the pricing of the notes in a way that benefitted them to the Halberts' detriment.

## CLAIMS

### I.     VIOLATIONS OF SECTION 11 OF THE 1933 ACT (Against Credit Suisse)

50.     The Halberts incorporate paragraphs 1–49 of the Complaint  herein by reference.

51.     This claim is brought pursuant to § 11 of the 1933 Act, 15 U.S.C. § 77k, against Credit Suisse as issuer of the Notes through which shares in the XIV were offered.

52.     The Halberts purchased the Notes pursuant to, or traceable to, the materially false and misleading Registration Statements detailed above. Credit Suisse knew that it was selling notes that would crash.  Credit Suisse knew that it would engage in hedging that would cause the notes to crash due to poor liquidity in the market and that as a result there was an active conflict of interest between the Halberts and themselves.  Credit Suisse knew that it was reaping major profits off of the Halberts and other investors by selling notes at a premium it intended to redeem cheaply.  None of this was adequately disclosed to the Halberts.

53.     The Halberts have sustained damages in that the value of the Notes has declined substantially from the prices at which they were purchased.

14

54.     At the time of their purchases of the Notes, the Halberts were without

knowledge of the facts concerning the untrue statements or omissions herein and

could not have reasonably discovered those facts prior to the date the XIV

collapsed and lost all value.

55.     Less than one year has elapsed from the time that Plaintiffs discovered

or reasonably could have discovered the facts upon which this Complaint is based

to the time that Plaintiffs filed this Complaint. Less than three years have elapsed

from the time that Plaintiffs purchased the Notes upon which this Count is brought

to the time Plaintiffs filed this Complaint.

Wherefore the Halberts respectfully request an award of damages

recoverable under Section 11 along with attorneys' fees, expenses, costs, and any

other legal or equitable relief the Court deems just under the circumstances.

## II.     VIOLATIONS OF SECTION 10(b) OF THE 1933 ACT (Against Credit Suisse and Janus)

56.     The Halberts incorporate paragraphs 1–49 of the Complaint  herein by

reference.

57.     This claim is brought pursuant to § 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5,

against Credit Suisse and Janus.

58.     The Defendants employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact and/or omitted to state material facts

necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Notes.

59.    Credit Suisse and Janus caused to be disseminated or approved the Intraday Indicative Values. The Intraday Indicative Values were materially false and misleading in that they misrepresented and failed to disclose material facts necessary in order to make them, in light of the circumstances under which they were made, not misleading.

60.    At all relevant times, the market for the Notes was an efficient market for the reason, among others, that the Notes met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated securities market. As a result of the foregoing, the market for the Notes promptly digested current information regarding the Notes from all publicly available sources—including the misstated Intraday Indicative Value—and reflected such information in the prices of the Notes. The Halberts purchased the Notes at artificially inflated prices, and a presumption of reliance applies.

61.    Credit Suisse and Janus acted with scienter in that they knew that the statements issued to investors, namely the false Intraday Indicative Values, were materially false and misleading; knew that such values would be issued or disseminated to the investing public; knowingly and substantially participated or

16

acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws; and failed to correct in real time the Intraday Indicative Value. Defendants were responsible for the calculation, either directly or indirectly, of the Intraday Indicative Values, and knew or recklessly disregarded that such values were materially inflated.

62.    Additionally, the disclosures in the offering document were misleading because they failed to disclose (1) that XIV was designed to collapse in the next volatility spike because the product had grown too large and there was inadequate liquidity to hedge the product without causing it to collapse; (2) Credit Suisse planned to profit and collapse the XIV through its hedging activities; and (3) there was an active and ongoing conflict of interest between Credit Suisse and the Halberts.

63.    The Halberts have suffered damages because, in reliance on the integrity of the market, they paid artificially inflated prices for the Notes.  The Halberts would not have purchased the Notes at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

64.    As a direct and proximate result of the Defendants' wrongful conduct, the Halberts have been damaged.  The Halberts bought XIV at artificially inflated

prices that collapsed when the Indicative Value was updated and Credit Suisse announced an acceleration event.

65.     The Halberts were further damaged because, if the Indicative Value had been continuously updated as promised, an acceleration event would not have occurred.  As a result, the Halberts were denied the opportunity to recover their losses as the value of the Notes rebounded.

66.     On information and belief, the Halberts were also damaged by Credit Suisse's hedging which artificially inflated VIX futures prices at the moment the Intraday Indicative Value stopped updating.  On information and belief, Credit Suisse engaged in these practices for the sole purpose of causing an acceleration event, thus allowing it to reap a tremendous profit at the expense of unsophisticated investors like the Halberts.  Defendants concealed the impact of this hedging by failing to update the Intraday Indicative Value for an hour after the impact of this hedging took place.

Wherefore the Halberts respectfully request an award of damages recoverable under Section 10(b) along with attorneys' fees, expenses, costs, and any other legal or equitable relief the Court deems just under the circumstances.

### III.     VIOLATIONS OF ALABAMA BLUE SKY LAW (Against Credit Suisse)

67.     The Halberts incorporate paragraphs 1–49 of the Complaint  herein by reference.

18

68.     The Alabama Blue Sky Law imposes strict liability on any person who "[s]ells . . . a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission."  Ala. Code § 8-6-19(a)(2)

69.     Credit Suisse represented that it would update the Intraday Indicative Value every 15 seconds.  It did not do so.  This fact is material because Credit Suisse's failure to update the Indicative Value led to an asymmetrical sell-off where hundreds of millions of dollars was shifted from the hands of unsophisticated, individual investors to sophisticated, institutional investors.

70.     Additionally, the disclosures in the offering document were misleading because they failed to disclose (1) that XIV was designed to collapse in the next volatility spike because the product had grown too large and there was inadequate liquidity to hedge the product without causing it to collapse; (2) Credit Suisse planned to profit and collapse the XIV through its hedging activities; and (3) there was an active and ongoing conflict of interest between Credit Suisse and the Halberts.

71.    Alternatively, Credit Suisse materially aided the unlawful sale of a security within the meaning of Alabama's Blue Sky Law.  Credit Suisse was a material factor in the sale of securities to the Halberts.

72.    The notes were purchased in Alabama.

Wherefore the Halberts respectfully request an award of damages recoverable under Ala. Code § 8-6-19(a) along with attorneys' fees, expenses, costs, and any other legal or equitable relief the Court deems just under the circumstances.

## IV.    NEGLIGENCE (Against Credit Suisse and Janus)

73.    The Halberts incorporate paragraphs 1–49 of the Complaint  herein by reference.

74.    "To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Lemley v. Wilson*, 178 So. 3d 834, 841 (Ala. 2015) (quoting *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994)).

75.    Credit Suisse and Janus owed duties to regularly update the Intraday Indicative Value.  The Halberts, as holders of XIV Notes were foreseeable plaintiffs who were harmed when Credit Suisse and Janus breached this duty.  This breach harmed the Halperts, not only through the loss of value of the investment,

but also by causing the XIV to incur an acceleration event that would not have occurred absent the breach.

Wherefore the Halberts respectfully request an award of compensatory and punitive damages along with attorneys' fees, expenses, costs, and any other legal or equitable relief the Court deems just under the circumstances.

## V.   WANTONNESS (Against Credit Suisse and Janus)

76.   The Halberts incorporate paragraphs 1–49 of the Complaint  herein by reference.

77.   "To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury. To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty. *To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains*."  *Lemley v. Wilson*, 178 So. 3d 834, 841–42 (Ala. 2015) (quoting *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994)) (emphasis in original, internal citation omitted).

78.   Credit Suisse and Janus owed duties to regularly update the Intraday Indicative Value.  On information and belief, Janus and Credit Suisse consciously chose not to update the Intraday Indicative Value on February 5, 2018 with

reckless indifference to the consequences. The Halberts, as holders of XIV Notes were foreseeable plaintiffs who were harmed when Credit Suisse and Janus breached this duty.  This breach harmed the Halperts, not only through the loss of value of the investment, but also by causing the XIV to incur an acceleration event that would not have occurred absent the breach.

Wherefore the Halberts respectfully request an award of compensatory and punitive damages along with attorneys' fees, expenses, costs, and any other legal or equitable relief the Court deems just under the circumstances.

## VI.   BREACH OF CONTRACT (Against Credit Suisse)

79.   The Halberts incorporate paragraphs 1–49 of the Complaint  herein by reference.

80.   "Under Alabama law, the elements of a breach-of-contract claim are: (1) the existence of a valid contract binding upon the parties in the action, (2) the plaintiff's own performance; (3) the defendant's nonperformance, or breach, and (4) damage. The basic elements of a contract are an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement." *Lambert v. First Fed. Mortg.*, 47 F. Supp. 3d 1310, 1318 (N.D. Ala. 2014) (quoting *Armstrong Bus. Servs., Inc. v. AmSouth Bank,* 817 So.2d 665, 673 (Ala.2001)) (internal quotations and alterations omitted).

81.     The prospectus forms a binding contract between Credit Suisse and the Halberts who purchased the XIV.  The Halberts performed their obligations under the contract.  Credit Suisse failed to perform when it did not keep up the Intraday Indicative Value as promised.  The Halberts were damaged as a result of the breach, not only through the loss of value of the investment, but also by causing the XIV to incur an acceleration event that would not have occurred absent the breach.

Wherefore the Halberts respectfully request an award of compensatory and punitive damages along with attorneys' fees, expenses, costs, and any other legal or equitable relief the Court deems just under the circumstances.

## VII.  FRAUDULENT MISREPRESENTATION (Against Credit Suisse and Janus)

82.     The Halberts incorporate paragraphs 1–49 of the Complaint  herein by reference.

83.     ""To establish a prima facie case of fraudulent misrepresentation, a plaintiff must show: (1) that the representation was false, (2) that it concerned a material fact, (3) that the plaintiff relied on the false representation, and (4) that actual injury resulted from that reliance."  *Aliant Bank, a Div. of USAmeribank v.*

*Four Star Investments, Inc.*, 244 So. 3d 896, 928 (Ala. 2017) (quoting *Boswell v.*

*Liberty Nat'l Life Ins. Co.*, 643 So.2d 580, 581 (Ala. 1994).

84.     In addition to the false statements in the registration statement, the

Defendants made false representations to the Plaintiffs concerning the value of the

Intraday Indicative Value from 4:09 pm until 5:10 pm.  The lack of updating was

material because it caused the Intraday Indicative Value to stop updating at a

critical time.  The Defendants knew that the statement was false at the time yet did

not correct it.  The fact was material because it caused the collapse of the value of

the stock and led to an acceleration event.  The Halberts relied on the misstatement

and were injured thereby.

Wherefore the Halberts respectfully request an award of compensatory and

punitive damages along with attorneys' fees, expenses, costs, and any other legal

or equitable relief the Court deems just under the circumstances.

## VIII.  <u>NEGLIGENT MISREPRESENTATION (Against Credit Suisse and Janus)</u>

85.     The Halberts incorporate paragraphs 1–49 of the Complaint  herein by

reference.

86.     Alabama follows the Restatement (Second) of Torts § 552.  *Fisher v.*

*Comer Plantation, Inc.*, 772 So. 2d 455, 461 (Ala. 2000).  This tort applies to those

who supply "false information for the guidance of others in their business

transactions" if the information was obtained or communicated without the "exercise of reasonable care."

87.     In the alternative, Defendants negligently represented the value of the Intraday Indicative Value throughout the relevant time period.  The Halberts were part of the groups of individuals Defendants intended to communicate the information to.  They relied on the information and suffered a loss as a result.

Wherefore the Halberts respectfully request an award of compensatory and punitive damages along with attorneys' fees, expenses, costs, and any other legal or equitable relief the Court deems just under the circumstances.

## IX.     FRAUDULENT SUPPRESSION (Against Credit Suisse and Janus)

88.     The Halberts incorporate paragraphs 1–49 of the Complaint  herein by reference.

89.     "The elements of a suppression claim are "(1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury." *Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C.*, 932 So. 2d 883, 891 (Ala. 2005).

90.     Defendants owed a duty to disclose accurate information concerning the intraday indicative value.  Defendants also owed a duty to disclose its engaging in hedging activity which led to an acceleration event.  It failed to disclose facts

concerning the intraday indicative value.  It concealed facts concerning its intent to cause an acceleration event.  As a result of these nondisclosures, the Halberts were induced to act and were damaged as a result.

Wherefore the Halberts respectfully request an award of compensatory and punitive damages along with attorneys' fees, expenses, costs, and any other legal or equitable relief the Court deems just under the circumstances.

## <u>JURY TRIAL DEMANDED</u>

The Halberts demand a jury trial on all claims so triable.

Respectfully Submitted,


*s/ Stephen D. Wadsworth*
Attorney for Plaintiff

**OF COUNSEL:**
Stephen D. Wadsworth (WAD025)
CAMPBELL GUIN LLC
505 20th Street North, Suite 1600
Birmingham, AL  35203
Telephone:   (205) 224-0750
stephen.wadsworth@campbellguin.com


## **CERTIFICATE OF SERVICE**


I hereby certify that on this the 9th day of November 2018, a copy of the above and foregoing has been served electronically, which will send notification of such to all parties registered to receive ECF filings.


*s/ Stephen D. Wadsworth*
OF COUNSEL

**EXHIBIT 1**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SET CAPITAL LLC, et al., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, TIDJANE THIAM, DAVID R. MATHERS, JANUS HENDERSON GROUP PLC, JANUS INDEX & CALCULATION SERVICES LLC, and JANUS DISTRIBUTORS LLC d/b/a JANUS HENDERSON DISTRIBUTORS, <br><br> Defendants. | Case No.: 1:18-cv-02268-AT-SN |

## CONSOLIDATED CLASS ACTION COMPLAINT

## I. NATURE AND SUMMARY OF THE ACTION

1. On February 5, 2018, XIV lost **96%** of its value, or approximately **$1.8 billion**, in a single day, devastating investors. Both prior to and during the Class Period, and unbeknownst to investors, the Credit Suisse Defendants engaged in a scheme to sell millions of XIV notes to investors for hundreds of millions of dollars while actively betting against XIV, knowing it was designed to fail. As the Credit Suisse Defendants' scheme began to pay off, and XIV's value nosedived on February 5, 2018, Defendants compounded the harm to investors by issuing materially false and misleading pricing information regarding XIV that led investors to buy even more XIV notes at drastically inflated values. As a result of Defendants' scheme, they reaped hundreds of millions in profits at the expense of their own investors, who were left holding virtually worthless securities.

2. XIV is an Exchange Traded Note ("ETN") issued and sold by Credit Suisse, and placed and marketed by Janus. XIV was created in 2010 to track the inverse of VIX futures contracts. In other words, when VIX futures contracts decreased in value by 1%, XIV increased in value by 1%, and vice versa. VIX futures generally measure expected volatility—how much a security price is anticipated to change over a given period of time—in the broader market. Because the market, and thus VIX futures, experienced a years-long extended period of declining volatility, punctuated only briefly by spikes in volatility, XIV investors generally received extraordinary returns for years, making XIV one of the most popular volatility ETNs on the market.

3. However, as discussed in detail below, during at least three brief occasions during the life of XIV, market volatility spiked significantly. During these brief volatility spikes, VIX futures prices spiked at the end of the trading day in a manner disproportionate to what would normally be expected. These large price movements were caused by Credit Suisse and other

volatility-related ETN issuers placing hedging trades to protect their balance sheets, *i.e.* buying VIX futures to offset the risk posed by the volatility ETNs they issued. Credit Suisse, for instance, engaged in such hedging to protect itself in the event an XIV investor sought to redeem his or her XIV notes, since Credit Suisse was obligated to pay the investor the value of the notes. Credit Suisse did so by holding short positions in VIX futures, so that when VIX futures prices dropped, Credit Suisse made money from the short positions, which in turn offset the resulting higher XIV prices, and thus higher redemption values, that Credit Suisse was required to pay XIV investors who wanted to redeem their notes.

4.      Due to the growth of the volatility ETN market, and particularly due to the massive growth in the value and number of XIV notes issued, the Credit Suisse Defendants knew or recklessly disregarded that there was not sufficient liquidity—that is, not enough VIX futures—to allow volatility-related product issuers like Credit Suisse to hedge their positions during volatility spikes.

5.      Credit Suisse had risk reporting mechanisms and protocols in place to ensure senior executives actively monitored and managed the risks XIV posed to Credit Suisse. Under these protocols, the liquidity issues in the VIX futures market were reported to Defendant Thiam and Defendant Mathers. Recognizing the threat this lack of liquidity posed to Credit Suisse, Credit Suisse announced on July 1, 2016 that it now had the unilateral right to demand purchasers of XIV notes sell Credit Suisse various hedging instruments, such as products known as "swaps," to help Credit Suisse protect its own balance sheet.

6.      Despite actively moving to protect Credit Suisse from this liquidity threat, the Credit Suisse Defendants did nothing to protect XIV's investors or disclose the liquidity threat to their investments. Rather, Credit Suisse saw an opportunity to use the lack of liquidity to profit at

its investors' expense. The Credit Suisse Defendants knew or recklessly disregarded that many investors were holding XIV notes for extended periods. They also knew or recklessly disregarded, due to Credit Suisse's risk protocols and modeling, that another volatility spike similar to the three Credit Suisse had experienced in recent years was inevitable. Further, based on their experience with these previous volatility spikes, the Credit Suisse Defendants knew that when the inevitable next volatility spike occurred, Credit Suisse could easily amplify the spike in VIX futures prices, and because XIV prices are inversely related to VIX futures prices, the Credit Suisse Defendants could cause XIV to be driven into the ground. Indeed, as described in detail below, Credit Suisse reserved itself the right to announce an "Acceleration Event" should XIV's price decline by 80% or more, giving it the ability to pay XIV investors pennies on the dollar in a forced redemption of their notes.

7.     Nevertheless, the Credit Suisse Defendants continued to grow the size of XIV, issuing and selling millions more XIV notes to unsuspecting investors, exacerbating the inevitable liquidity issues in the VIX futures market when the next volatility spike came. During the Class Period, investors paid Credit Suisse prices as high as $135 per XIV note. Unbeknownst to investors, however, the Credit Suisse Defendants were betting that, once volatility returned, as it was statistically certain to do, they could drive a liquidity squeeze in the VIX futures market that would cause the price of those futures to spike, triggering an Acceleration Event and allowing Credit Suisse to profit at XIV investors' expense. As one analyst later put it, Credit Suisse induced XIV investors to effectively "collect[] pennies in front of a steamroller."

8.     On February 5, 2018—just days after it offered an additional 16.275 million XIV notes—Credit Suisse's undisclosed bet paid off. On that day, volatility returned, driving up the price of VIX futures with it. After the close of regular market trading at 4:00 p.m., Credit Suisse

began to buy up approximately 105,000 VIX futures contracts—roughly one quarter of the entire VIX futures market—driving up the price of VIX futures and intentionally destroying the value of XIV.

9.      By 4:09 p.m., Credit Suisse knew its large purchases of VIX futures contracts had driven XIV's value to approximately $20, which was more than an 80% drop in value from the previous day's closing value, and thus that an Acceleration Event had occurred.  But the Credit Suisse Defendants, instead of announcing an Acceleration Event, halting trading, or otherwise protecting investors, continued to drive a liquidity squeeze in the VIX futures market.  By 4:15 p.m., Credit Suisse knew, based on the prices of the VIX futures contracts it was buying, that 96% of XIV's value had been wiped out.

10.     But this was only part one of the two-part fraud perpetrated on XIV investors.  Beginning at approximately 4:09 p.m. that same day, Credit Suisse and Janus stopped updating XIV's "Intraday Indicative Value," a value Defendants misleadingly told investors approximated the actual value of XIV and would be updated *every 15 seconds* based on real-time prices of VIX futures contracts.

11.     Between about 4:09 p.m. and 5:09 p.m., Defendants falsely represented to investors that XIV's Intraday Indicative Value was between about $24 and $27 per note, thus concealing that XIV had suffered an Acceleration Event, and thereby leading investors to purchase approximately *$700 million more* in XIV notes at artificially inflated prices.  Had the Intraday Indicative Value been properly and accurately disseminated as promised, investors would have known that XIV was, in fact, worth between $4.22 and $4.40 per note, and thus that it had experienced a catastrophic Acceleration Event that would lead to the forced redemption of all XIV notes for pennies on the dollar.

12.     This failure to update XIV's Intraday Indicative Value allowed Credit Suisse to continue to profit at its investors' expense.

13.     It was not until 5:09:05 p.m. that Credit Suisse and Janus finally updated the Intraday Indicative Value to $4.2217 per note, approximately *1/6th* the artificially inflated value they disseminated during the previous hour.

14.     The next day, Credit Suisse announced that it was redeeming all XIV notes, citing as its reason that an Acceleration Event occurred as a result of the greater than 80% drop in XIV's Intraday Indicative Value the previous day.  On February 21, 2018, XIV was terminated and all notes were redeemed at $5.99 per note.

15.     Tellingly, Credit Suisse also announced that, unlike XIV investors, it had not suffered any losses on February 5, 2018, admitting it protected itself through its hedging activities. Although not disclosed at the time, Credit Suisse not only protected itself through its hedging activities, but also profited handsomely, making hundreds of millions of dollars at the expense of its investors.

16.     Indeed, on April 25, 2018, Credit Suisse reported that it had made approximately $490 million in its equity sales and trading division for the fiscal quarter ended March 31, 2018, a 30% increase compared the previous quarter, stating that the impressive figures were "***due to more favorable trading conditions, particularly higher levels of volatility which benefited our derivatives business.***"[3]  (Emphasis added).

17.     The events of February 5, 2018 shocked the market, with reporters and investors questioning Credit Suisse as to how XIV could have collapsed so quickly and dramatically, causing

---

[3] https://www.sec.gov/Archives/edgar/data/1053092/000137036818000025/a180425q1-ex99_1.htm

investors to lose billions of dollars. Further, the SEC began to investigate Credit Suisse and its role in XIV's collapse. In response, the Credit Suisse Defendants actively attempted to conceal the fraud by issuing a series of incoherent explanations, many of which were patently false. For example, on February 14, 2018, Defendant Thiam was interviewed by *Bloomberg* and made clear that he was actively involved in and aware of the scheme to defraud investors and XIV's crash, stating that the Acceleration Event "was actually to protect investors. Because the product stopped trading, it was quasi-impossible to price, and we needed to give certainty to the market at the market open. So before the morning—and this—*we* went through a long process, *we* don't make these decisions lightly, there are people involved from every aspect of the business, from compliance to the front office—and they collectively—I don't make those types of decisions— they collectively reached a decision which was in the interest of investors, which was to close it. But there are quite a few products like that in the market, because they serve a useful purpose. They allow market participants to manage their risk better."[4] (Emphasis added).

18.    Given that investors lost approximately **$1.8 billion** in value, it strains credulity to claim that the Acceleration Event, which locked in the redemption value of XIV notes Credit Suisse was required to pay at pennies on the dollar, protected investors.

19.    Notably, had Credit Suisse not forcibly redeemed XIV notes "to protect investors," XIV's value would have stabilized rapidly. By March 6, 2018, as volatility levels stabilized and returned to normal, XIV would have been worth approximately $30.88. Instead, Credit Suisse forcibly redeemed all XIV notes at $5.99 per note, locking in its extraordinary profits.

---

[4] https://www.bloomberg.com/news/articles/2018-02-14/credit-suisse-s-thiam-warns-volatility-is-a-double-edged-sword

Redacted

## V. EXCHANGE ACT ALLEGATIONS

### A. Janus Creates XIV, An Inverse VIX Exchange Traded Note, And Partners With Credit Suisse To Issue The XIV Notes

50. In 1993, the Chicago Board Options Exchange developed a metric intended to measure the near-term expected volatility in the broad equity market, as demonstrated by prices of options on the S&P 500 Index[5] ("SPX"). This measure of expected volatility, known as the VIX Index or simply the VIX, is sometimes referred to as Wall Street's "fear index" or "fear gauge."

51. The VIX tracks higher when the market is anticipating increased volatility, and tracks lower when the market anticipates less volatility in the coming 30 days. On its website, the

---

[5] A stock index based on the 500 largest companies whose stock is listed for trading on the NYSE or NASDAQ.

CBOE states that "the VIX Index is intended to provide an instantaneous measure of how much the market "thinks" the S&P 500 Index will fluctuate in the 30 days from the time of each tick of the VIX Index."

52.     In 2004, the CBOE created VIX futures.  Futures contracts represent a promise, generally made through a futures exchange, to buy or sell a particular commodity or financial instrument at a predetermined price at some future date.

53.     In 2006, the CBOE created VIX options. An option gives the buyer the opportunity, although not the obligation, to buy or sell a given security at an agreed upon price within a certain period of time.

54.     VIX futures and options essentially allow investors to trade and/or hedge an investment position based on their assessment of future market volatility.[6]

55.     In 2010, VelocityShares LLC, a predecessor of one of Janus's subsidiaries, created VelocityShares Inverse VIX Short Term Exchange Traded Notes, commonly known as and traded under the name XIV.  An Exchange Traded Note, or ETN, is an unsecured debt instrument traded on a major exchange.  ETNs function somewhat like promissory notes, in that investors pay money to the institution sponsoring the ETN, and upon maturity, receive money.  Unlike traditional promissory notes, however, the value of ETNs such as XIV is derived from a particular market index—here an index tracking short-term VIX futures—and payment is subject to the

---

[6] This Consolidated Complaint does not allege that Defendants participated in CBOE-sponsored special auctions in S&P 500 index options, that the auction system that determined settlement prices for the VIX was manipulated or manipulatable, or that the settlement price for the CBOE volatility index (the VIX itself) was manipulated or artificial.  Lead Plaintiffs in this case take no position on any of these matters, which are irrelevant to the instant case, but are the subject of separate litigation by other plaintiffs in other cases.

creditworthiness of the sponsor issuing the ETN.  In advance of the maturity date, XIV note holders had the right to cause Credit Suisse to redeem their notes.

56.     The value of XIV was derived from the inverse value of the daily returns of the S&P 500 VIX Short-Term Futures Index ("SPVXSP"), which tracks a portfolio of first- and second-month VIX futures contracts with a weighted-average time to maturity of 30 days.  This means that, generally speaking, when the SPVXSP went down 1% in one trading day, XIV was designed to go up 1% that same trading day, and vice versa.

57.     In November 2010, Credit Suisse entered into a non-exclusive license agreement with JIC, as successor to Velocity Index & Calculation Services, to license for a fee, the right to use certain XIV and VelocityShares trade names, trademarks and service marks, which are owned by Janus, doing business as Janus Henderson Investors.  Credit Suisse then began issuing XIV notes.

58.     Janus' relationship to Credit Suisse's XIV notes, however, was not just limited to the licensing of its trademarks, but also included the marketing and placement of XIV notes.  As stated in Credit Suisse's January 29, 2018 pricing supplement (the "January Supplement"), "Janus Distributors LLC, effective May 30, 2017 doing business as Janus Henderson Distributors ("JHD"), will receive all or a portion of the Daily Investor Fee in consideration for its role in marketing and placing the securities under the 'VelocityShares™' brand."  As such, JHD was paid for selling XIV notes to investors.  Accordingly, JHD's fees and profits from XIV were tied to the number of XIV notes outstanding and marketed by JHD.  As the January Supplement detailed, "[t]he actual amount received by JHD in a given year will depend on the number of ETNs of any series then outstanding and the number of other then outstanding ETNs of any series issued by us and marketed and/or placed by JHD. From time to time, JHD and its affiliates have, and in the

future may, engage in transactions with and perform services for us for which they have been, and may be, paid customary fees."

59.     The Daily Investor Fee was an annual 1.35% fee, collected on a daily basis.  When XIV grew to a total value of $1.9 billion in market capitalization, for instance, Credit Suisse and Janus collected at least $25,650,000 in annual fees.  Notably, when XIV increased in value on any given day, Credit Suisse and Janus collected a commensurately larger daily fee.  Thus, as XIV grew and grew, Credit Suisse and Janus collected more and more in fees.

60.     In addition to JHD's role in marketing and placing XIV notes, as explained in Sections H and I, *infra*, Janus's subsidiary JIC was also instrumental to the daily operations of XIV, including active involvement in crucial matters such as: (i) determinations concerning the calculation of various values related to the XIV notes, (ii) determinations concerning the underlying inputs that impacted the calculations of these values; (iii) the ability to cause an acceleration event to redeem the XIV notes earlier than their stated maturity date, and (iv) designating when a "Market Disruption Event" occurred.  Janus, by owning and controlling these entities, also had significant control over the functioning of XIV and possessed significant rights concerning them, including the right to cause Credit Suisse to accelerate the redemption of XIV notes.

### B.     XIV's Explosive Growth And Rapidly Increasing Price

61.     From the initial issue of XIV in 2010, when XIV opened at $10 per share, XIV's price rose dramatically.  After a 10:1 split on June 27, 2011, that took its price from $160 to $16, XIV rose again to $146 at the beginning of 2018.  During the seven years prior to February 5, 2018, the average annual return on XIV was 41%.  During the year and a half preceding February 5, 2018, XIV increased from $18 to $146.44, or 813%.  By holding their XIV notes, investors were seeing massive returns.  Accordingly, Credit Suisse knew that XIV investors were not using the

notes as a "tool []to manage daily trading risks," as characterized in the January Supplement. These large returns are depicted below:



62.     Indeed, as shown below, XIV dramatically outperformed returns on the S&P 500 Index, which itself experienced an extraordinary period of growth during the same time period. For example, in 2017, XIV had annual returns of 187.5%, compared to an S&P 500 return of 22% in an extraordinary bull market.



**C.    Credit Suisse Knew Or Recklessly Disregarded Volatility Spikes Led To Liquidity Issues**

63.    Over time, Credit Suisse continued to issue more and more XIV notes to unsuspecting investors.  On June 30, 2017, for instance, Credit Suisse offered an additional 5,000,000 XIV notes on top of the 9,018,880 notes that were already issued and outstanding.  On January 29, 2018, Credit Suisse offered an additional 16,275,000 notes on top of the 10,793,880 XIV notes then-outstanding.  The issuance of new notes, combined with the rise in XIV's value, led XIV's market cap to increase to approximately $1.9 billion by February 2018.

64.    Credit Suisse continued issuing more XIV notes and allowing the market cap to rise despite its knowledge that, the next time VIX's volatility spiked, as it did every few years, XIV's viability would be threatened.  Unbeknownst to investors, however, Credit Suisse, took advantage of these issues to ensure it would profit at its investors' expense.

65.    The cost and availability of VIX futures during VIX spikes is largely driven by hedging activity by VIX-related Exchange Traded Product ("ETP") issuers, including, most critically, Credit Suisse, seeking to protect their balance sheets.  Because of the requirement that

ETN issuers pay note holders the value of the ETN when investors seek to redeem their notes, ETN issuers, like Credit Suisse, do not want to put their balance sheets at risk by leaving the full position "unhedged." For instance, from XIV's inception to February 2, 2018, Credit Suisse was required to redeem at least 509 million XIV notes (split-adjusted) for $13.3 billion at an average price of $26.05 per note. Had Credit Suisse not hedged its XIV position continually, Credit Suisse would have lost about $364 million to fulfill its redemption obligation to investors.[7]

66.    To hedge its exposure to XIV, Credit Suisse needed to hold largely short positions in VIX futures (or swaps or options), which, as explained above, are inversely related to XIV. Thus, when VIX futures prices dropped, Credit Suisse made money from its short positions, which offset the ensuing higher XIV prices—and thus higher redemption values—Credit Suisse was required to pay to XIV investors seeking to redeem their notes.

67.    To adjust its VIX futures positions based on price fluctuations in XIV, *i.e.* to maintain its hedge, Credit Suisse adjusted its VIX futures portfolio at the end of each trading day based on XIV's performance that day.

68.    Importantly, virtually all VIX-related ETP issuers engaged in such hedging activities and, thus, during large market movements these issuers simultaneously bought VIX futures to hedge their positions.

69.    On at least three occasions during the life of XIV prior to February 5, 2018, the market experienced a spike in the VIX Index and an even larger spike in VIX futures prices due to the hedging activities described above. Over the course of these three VIX spikes, the Credit

---

[7] The cost and availability of VIX futures during and after VIX spikes is also affected, in part, by leveraged inverse VIX ETPs like SVXY that are required to buy VIX futures when they go up. In either case, the result is increased demand for VIX futures.

Suisse Defendants learned that there were simply not enough VIX futures contracts relative to the hedging demand from Credit Suisse and other VIX-related ETP issuers. In other words, there were "liquidity" issues in the VIX futures market during and after spikes in the VIX. These liquidity issues caused VIX futures prices to temporarily increase even more than what would be expected based on the size of the VIX increase, specifically during the end-of-day period when issuers bought VIX futures to hedge their positions.

70. As evident from the chart below, the spikes were relatively brief and sharp:



71. Between August 4, 2011 and August 8, 2011, there was a three-trading day spike in the VIX. On August 4, 2011, XIV opened at $14.83, and closed on August 8, 2011 at $10, a decline of 32.57%, with the XIVIV—the Intraday Indicative Value—dropping 38.42% at one point.

72. Between August 20, 2015 and August 24, 2015, there was another three-trading day spike in the VIX:

| Index | Date | Open | High | Low | Close |
|-------|------|------|------|-----|-------|
| VIX | August 20, 2015 | 16.55 | 19.24 | 16.13 | 19.14 |
| VIX | August 21, 2015 | 22.55 | 28.38 | 20.80 | 28.03 |
| VIX | August 24, 2015 | 28.03 | 53.29 | 28.03 | 40.74 |

73.    The VIX spike on August 24, 2015, for instance, caused volume in the front- and second-month VIX futures contracts to spike during afterhours trading to nearly one third of the entire front- and second-month VIX futures market.  This, in turn, caused a spike in VIX futures prices that resulted in XIV at one point in afterhours trading dropping approximately 32.46% from its previous close.  As explained below, the January Supplement provided Credit Suisse the right, but not the obligation, to redeem shares pursuant to an "Acceleration Event" if XIV's Intraday Indicative Value fell 80% or more from the previous day's Closing Indicative Value.  The August 24, 2015 crash in XIV's value was thus a significant risk event that was immediately escalated to Defendants Thiam and Mathers in accordance with Credit Suisse's risk protocols described below.

74.    Between June 9, 2016 and June 24, 2016, there was another spike in the VIX, though more gradual than the previous two spikes.  On June 24, 2016, approximately 118,000 first- and second-month VIX futures contracts traded in the aftermarket, which represented nearly a quarter of the entire first- and second-month VIX futures market.  Again, this huge volume caused a spike in VIX futures prices, resulting in a sharp drop in the XIV.  From a close of $30.05 on June 23, 2016, XIV dropped as low as $20.79, or *30%*, during afterhours trading on June 24.  This risk event was immediately escalated to Defendants Thiam and Mathers in accordance with Credit Suisse's risk protocols described below.

75.    Following these liquidity issues in the VIX futures market, on July 1, 2016, Credit Suisse made the following announcement ("July 2016 Announcement"), which was also filed with the SEC:

Credit Suisse announced today that it will place conditions on its acceptance of offers to purchase VelocityShares™ Daily Inverse VIX Short Term ETNs (Ticker Symbol: "XIV").

Beginning on July 5, 2016, Credit Suisse may issue additional ETNs on a weekly basis and may condition its acceptance of a counterparty's offer to purchase the ETNs on its agreement to sell to Credit Suisse certain hedging instruments consistent with Credit Suisse's hedging strategy, including but not limited to swaps. Any such hedging instruments will be executed on the basis of the indicative value of the ETNs at that time, will not reflect any premium or discount in the trading price of the ETNs over their indicative value and will be on terms acceptable to Credit Suisse, including the counterparty meeting Credit Suisse's creditworthiness requirements, margin requirements, minimum size and duration requirements and such other terms as Credit Suisse deems appropriate in its sole discretion. In addition, Credit Suisse may from time to time issue the ETNs into inventory of its affiliates.[8]

76.     The July 2016 Announcement confirms that the three VIX spikes in 2011, 2015, and 2016, made apparent to the Credit Suisse Defendants that there were major problems related to its end-of-day rebalancing of its XIV hedges.  Specifically, during these VIX spikes Credit Suisse saw issues with the cost and availability of VIX futures during its end-of-day hedging process.  Pursuant to Credit Suisse's risk protocols described below, these hedging issues were escalated immediately to senior management, including the CARMC, which included the Individual Defendants, and were discussed by Credit Suisse's risk management groups, including the CARMC.  As discussed in detail below, the CARMC, which consisted of Credit Suisse's most senior officers, including Defendants Thiam and Mathers, was responsible for actively monitoring risk at the highest level, recommending risk limits to the Board, and allocating risk limits among the Bank's different lines of business, and any breach of those limits resulted in "immediate notification" to Defendant Thiam.

---

[8] https://www.prnewswire.com/news-releases/credit-suisse-places-conditions-on-its-acceptance-of-offers-to-purchase-velocityshares-daily-inverse-vix-short-term-etns-ticker-symbol-xiv-300293417.html; https://www.sec.gov/Archives/edgar/data/1053092/000095010316014568/dp66967_ex9901.htm.

77. Because the CARMC was alerted that, during and after VIX spikes, the availability, *i.e.* liquidity, of VIX futures was insufficient to hedge its growing position in XIV, exposing Credit Suisse to substantial risk, Credit Suisse's risk management protocols dictated that the CARMC— and thus the Individual Defendants—would have determined Credit Suisse needed to give itself additional avenues to hedge XIV. Thus, Credit Suisse issued the July 2016 Announcement to give itself the option to demand from XIV purchasers "certain hedging instruments," such as swaps, so that it could protect itself from the liquidity issues escalated to the CARMC.

78. Nevertheless, Credit Suisse continued to issue new XIV notes, despite knowing that it had already grown XIV too big to be adequately hedged by the relatively small VIX futures market, and that there were liquidity issues with VIX futures during the daily rebalancing period during afterhours trading.

79. This announcement also makes clear that the Credit Suisse Defendants knew that XIV investors were holding XIV for weeks, months, or even years. Credit Suisse did not hedge intraday purchases. Rather, by rebalancing at the end of each trading day, Credit Suisse hedged over-night XIV positions held by investors. This is because, as explained above, Credit Suisse purchased VIX futures to protect its balance sheets from the liability of future redemptions of XIV notes. Thus, an investor who bought and redeemed an XIV note during the day no longer posed any liability risk to Credit Suisse which Credit Suisse would need to hedge. Credit Suisse's July 2016 Announcement was thus an implicit admission by Credit Suisse that XIV had a typical holding period of weeks, months, or even years, and that, by and large, investors were not using XIV as a tool to manage daily trading risk.

80. That Credit Suisse knew it had grown XIV too big for the size of the VIX futures market is further confirmed by Credit Suisse's own experience with other VIX-related products.

In 2012, Credit Suisse stopped issuing shares of VelocityShares Daily 2x VIX Short-Term ETNs ("TVIX") after massive demand caused TVIX values to surge and become dislocated from the values of the underlying VIX futures upon which TVIX was based.  Though Credit Suisse cited "internal limits on the size of the [TVIX] ETN" as the reason for the halt, even as far back as 2012 at least one analyst noted that "[t]he potential issue is whether this is a *symptom of the volatility-based exchange-traded products starting to outgrow the size of the VIX futures market*."[9] (Emphasis added).  Notably, Credit Suisse's "internal limits" did nothing to constrain the massive growth of XIV in the following years, because it planned to profit from this massive growth.

81.    In addition, Credit Suisse knew the VIX was statistically certain to undergo a spike every few years.  After the events of February 5, 2018, analysts with the Bank for International Settlements noted "the historical tendency of volatility increases to be rather sharp" and that Credit Suisse was thus allowing XIV investors to effectively "collect[] pennies in front of a steamroller."

82.    Also after February 5, 2018, Artur Sepp, a former analyst for Merrill Lynch and Bank of America, analyzed the probability of a one-day VIX futures spike of 80% occurring, which is the level at which an Acceleration Event occurs.  Based on historical data, Sepp found that the probability of such a spike was about 0.37% at the high range, meaning such an event is expected to *occur every year*, or 0.18% at the low range, meaning such an event is expected to *occur once every other year*.

83.    In other words, it was a statistical certainty that the VIX and VIX futures would spike.  As explained below, Credit Suisse's risk management groups, including its most senior

---

[9] https://www.reuters.com/article/us-market-volatility-tvix/analysis-out-of-control-volatility-etn-triggers-risk-concerns-idUSTRE81M2AO20120223

executives, ran similar volatility stress tests, and thus knew, or at the very least recklessly disregarded, these statistics.

84.     Investors were not privy to—and Credit Suisse never told them—about the liquidity issues Credit Suisse was experiencing in regards to hedging its XIV notes exposure, the risks these issues posed to Credit Suisse, why Credit Suisse made the July 2016 Announcement, and how Credit Suisse's continued growth of XIV exacerbated the liquidity issue, which Credit Suisse intended to exploit.

### D.     Credit Suisse Knew Or Recklessly Disregarded That XIV Investors Held Their Notes For Long Periods, Enabling Credit Suisse To Profit

85.     In addition to its knowledge that VIX volatility would inevitability spike and that investors would be wiped out when it did, Credit Suisse also knew that XIV notes were being held by investors for long periods of time.  Credit Suisse bet that such holding patterns would allow it to profit at its investors' expense once the next VIX spike occurred.

86.     Specifically, Credit Suisse knew that, rather than being used as a "tool[] for sophisticated investors to manage daily trading risks," XIV was an extremely popular product that was purchased and held over long periods by many individual investors, groups of investors, family fund traders, exchange traded funds, and hedge funds.  Indeed, according to Morningstar Inc., "[j]ust one fifth of XIV's outstanding shares are owned by funds and institutions[,]" suggesting that "retail investors could own a sizeable chunk of the volatility product which booked a 585 percent gain for the two years ending Feb. 1[, 2018]."[10]

87.      Supporting that Credit Suisse knew XIV was largely purchased and held by average individual investors, Credit Suisse did not require investors to have an options account to

---

[10]  https://uk.reuters.com/article/uk-credit-suisse-gp-notes/credit-suisse-volatility-fund-liquidated-after-market-selloff-idUKKBN1FQ1A0

trade XIV. Instead, many of the XIV purchases came from orders on the Robinhood app, a smart phone application that markets itself as a tool to let individuals "learn to invest in the stock market for free."[11]  On the website Reddit.com, there was a "Trade XIV" group with 1,800 active members. Like popularly traded mutual funds built for individual investors, XIV charged a management fee.

88.     XIV's popularity was regularly discussed in the media and among investors. In an April 9, 2015 interview published on *Seeking Alpha*, Chris DeMuth, the co-manager of investment firm Rangeley Capital LLC, was asked, "If you had to pick a stock today and hold it for 20 years, what would it be?"[12] He answered:

> The Daily Inverse Short-Term ETN (NASDAQ:XIV).... It is the closest thing the world offers to the perfect security. It is a transfer mechanism between anyone who thinks of risk as volatility and those of us who think of risk as the risk of overpaying. The price-insensitive preference to avoid volatility is a real, durable, expensive preference that is so different than how I think about risk that owning XIV would be a natural thing for me to do for 20 years. It has been a long idea of mine since it was first launched, and I still own it today.

89.     On August 28, 2017, *The New York Times* described VIX-related products like XIV as "frequently among the most widely traded stocks of the day."[13]

90.     Moreover, as explained above, Credit Suisse incentivized Janus to sell as many XIV notes as possible, since Janus's fees and profits from XIV were tied to the number of XIV notes outstanding.

---

[11] https://www.robinhood.com/?utm_source=google&utm_campaign=1347055090&utm_content
=59789658611&utm_term=263208028936__%2Brobinhood&gclid=EAIaIQobChMIuOTerrfR3
AIVSZyzCh36oQ-EEAAYASAAEgJS2PD_BwE
[12] https://seekingalpha.com/article/3059096-an-interview-with-chris-demuth-jr-author-of-sifting-the-world
[13] https://www.nytimes.com/2017/08/28/business/dealbook/vix-trading.html

91. Because Janus received the daily fees on XIV notes, Credit Suisse had to find another way to profit from XIV. Credit Suisse received 100% of the proceeds for issuing the XIV notes (less any fee). Because the Credit Suisse Defendants knew it was a statistical certainty that the VIX would spike at some point, and because the Credit Suisse Defendants knew end-of-day hedging activities could cause VIX futures to spike even higher and drive XIV into the ground, the Credit Suisse Defendants knew they could reap massive profits by paying long-term XIV investors pennies on the dollar after destroying XIV and subsequently announcing an acceleration.

92. Thus, Credit Suisse sold XIV notes at values as high as $135 during the Class Period, while at the same time it actively took steps to ensure that it would only be required to pay investors pennies on the dollar once volatility returned, VIX futures spiked due to liquidity issues, and the value of XIV notes crashed. For instance, an investor who paid Credit Suisse $135 for an XIV note and held that note until the next volatility event would only be owed a few dollars after XIV crashed, with Credit Suisse pocketing the difference.

### E. Credit Suisse's Risk Management Structure Ensured The Individual Defendants Knew Or Recklessly Disregarded The Undisclosed Liquidity Risks

93. Due to the risk management structure in place at Credit Suisse, senior executives at Credit Suisse were well aware of, or at the very least recklessly disregarded, the previous VIX spikes and resulting liquidity issues in the VIX futures market, as well as the opportunities to be gained at the expense of long-term holders of XIV notes who made up a significant portion of XIV investors. Indeed, the July 2016 Announcement—which was made specifically to protect Credit Suisse from the effects of VIX futures liquidity issues—was required to be approved by the CARMC, and thus Defendants Thiam and Mathers, as it represented a material change to Credit Suisse's risk exposure.

94.     On March 24, 2017, Credit Suisse filed its 2016 Annual Report with the SEC on Form 20-F (the "2016 Annual Report" or the "Report"), which explained in detail the Bank's extensive risk protocols and reporting mechanisms.  The Report proclaimed that "the prudent taking of risk in line with our strategic priorities" was "fundamental" to Credit Suisse's business as a leading global bank and "ensuring that capital is well deployed to support business activities." In describing the Bank's "disciplined" risk culture, the Report stated:

> We base our business operations on conscious and disciplined risk-taking . . . We establish a clear risk appetite that sets out the types and levels of risk we are prepared to take; We actively monitor risks and take mitigating actions where they fall outside accepted levels; Breaches of risk limits are identified, analyzed, and escalated, and large, repeated or unauthorized exceptions may lead to terminations, adverse adjustments to compensation or other disciplinary action.

95.     The Report emphasized that, to ensure the effectiveness of the Bank's risk controls, there was "strong involvement of senior management and the Board of Directors" in the Bank's risk management procedures.  Indeed, the Report stated the Bank had established a sub-committee of its Executive Board, CARMC, consisting wholly of the Bank's most senior officers.  CARMC met regularly on a monthly basis and included "the chief executive officers (CEOs) of the Group[14] and the divisions, the Chief Financial Officer, the Chief Risk Officer (CRO) and the Treasurer."  Thus, Defendants Thiam and Mathers were on the CARMC.

96.     Further, the Report stated that CARMC also played a central role in the Bank's risk management procedures, as it was responsible for actively monitoring risk at the highest level, recommending overall risk limits for the Bank to the Board, and setting and allocating risk limits among the Bank's different lines of business:

> [CARMC] is responsible for supervising and directing our risk profile, recommending risk limits at the Group level to the Risk Committee and the Board, establishing and allocating risk limits among the various businesses, and for

---

[14] The 2016 Annual Report defines "the Group" to mean Defendant Credit Suisse Group AG.

developing measures, methodologies and tools <u>to monitor and manage the risk portfolio.</u>

(Emphasis added).

97.     The 2016 Annual Report explained that risk limits were critical to the Bank's risk management procedures, as they were designed "to maintain our risk profile within our overall risk appetite."  The Report explained that "<u>[l]imits are binding thresholds that require discussion to avoid a breach and trigger immediate remediating action if a breach occurs</u>."  (Emphasis added).  The Report also stated that "[w]hile the primary purpose [of risk limits] is risk management, <u>risk limits are also useful tools in the identification of trading misconduct and unauthorized trading activities</u>."  (Emphasis added).

98.     The Report stated the Bank had several levels of risk limits within its extensive risk management framework, the breach of any one of which would trigger immediate escalation procedures to notify senior management.  Specifically, the Report stated the "<u>overall risk limits</u>" for the Bank were "<u>set by the Board in consultation with the Risk Committee **and are binding**</u>," (emphasis added), and that any breach of these limits "would result in an ***<u>immediate notification to the chairman of the Board's Risk Committee and the Group CEO</u>***, and written notification to the full Board at its next meeting":

> The overall risk limits for the Group are set by the Board in consultation with its Risk Committee <u>and are binding</u>. In the rare circumstances where a breach of these limits would occur, it would result in an <u>immediate notification to the Chairman of the Board's Risk Committee and the Group CEO</u>, and written notification to the full Board at its next meeting. Following notification, the Group CRO may approve positions that exceed the Board limits up to a predefined level and any such approval is reported to the full Board. Positions that exceed the Board limits by more than the predefined level may only be approved by the Group CRO and the full Board acting jointly. In 2016 and 2015, no Board limits were exceeded.

(Emphasis added).

99.     Thus, Thiam, as CEO, received "immediate notification" of any and all breaches of risk limits, including those relating to XIV.

100.    The next level of risk limits was set by CARMC "[i]n the context of the overall risk appetite of the Group, as defined by the limits set by the Board and its Risk Committee." Specifically, CARMC was "responsible for allocating divisional risk limits and more specific limits deemed necessary to control the concentration of risk within individual lines of business." The Report emphasized that CARMC's "limits ***are binding*** and generally set close to the planned risk profile to ensure that any meaningful increase in risk exposures is promptly escalated." (Emphasis added).

101.    The final level of limits was set by divisional management, who would "use[] a detailed framework of individual risk limits designed to control risk-taking at a granular level by individual businesses and in the aggregate." These risk controls were intended to, among other things, "trigger senior management discussions with the businesses involved, risk management and governance committees in case of change in the overall risk profile." (Emphasis added). While "divisional chief risk officers and certain other members of senior management" had authority to "temporarily increase" these more granular limits "by an approved percentage not for a specified maximum period," significantly, any excess was "subject to formal escalation procedures and must be remediated or expressly approved by senior management." Moreover, even in this circumstance, senior management was required to continuously monitor and renew its approval of any excesses that were not remediated within ten days:

> Senior management approval is valid for a standard period of ten days (or fewer than ten days for certain limit types) and approval has to be renewed for additional standard periods if an excess is not remediated within the initial standard period.

102.    Credit Suisse also has a Valuation Risk Management Committee ("VARMC"), which is chaired by its CFO, Defendant Mathers, which "is responsible for establishing policies regarding the valuation of certain material assets and the policies and calculation methodologies applied in the valuation process." The VARMC determined the VaR regimen—discussed further below—and data sources for analyzing both the asset class net numbers and the numbers for a product like XIV.

103.    The 2016 Annual Report also describes another committee, the Risk Processes & Standards Committee ("RPSC"), which "reviews major risk management processes, issues general instructions, standards and processes concerning risk management, approves material changes in market, credit and operational risk management standards, policies and related methodologies, and approves the standards of [the Bank's] internal models used for calculating regulatory capital requirements." The RPSC would have reviewed the flags and alarms like those created by one of the prior XIV rebalancing liquidity issues described above.

104.    Finally, the Report describes the Reputational Risk & Sustainability Committee ("RRSC"), which "sets policies and reviews processes and significant cases relating to reputational risks and sustainability issues. It also ensures compliance with [the Bank's] reputational and sustainability policies and oversees their implementation." In other words, the RRSC is supposed to prevent bad publicity like news reports that Credit Suisse would take profits from exercising the XIV Acceleration Option to the detriment of investors.

105.    As described in the 2016 Annual Report, a metric known as Value-at-Risk ("VaR") was "one of the main risk measures for [risk] limit monitoring." VaR:

> quantifies the potential loss on a given portfolio of financial instruments over a certain holding period and that is expected to occur at a certain confidence level." Specifically, Credit Suisse's VaR model uses a "two-year historical dataset, a one-day holding period and a 98% confidence level. This means that we would expect

daily mark-to-market trading losses to exceed the reported VaR not more than twice in 100 trading days over a multi-year observation period. . . .  Our VaR used for limit monitoring purposes also uses a two-year historical dataset, a one-day holding period and a 98% confidence level.

106.    Credit Suisse also "*__estimate[d] losses associated with unusually severe market__*

*__movements__*," "including stressed VaR, position risk and scenario analysis."  (Emphasis added).

107.    On March 23, 2018, Credit Suisse filed its 2017 Annual Report with the SEC on Form 20-F ("2017 Annual Report").  The 2017 Annual Report stated that the average VaR for Credit Suisse's entire equities asset class throughout the previous year was $10 million, with a maximum VaR of $13 million for the asset class.

108.    Even dividing XIV's approximate $1.8 billion loss by *__100__* still shows a loss larger than the VaR for Credit Suisse's *entire* equities asset class.

109.    Credit Suisse's CARMC, and thus the Individual Defendants, allowed the risk controls and risk levels to be breached because they calculated that Credit Suisse could make money at its investors' expense.  Credit Suisse knew the structure of XIV meant that the Bank was paid by investors to bet on volatility returning.  Credit Suisse knew that once volatility spiked—as it knew was a certainty—Credit Suisse would squeeze the end-of-day rebalancing market, cover itself, and then exercise the Acceleration Option only after it had driven XIV into the ground, paying investors pennies on the dollar while pocketing hundreds of millions in profit.

110.    Investors relied on Credit Suisse's statements regarding their internal risk limits.

**F.    After An Extended Period Of Low Volatility, Credit Suisse Issued Millions More XIV Notes On January 29, 2018, Making More Money While Planning To Profit From An Imminent VIX Spike**

111.    Despite knowing that there were significant liquidity issues in end-of-day hedging, and that it would be impossible for VIX-related ETP issuers to handle even a moderate volatility spike, the Credit Suisse Defendants continued to issue more XIV notes, exacerbating their hedging

problem and contributing to XIV's ultimate destruction. Indeed, Credit Suisse continued to expand XIV by selling large amounts of XIV notes right up through January 29, 2018, when Credit Suisse offered an additional 16,275,000 XIV notes, knowing the expansion of XIV would further exacerbate future liquidity issues, and that it was a near certainty that hedging activities, including Credit Suisse's own, after even a modest VIX spike would destroy XIV.

112. By February 2018, VIX-related ETPs reached approximately $4 billion in assets under management. Of this amount, XIV alone accounted for approximately $1.9 billion.

113. By this time, it had been over 1.5 years since the last major VIX spike, and Credit Suisse knew it was a statistical certainty another spike would occur at some point.

114. Credit Suisse wanted to continue to grow XIV because investors—who Credit Suisse knew by and large were holding XIV for long periods—paid Credit Suisse upwards of $135 per note, allowing Credit Suisse to accrue billions. As explained above, Credit Suisse also knew that it was a statistical certainty that the VIX would spike sharply at some point, resulting in a liquidity squeeze in the VIX futures market during the end-of-day rebalancing period, to which Credit Suisse would contribute, and the inevitable collapse of XIV. This collapse would allow Credit Suisse to pay back XIV note holders only pennies on the dollar while it pocketed the difference.

115. Indeed, because Credit Suisse had grown XIV so much larger than the VIX futures upon which XIV's value was based, Credit Suisse knew it could easily, and relatively cheaply, buy VIX futures to cause XIV to collapse.

116. Thus, Credit Suisse continued to grow and sell XIV to investors knowing it was selling them a ticking time bomb. Investors continued buying XIV as they saw large returns during an extended period of low volatility. Meanwhile, Credit Suisse knew for a fact that (1) investors

were holding XIV notes for extended periods, (2) a VIX spike was inevitable, (3) based on previous VIX futures liquidity issues, Credit Suisse could cheaply and easily contribute to a spike in VIX futures when the VIX spike happened, and (4) it could announce an Acceleration Event allowing it to pay XIV investors pennies on the dollar while protecting itself from a public relations disaster by blaming the Acceleration Event on volatility.

**G.    Defendant Thiam's Restructuring Plan Provided Additional Incentive For Credit Suisse To Destroy XIV**

117.    The prospect of massive profits was not the only incentive for Credit Suisse to bet against its investors and cause XIV to collapse.  The Bank was in the midst of a major three-year restructuring plan in which Credit Suisse announced it would slash risky assets in favor of the Bank's more stable wealth management division.  This restructuring placed added pressure on the Bank to ensure it closed out XIV at the first opportunity.

118.    On July 1, 2015, Defendant Thiam became Credit Suisse's CEO.  Due to the Bank's historical challenges maintaining adequate capital, and the fact that it was about to face even steeper capital requirements by regulators, analysts and investors expected Thiam to substantially scale back the investment bank, as they noted another bank, UBS, had already done years ago.

119.    On Credit Suisse's third quarter October 21, 2015 earnings call, Thiam announced his new strategy for Credit Suisse to emphasize the Bank's more stable Private Banking & Wealth Management division while "right-sizing," or shrinking, the investment bank to "reduce earnings volatility."  Thiam also announced that, in addition to these efforts, Credit Suisse would issue a private placement and rights offering in an effort to raise an additional CHF 6 billion ($6.1 billion) in much needed external capital from the Bank's investors.

120.    Credit Suisse also announced on the October 21, 2015 call that, to ensure the shrinkage of the investment bank and of the Global Markets division in particular, the Bank had

created an entirely separate unit—the "Strategic Resolution Unit," or "SRU"—that was devoted to downsizing prior management's risky investments that did not conform with the Bank's new strategy. The Bank's CFO, Defendant Mathers, described the SRU as a "stand-alone segment with its own governance structure and reporting obligations and clear accountability for its primary objectives," which were the "immediate right-sizing of the Global Markets division, as well as the other exposures that do not fall within the strategic goals of the business divisions." Mathers stated that the SRU would have a "direct reporting line" to him.

121.    A Morningstar report, however, commented that Credit Suisse's cuts to the investment bank were less than hoped, which was discouraging in light of the investment bank's poor third quarter performance:

> We're disappointed that new CEO Tidjane Thiam is maintaining Credit Suisse's commitment to having a strong investment bank, as we'd thought UBS-style radical cuts were possible. The revised strategy, which will significantly cut macro businesses . . . will cut only about 20% of the investment bank's risk-weighted assets . . . Credit Suisse's performance in the third quarter was disappointing . . . Very bad performance from the investment bank was behind most of the drop—strategic pre-tax income in the unit fell to CHF 282 million from CHF 995 million in the year-ago quarter, as fixed income trading revenue declined significantly.

122.    An October 21, 2015 *Financial Times* article also highlighted analysts' criticisms of Thiam's shrinkage of the investment bank by only 20%, stating "[i]t was a far cry from the speculation immediately after Tidjane Thiam's appointment in March as chief executive, when the bank's shares surged 8 percent on hopes of a big push into Asia, a big wealth management acquisition and drastic cuts to investment banking."

123.    In the following years, as part of the restructuring, Credit Suisse cut thousands of jobs, sold off risky legacy assets, and raised more than 10 billion Swiss francs ($10.2 billion) from shareholders.

124.    Pressure on the Bank continued, however, resulting in an October 2017 campaign by activist investor RBR Capital Advisors to break up Credit Suisse.[15]  On November 28, 2017, Defendant Thiam, speaking regarding his restructuring plan to reduce reliance on volatile trading in favor of wealth management, stated:  "The shareholders have been through a lot.  I'm painfully aware that I had to dilute my shareholders very significantly[. . . .]  As we generate more profit and the bank does better," he said, "the goal of all this is to return capital to shareholders."  He further stated that, to return capital to shareholders, "[e]verything is on the table[.]"

125.    Thus, in addition to their motive to capitalize on volatility spikes at investors' expense, Credit Suisse faced intense pressure to profitably close XIV from two fronts:  (1) pressure from Thiam and investors to drastically scale back Credit Suisse's investment bank; and (2) pressure to generate profit as soon as possible to quell brewing investor revolts.

**H.    XIV's "Calculation Agents"**

126.    Credit Suisse relied on two different entities to provide calculation-related services and make certain determinations for XIV:  CSI and JIC.

127.    CSI is an affiliate and major subsidiary of Credit Suisse.

128.    CSI and JIC were owned and controlled by Credit Suisse and Janus, respectively.

129.    CSI and JIC were defined by Credit Suisse in the January Supplement as the "Calculation Agents."

130.    As the Calculation Agents, CSI and JIC had significant control, responsibilities, and rights concerning XIV.

131.    The January Supplement summarizes the "Role of the Calculation Agents" as to the XIV as:

---

[15] https://www.reuters.com/article/us-credit-suisse-gp-rbr-capital-advisors/activist-investor-rbr-launching-campaign-to-break-up-credit-suisse-ft-idUSKBN1CL31E

The Calculation Agents will, in their reasonable discretion, make all calculations and determinations regarding the value of the ETNs, including at maturity or upon redemption by Credit Suisse, Market Disruption Events (see "— Market Disruption Events"), Business Days and Index Business Days, the Daily Investor Fee amount, the Daily Accrual, the closing level of the applicable underlying Index on any Index Business Day, the Maturity Date, any Early Redemption Dates, the Acceleration Date, the amount payable in respect of your ETNs at maturity, upon redemption or upon acceleration by Credit Suisse and any other calculations or determinations to be made by the Calculation Agents as specified herein. CSI will have the sole ability to make determinations with respect to reduction of the Minimum Redemption Amount, certain Acceleration Events, and calculation of default amounts. ***JIC will have the sole ability to calculate and disseminate the Closing Indicative Value***, make determinations regarding an Index Business Day, and determinations of splits and reverse splits. ***All other determinations will be made by the Calculation Agents jointly.*** Absent manifest error, ***all determinations of the Calculation Agents will be final and binding on you and us,*** without any liability on the part of the Calculation Agents. You will not be entitled to any compensation from us for any loss suffered as a result of any of the above determinations by the Calculation Agents.

(Emphasis added).

132.    Per the January Supplement, JIC had the responsibility to calculate and disseminate the Closing Indicative Value, determine what constituted an "Index Business Day," and make determinations of splits and reverse splits.  The January Supplement states that "[a]ll other determinations will be made by the Calculations Agents jointly."

133.    The Calculation Agents together possessed significant power and control over the XIV notes that could be exercised at their sole discretion.  This control and power covered almost all aspects of the XIV notes and their existence.

134.    As described in the January Supplement, these powers included, among other material duties and determinations, crucial matters such as: (i) determinations concerning the calculation of various values related to the XIV notes, (ii) determinations concerning the underlying inputs that impacted the calculations of these values; (iii) the ability to cause an acceleration event to redeem the XIV notes earlier than their stated maturity date, and (iv) designating when a Market Disruption Event occurred.

135.    First, the Calculation Agents were responsible for calculating and issuing the Intraday Indicative Values and Closing Indicative Values, detailed below.  These values were not only crucial to the structure and pricing of XIV, but were also heavily relied upon by investors in making decisions concerning their investments in XIV.

136.    Second, the Calculation Agents could alter the very index upon which the Intraday Indicative Value and the Closing Indicative Value were based.  As stated in the January Supplement, "[t]he Calculation Agents, may modify, replace or adjust the Indices under certain circumstances even if the Index Sponsor continues to publish the applicable Index without modification, replacement or adjustment."

137.    Third, the Calculation Agents were given the right and power to cause an Acceleration Event at their discretion that could beneficially impact Credit Suisse.  Notably, the January Supplement defined an Acceleration Event as, among other things:

> any event, as determined by us *or the Calculation Agents that we or any of our affiliates or a similarly situated party* would, after using commercially reasonable efforts, be unable to, or *would incur a materially increased amount of tax, duty, expense or fee (other than brokerage commissions) to acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction or asset it deems <u>necessary to hedge the risk of the ETNs</u>*, or realize, recover or remit the proceeds of any such transaction or asset.

(Emphasis added).   The January Supplement also defined an Acceleration Event as having occurred "*if, at any point, the Intraday Indicative Value is equal to or less than twenty percent (20%) of the prior day's Closing Indicative Value.*"   (Emphasis added).  Notably, the January Supplement also provided that Credit Suisse could, at any time, exercise its unconditional right to an "Optional Acceleration" of all XIV notes.

138.    Fourth, the Calculation Agents had the power to determine when a Market Disruption Event occurred.  The impact of such a determination is, in relevant part, discussed in the following section

**I.    XIV's Closing Indicative Value and Intraday Indicative Value**

139.    Materially important to XIV's investors was the calculation and publication of XIV's Intraday Indicative Value and Closing Indicative Value by the Calculation Agents.

140.    Each of these values was derived from a pre-defined formula utilizing the values of the SPVXSP, the underlying index explained above which tracks a portfolio of first- and second-month VIX futures contracts.

141.    The January Supplement stated the following concerning the value of each "Index," including SPVXSP:

> ***The value of each Index will be published by Bloomberg in real time*** and after the close of trading on each Index Business Day . . . ***The intraday level of each of the Indices is calculated in real time by S&P on each S&P 500 VIX Futures Business Day*** . . . ***applying real time prices of the relevant VIX futures contracts.***

(Emphasis added).

142.    The Closing Indicative Value serves as the basis of the value of XIV in the event of an early redemption, an acceleration, or upon maturity.  In essence, the Closing Indicative Value equates to Credit Suisse's liability for each XIV note, as the Closing Indicative Value is used to calculate the amount due to an investor under each of these events.  These events were also the only way Credit Suisse would close out its financial obligations to holders of XIV notes.  Otherwise, as stated by Credit Suisse in the January Supplement, "[a]s long as an active secondary market in the ETNs exists, we expect that investors will purchase and sell the ETNs primarily in this secondary market."

41

143. Given that the Closing Indicative Value was only published at the end of an Index Business Day, the Intraday Indicative Value provided to the market the value of XIV (as it related to the value investors would receive from Credit Suisse as a result of a redemption or an acceleration of the XIV ETNs, subject to any fees associated with such event) every 15 seconds during an Index Business Day.

144. The Intraday Indicative Value is designed to provide the "economic value" of XIV at a given point in time, and was to be calculated and disseminated to the market every 15 seconds.

145. In relevant part, the January Supplement states that:

> **The "Intraday Indicative Value" for each series of ETNs is designed to approximate the economic value of such series of ETNs at a given time.** It is calculated using the same formula as the Closing Indicative Value, except that instead of using the closing level of the applicable underlying Index, the calculation is based on the most recent intraday level of such Index at the particular time. **The Intraday Indicative Value of the ETNs will be calculated every 15 seconds on each Index Business Day during the period when a Market Disruption Event has not occurred or is not continuing and disseminated over the Consolidated Tape, or other major market data vendor.**

(Emphasis added).

146. Per the Prospectus, the Intraday Indicative Value is calculated "using the same formula as the Closing Indicative Value, except that instead of using the closing level of the applicable underlying Index, the calculation is based on the most recent intraday level of such Index at the particular time."

147. Credit Suisse knew that the Intraday Indicative Value was material to, and relied on, by investors. It stated in the January Supplement, for example, the following:

> **Investors can compare the trading price of the ETNs (if such concurrent price is available) against the Intraday Indicative Value to determine whether the ETNs are trading in the secondary market at a premium or a discount to the economic value of the ETNs at any given time.**

(Emphasis in original).

148. The Intraday Indicative Value was published under its own Bloomberg ticker, XIVIV. NASDAQ was the official disseminator of the XIVIV. According to Reuters data, NASDAQ disseminated the XIVIV to investors on a second-by-second basis to facilitate investors' access to this critical information.

149. Although the January Supplement notes that "[t]he actual trading price of the ETNs of any series may be different from their Intraday Indicative Value" and that "[t]he actual trading price of the ETNs in the secondary market may vary significantly from their Intraday Indicative Value," (emphasis omitted), the XIVIV closely matched the actual market trading prices in the market.

150. As detailed in the following chart, on January 3, 2017, a representative normal trading day, the XIVIV closely followed XIV's market price, "approximat[ing] the economic value" of XIV in real time as promised by the prospectus supplement:



151.    The January Supplement also discussed what would occur if certain market events affected the Closing and Intraday Indicative Values, who would be responsible for determining if these events occurred, and how these events would affect XIV and XIV investors.

152.    The Credit Suisse Defendants defined such events as a "Market Disruption Event." Specifically, the January Supplement defines a Market Disruption Event as follows:

> A "**Market Disruption Event**" will be any event that, in the determination of the Calculation Agents, could materially interfere with our, our affiliates, third parties with whom we transact, or similarly situated third party's ability to establish, maintain or unwind all or a material portion of a hedge that could be effected with respect to the ETNs, including, but not limited to:
>
> • a suspension, absence or material limitation of trading in option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or to the underlying futures, if available, on their respective Primary Exchange or Related Exchange, as determined by the Calculation Agents,
>
> • option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, if available, not trading on their respective Primary Exchange or Related Exchange, as determined by the Calculation Agents,
>
> • the Index Sponsor or the CBOE fails to publish or compute the Indices or VIX Index, or
>
> • any trading restriction imposed upon, option or futures contracts relating to the Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or to the underlying futures, if available, on their respective Primary Exchange or Related Exchange due to a price change in that respective instrument exceeding limits set by that market before the close of trading in that market on any day, as determined by the Calculation Agents.

153.    Importantly, this definition defines an "absence or material limitation of trading" in option or futures contracts relating to the underlying indices, the components of the indices, or to the underlying futures by reason of "a price change exceeding limits set by that market," "an imbalance of orders relating to that stock, instrument or those contracts," or "a disparity in bid and ask quotes relating to that stock, instrument or those contracts."

154.     In the event that a Market Disruption Event occurred, the Calculation Agents were to "*determine the Daily Index Performance on such Index Business Day based on their assessment of the level of the applicable underlying Index that would have prevailed on such Index Business Day were it not for such Market Disruption Event.*"  (Emphasis added).

### J.     Credit Suisse's Manipulative Scheme Succeeds And Steamrolls Over XIV Investors

155.     On Monday, February 5, 2018, Credit Suisse seized the opportunity presented and executed its long-awaited plan to close out XIV while pocketing millions at the expense of its investors.

156.     The market had experienced a 1.5-year period of notably low volatility, with stocks rising and the XIV's value skyrocketing.

157.     The previous trading day, Friday, February 2, 2018, XIV closed its regular trading session at 4:00 p.m. EST at a price of $108.3681 per Note.

158.     The next trading session on February 5, 2018, XIV opened at $104.27 per Note.

159.     On this day, the stock market pulled back, with the S&P 500 dropping 4.1% "amid concerns about rising bond yields and higher inflation," reinforced by the January 2018 U.S. jobs report "that prompted worries the Federal Reserve w[ould] raise rates at a faster pace than expected" in 2018.[16]

160.     As the stock market dropped, the VIX index spiked.  The SPVXSP, which tracked the return on first- and second-month VIX futures contracts, also rose sharply.  The first- and second-month VIX futures contracts at the time were the February 2018 and March 2018 contracts.

---

[16] https://www.reuters.com/article/us-usa-stocks/wall-street-plunges-sp-500-erases-2018s-gains-idUSKBN1FP1OR

161.    XIV's Intraday Indicative Value, the XIVIV, which inversely tracked the SPVXSP, dropped precipitously during the day.  At the close of regular market trading at 4:00 p.m., XIVIV was at $72.59.

162.    Knowing of the previous liquidity issues and that other participants in the VIX-related ETP market would be seeking to hedge their positions by buying VIX futures, Credit Suisse executed its plan to rid itself of XIV while making hundreds of millions of dollars at investors' expense and blaming the collapse on market forces.  Credit Suisse bought up thousands of February and March VIX futures contracts, drastically reducing their supply, and as a result drastically driving up the price of the contracts.  Between 4:00 p.m. and 4:15 p.m., February VIX futures prices went from $23.10 to $33.20, and March VIX futures prices went from $18.90 to $27.95, a spike of 43.72% and 47.88% respectively.

163.    That Credit Suisse was a primary mover of this spike is supported by its own admission the following day that it faced "no material impact" from XIV's plunge because, as the issuer of XIV, "we hedge the risk.  We hedge XIV by trading VIX futures."

164.    On February 2, 2018, XIV had 14,993,880 notes issued and outstanding at a closing indicative value of $108.3681 per note.  A fully hedged portfolio had a short exposure to VIX futures contracts of $1.6 billion, taking into account Credit Suisse's two other short-term VIX ETNs.  To have fully hedged its risk on February 5, Credit Suisse needed to buy a combined 105,474 VIX futures contracts by 4:15 p.m., when the daily VIX futures' settlement values are calculated by the CBOE.

165.    And, indeed, transaction data show a spike in trading volume in February and March VIX futures contracts to 167,377 VIX futures contracts, or roughly one third of the entire February and March VIX futures market, just before 4:15 p.m. on February 5.  From August 2012

through August 2018, the average minute-by-minute trading volume for these futures contracts was approximately 1,000. This was also the average volume on February 2. Thus, ***the trading volume in the February and March VIX futures contracts during aftermarket trading on February 5 was more than <ins>167 times</ins> the usual volume of trades***. The following chart shows the drastically increased volume and prices in VIX futures trading:



166. By driving up the price of the VIX futures contracts to which the value of XIV was inversely tied, Credit Suisse knew it could close out XIV by announcing an Acceleration Event while blaming the collapse on market volatility. Remaining holders of XIV notes, who had paid Credit Suisse as much as $135 per note during the Class Period, would receive pennies on the dollar while Credit Suisse reaped hundreds of millions in profit.

167. By 4:09 p.m., Credit Suisse's strategy was going as planned. By this time, Credit Suisse specifically knew that, due to its large purchases of February and March VIX futures contracts which drove up the price of those contracts, XIV's true economic value had dropped to approximately $20, which constituted more than an 80% drop in value from the previous trading

day's Closing Indicative Value, and thus, according to its own January Supplement, an Acceleration Event had occurred.



168.    Yet Credit Suisse, instead of announcing an Acceleration Event, halting trading, or otherwise protecting investors, continued to profit at its investors' expense as Credit Suisse continued driving a liquidity squeeze in the VIX futures market.

169.    By 4:15 p.m., Credit Suisse knew based on the prices of the VIX futures contract it was buying that XIV's Closing Indicative Value would decline by 96% from the previous day's Closing Indicative Value.  The last trade by 4:15 p.m. on February 5, 2018 in the February VIX futures contract was at $33.20 and the last trade in the March contract was at $27.95.  These prices were 112.5% and 86.8% higher, respectively, than the previous day's settlement values for the February and March contracts.  The weights to be applied on February 5, 2018 to these two daily changes were known to Credit Suisse to be 0.35 and 0.65, so the weighted average increase in the relevant futures settlement values was certain to be 95.77% give or take a trivial amount as a result of using the average of bid and ask quotes at 4:15 p.m. instead of last trade prices and because of the tiny daily accrual of interest and fees.

170.    The percentage change in the S&P 500 on February 5, 2018 was approximately negative 4%.  Historically, the correlation of the front month VIX futures contract to the S&P 500 index should have produced a 15% to 25% jump in the front month VIX futures contract price from the prior day's close.  Instead, on February 5, 2018, due to Credit Suisse's liquidity squeeze, the jump was almost ***100%.***

### K.    Credit Suisse And Janus Issue Materially False And Misleading XIV Intraday Indicative Values On February 5, 2018

171.    Throughout the day on February 5, 2018, XIV's Intraday Indicative Value closely tracked the XIV market price until approximately 2:30 p.m., when it started to diverge.  This divergence was much more significant in aftermarket trading, and was exceptionally large between the hours of 4:08 and 5:09 p.m.

172.    The following graph depicts the movements of the Intraday Indicative Value relative to the XIV ETN market prices throughout February 5, 2018:



173.    The chart below represents the uniqueness and magnitude of the divergence of the XIV market price and Intraday Indicative Value against the 99.9 percentile of these prior differences during the month preceding January 29, 2018:



174.    At 4:09:48 p.m., the XIVIV showed a value of $27.0855, and failed to update until approximately 4:12:33, when it showed a value of $27.1951.  It then updated two more times in the next minute, showing a value of $26.3182 at 4:12:47 and a value of $24.8933 at 4:13:03.  After this, the Calculation Agents stopped updating XIVIV altogether.  Between 4:35:48 and 4:38:34 p.m., XIVIV changed values slightly to show a value between $24.5645 and $27.0855, before freezing again at $24.6961 until 5:09:05 p.m., when the Calculation Agents finally updated XIVIV to $4.2217.

175.    At all times between 4:09:48 p.m. and 5:09:04 p.m., the Calculation Agents represented the Intraday Indicative Value to be between $24.8933 and $27.0855 (the "Flatline Value"), and Reuters data shows that NASDAQ was updating the market with the Flatline Value at one-second intervals during this period.

176.    Within 14 seconds after the issuance of the Flatline Value at 4:09:48 p.m., the value became false and/or misleading to investors when the Intraday Indicative Value stopped updating and the Flatline Value was continually reported to investors as the current Intraday Indicative Value despite it no longer representing the actual current value of the Intraday Indicative Value.

177.    As a result, investors took the Flatline Value as a sign of the relative strength of XIV and bought XIV notes at drastically inflated prices between 4:09:48 p.m. and 5:09:04 p.m. EST.

178.    As the Flatline Value was posted until 5:09:04 p.m., it served as a new statement of the Intraday Indicative Value every 15 seconds, as Credit Suisse repeatedly stated in the January Supplement to investors that the Intraday Indicative Value would be updated every 15 seconds except when a Market Disruption Event had occurred and was disseminated (and in this event Credit Suisse, CSI, Janus, JIC never disseminated that a Market Disruption Event occurred).  Thus, the market considered the Flatline Value to be the correct, up-to-date Intraday Indicative Value during the 4:09:48 p.m. and 5:09:04 p.m. timeframe and relied upon it, because Credit Suisse explicitly told investors that they should evaluate it before investing in the XIV notes.

179.    Given the events of February 5, 2018 and the absence of information disseminated by Credit Suisse, Janus, or the Calculation Agents concerning the unreliability of the Intraday Indicative Value and/or that a Market Disruption Event and/or an Acceleration Event was occurring or had occurred, an average investor reasonably relied upon the Intraday Indicative Value made available to them by Credit Suisse through the Calculation Agents.

180.    This is substantiated by the fact that investors continued to purchase XIV notes at inflated market prices as a result of the Flatline Value reflecting a higher Intraday Indicative Value then what would have been reported if the Intraday Indicative Value had continued to be

disseminated as represented by Credit Suisse. Indeed, during this approximately hour-long period, investors purchased hundreds of millions worth of XIV notes when Defendants represented to the public that the economic value of the notes was $24.6961 but knew that the true economic value was already between $4.22 and $4.40.

181.    Notably, because the XIVIV showed a value between approximately $24 and approximately $27 throughout this period, investors were led to believe that XIV had *not* suffered an Acceleration Event, because those values did not represent an 80% or greater drop from the previous day's Closing Indicative Value of $108.3681. Thus, the false XIVIV values disseminated by the Calculation Agents led investors to believe XIV survived the day's turmoil and that the price would bounce back, allowing them to profit on these purchases.

182.    Further, during this time, investors could not accurately evaluate the Intraday Indicative Value against the XIV's market price to follow Credit Suisse's admonition in the January Supplement that "[b]efore trading in the secondary market, you should compare the Closing Indicative Value and Intraday Indicative Value with the then-prevailing trading price of the ETNs."

183.    After XIVIV stopped updating, the divergence between XIV's market price grew substantially before the market price of the notes began to fall more precipitously towards the stagnant Flatline Value.

184.    By using data only available after the events of February 5, 2018, and applying the Intraday Indicative Value formula disclosed by Credit Suisse in the January Supplement, the falsity of the Flatline Value can be seen at each 15 second interval from 4:09:48 p.m. until 5:09:05 p.m. when the value resumed updating. Below is a chart that depicts this time frame, and shows XIV's

economic value, the XIVIV as disseminated by Credit Suisse and Janus, and the "But-for XIVIV," which represents what the true XIVIV should have shown:



185.    Thus, the Flatline Value was materially false and/or misleading, as it did not represent the actual Intraday Indicative Value.  Moreover, if a Market Disruption Event was occurring or had occurred during the Flatline Value period, the Flatline Value was misleading as neither Credit Suisse, CIS, Janus, nor JIC disclosed to the market that the Flatline Value was unreliable or that a Market Disruption Event had occurred or was occurring.

186.    On February 5, 2018, by 4:15 p.m. EST the last trade in the February futures contract was at $33.20, and the last trade in the March contract was at $27.95.  The pricing on these contracts was 112.5% and 86.8% higher, respectively, than the prior close for the corresponding February and March futures contracts.

187.    Thus, the February 5th futures pricing supported an Intraday Indicative Value on XIV of $4.40 per note and a Closing Indicative Value of $4.22 per note.  Nevertheless, Credit Suisse, Janus, CIS, and JIC continued to incorrectly report the Flatline Value as $24.6961 until

5:09:04 p.m. Notably, because of the liquidity squeeze it engineered, Credit Suisse knew definitively XIV's true Intraday Indicative Value and that it and the Calculation Agents were disseminating grossly inaccurate XIVIV values.

188.     Credit Suisse also knew investors were purchasing XIV at massively inflated values based on materially misleading XIVIV values which were not being updating in real time based on the real-time prices of the relevant VIX futures contracts, and that it had a duty to update its previous assertions regarding the accuracy and real-time pricing of XIVIV.

189.     But rather than post accurate XIVIV values, disclose to the market that XIVIV was not to be relied upon, or, alternatively, alert the market that a Market Disruption Event had occurred, halt trading, or otherwise protect investors, Credit Suisse continued to execute its plan to drive the liquidity squeeze and run XIV into the ground.

190.     It was not until 5:09:05 p.m. that the Calculation Agents finally updated the XIVIV to a value of $4.2217 per note, nearly 1/6th the value they had disseminated during the previous hour.

### L.     Investors Lose Hundreds Of Millions Due To Defendants' False and Misleading Intraday Indicative Value

191.     Credit Suisse and Janus failed to disclose that they (through CSI and JIC) caused the Intraday Indicative Value to stop updating at 4:09:48 p.m., thereby causing investors to believe the Flatline Value issued by the Calculation Agents at 4:09:48 p.m. was its current value until it resumed updating at 5:09:05 p.m. As a result, investors were led to believe that the difference between the market trading price and the Intraday Indicative Value was substantially and materially less than it was being represented by Credit Suisse.

192.     Defendants' failure to disseminate the correct XIVIV—or, at a minimum, alert the market that Defendants determined a Market Disruption Event occurred—from 4:09:48 p.m. to

5:09:04 p.m. on February 5, 2018 was catastrophic for investors. On February 5, 2018, at 4:00 p.m. EST, the regular-hours market for the trading of the XIV closed. At close, the XIV's last trading price was $99. Less than 30 minutes later, during the after-hours market, the price per XIV note had dropped to $70.01. By 4:45 p.m., the price had further dropped to $42.81 per XIV note. Finally, at 6:28 p.m. the trading price of XIV had declined to a low of $10.16 per note, a ***drop of approximately 89.74%*** from its closing value.

193. Further, what appeared to investors as the relative strength of XIV prices in the face of the doubling of the VIX volatility levels enticed $700 million of new investments. All of those investors lost 80% to 90% of the money they invested from 4:08 p.m. to 5:09 p.m

**M.    Credit Suisse Scheme Results In Hundreds Of Millions In Profits For It At The Expense Of Investors**

194. In Credit Suisse's Form 6-K announcing its fiscal results for the quarter ended March 31, 2018, Credit Suisse stated: "In 1Q18, equity sales and trading revenues of CHF 490 million increased 30% compared to 4Q17, ***due to more favorable trading conditions, particularly higher levels of volatility which benefited our derivatives business. We had substantially higher revenues across flow and structured equity derivatives driven by these more favorable market conditions***[.]" (Emphasis added).[17] This was quite a turnaround for the Bank, which had posted its third consecutive annual loss, and had just reported a 22% decline in the equities asset class the previous quarter.

195. Only after additional non-public information becomes available to Lead Plaintiffs can an accurate figure of Credit Suisse's profits be ascertained. However, based on public

---

[17] https://www.sec.gov/Archives/edgar/data/1053092/000137036818000025/a180425q1-ex99_1.htm

information available to Lead Plaintiffs, a very conservative estimate of Credit Suisse's profits from XIV is $475 million.

196.    As of January 26, 2018, Credit Suisse had 10,793,880 XIV notes issued and outstanding.  On January 29, 2018, Credit Suisse filed the January Supplement announcing that it would be offering up to 16.275 million additional XIV notes to investors.  By February 2, 2018, Credit Suisse had increased the number of its XIV notes issued and outstanding to 14,993,880.  Thus, not even including any shares that may have been redeemed in the interim, in just five trading days after the filing of the January Supplement, Credit Suisse had increased the number of XIV notes issued and outstanding by at least 4.2 million notes, or over ***38.9%***.  This, however, may not represent the full number of XIV notes that Credit Suisse sold after the filing of the January Supplement, as it does not account for any XIV notes sold by Credit Suisse after February 2, 2018, including on February 5, 2018 when XIV trading volume soared.

197.    As noted in the January Supplement, Credit Suisse "expect[s] to receive proceeds equal to 100% of the issue price to the public of the ETNs we issue and sell after the Inception Date."  Based on the low and high trading market prices for XIV notes from January 29, 2018 through February 2, 2018, inclusive, Credit Suisse received gross proceeds of approximately $500,388,000 to $567,210,000 on the 4.2 million XIV notes it sold during this timeframe.  The XIV notes that Credit Suisse offered and sold during this time would ultimately serve as a windfall to Credit Suisse as it sold the XIV notes at significantly higher market prices than the $5.99 it ultimately paid upon their redemption.  After accounting for the $5.99 per note redemption cost, Credit Suisse profited in the range of approximately ***$475 million to $542 million*** on just the 4.2 million XIV notes it sold in the days before the events of February 5, 2018.

198.     Beyond the profits made on the 4.2 million XIV notes, Credit Suisse further benefited by extinguishing the long-term debt liabilities on its balance sheet it held prior to issuing notes through the January Supplement for mere pennies on the dollar.  Moreover, by extinguishing the long-term debt of the XIV notes, Credit Suisse was able to capture the difference beyond the price it received when it sold XIV notes to investors and the redemption value of $5.99 it ultimately paid.

### N.     The Credit Suisse Defendants Announce An Acceleration Event, Locking In Their Profits

199.     On February 6, 2018, Credit Suisse issued a press release stating that XIV had experienced an Acceleration Event, and that Credit Suisse would be liquidating XIV:

> Since the intraday indicative value of XIV on February 5, 2018 was equal to or less than 20% of the prior day's closing indicative value, an acceleration event has occurred.  Credit Suisse expects to deliver an irrevocable call notice with respect to the event acceleration of XIV to The Depository Trust Company by no later than February 15, 2018. The date of the delivery of the irrevocable call notice, which is expected to be February 15, 2018, will constitute the accelerated valuation date, subject to postponement due to certain events. The acceleration date for XIV is expected to be February 21, 2018, which is three business days after the accelerated valuation date. On the acceleration date, investors will receive a cash payment per ETN in an amount equal to the closing indicative value of XIV on the accelerated valuation date. The last day of trading for XIV is expected to be February 20, 2018. As of the date hereof, Credit Suisse will no longer issue new units of XIV ETNs.
>
> On February 2, 2018, the closing indicative value was USD 108.3681. None of the other ETNs offered by Credit Suisse are affected by this announcement.

200.     The same day, Credit Suisse stated it faced "no material impact" from XIV's collapse.  Credit Suisse spokesperson Nicole Sharp told CNBC by email:  "We are the issuer of the [XIV] ETN and, having issued it, we hedge the risk.  We hedge XIV by trading VIX futures. . . .  The positions constitute part of a portfolio."[18]  Credit Suisse continued to maintain, despite its

---

[18] https://www.cnbc.com/2018/02/07/credit-suisse-defends-controversial-xiv-etn-amid-market-turmoil.html

knowledge of XIV's extraordinary popularity as a long term holding for retail investors, that XIV "was meant for short-term holding" and that it was marketed exclusively to professional investors.[19]

201.  Pursuant to the announcement of the Acceleration Event, on February 20, 2018, XIV ceased trading.  On the following day, XIV was terminated and redeemed at $5.99 per note.

202.  Underscoring the temporary nature of the liquidity squeeze engineered by Credit Suisse on February 5, 2018, the very next trading day, February 6, 2018, short-term VIX futures prices dropped precipitously, with the SPVXSP closing at $71.78, down 25.95% from its February 5, 2018 close of $96.94.

### O.  Facing Investor Outrage And Government Investigations, The Credit Suisse Defendants Actively Attempt To Conceal Their Fraud

203.  The events of February 5, 2018 shocked the market, with reporters and investors questioning Credit Suisse as to how XIV could have collapsed so quickly and dramatically, causing nearly $2 billion in investor losses.

204.  Further, nearly immediately after XIV's collapse, the SEC began investigating Credit Suisse.  Specifically, according to *The Wall Street Journal*, the SEC is currently "examining the market mayhem, calling Credit Suisse . . . and questioning the bank about [XIV]. . . . Regulatory officials asked about how the investment's performance is calculated and whether retail investors were shareholders[.]"[20]

---

[19] *Id.*
[20] https://www.wsj.com/articles/market-volatility-strikes-exchange-traded-products-alarming-investors-and-regulators-1518440400?mod=searchresults&page=1&pos=1

205.     Then, on February 14, 2018, *Bloomberg* published an article noting that "[i]t's clear many individual investors bought [XIV], and for much longer than a day.  It's also clear they didn't understand that they weren't buying a gun but a live grenade. . . ."[21]

206.     Credit Suisse's response was telling.  Defendant Thiam stated: "Really it's a matter for regulators whether they need to stop retail investors from investing in [products like XIV]."[22]  In other words, Credit Suisse knew it was selling a dangerous product that was structured and used in a manner at odds with Credit Suisse's characterizations, but saw no problem in profiting at investors' expense.

207.     But not only were the Credit Suisse Defendants callous in the face of devastated investors, they actively attempted to conceal the fraud through a series of evasive explanations.  On February 14, 2018, for instance, Defendant Thiam stated that Credit Suisse closed XIV because "there is no prospect of recovery. . . .  Once you hit that bottom, the structure of the product means there is no recovery."[23]  But this was patently false.  Had Credit Suisse not liquidated XIV, its value would have stabilized rapidly.   By March 6, 2018, XIV would have been worth approximately $30.88.   Instead, Credit Suisse paid investors $5.99 per share based on XIV's Closing Indicative Value on February 15, 2018—80.6% less.

208.     On February 14, 2018, Defendant Thiam was interviewed by *Bloomberg* and stated that, with respect to XIV, the decision to announce an Acceleration Event "was actually to protect investors.  Because the product stopped trading, it was quasi-impossible to price, and we needed

[21] https://www.bloomberg.com/news/articles/2018-02-14/banks-like-credit-suisse-can-t-sell-grenades-without-blowback

[22] https://www.cnbc.com/2018/03/19/credit-suisse-vix-etn-lawsuits-tidjane-thiam-says-bank-not-at-fault.html

[23] https://www.bloomberg.com/news/articles/2018-02-14/credit-suisse-s-thiam-warns-volatility-is-a-double-edged-sword.

to give certainty to the market at the market open.  So before the morning—and this—*we* went through a long process, *we* don't make these decisions lightly, there are people involved from every aspect of the business, from compliance to the front office—and they collectively—I don't make those types of decisions—they collectively reached a decision which was in the interest of investors, which was to close it.  But there are quite a few products like that in the market, because they serve a useful purpose.   They allow market participants to manage their risk better."[24] (Emphasis added).

209.    These assertions, too, were patently false, further supporting Thiam was actively concealing that the real reason to announce an Acceleration Event was for Credit Suisse to profit at its investors' expense.  XIV had not "stopped trading."  To the contrary, investors bought approximately $700 million in XIV notes during aftermarket trading on February 5, 2018.  Nor was XIV "quasi-impossible to price."  Neither Credit Suisse nor Janus offered any explanation for the freeze in updating XIVIV on February 5, 2018.  To the extent the freeze occurred because XIV became "quasi-impossible to price," this was due to Credit Suisse's own actions.  In any event, the liquidity squeeze it engineered rapidly subsided and XIVIV began to update again beginning at 5:09:05 p.m., so Thiam's claim that Credit Suisse closed XIV on *February 6* because it was "quasi-impossible to price" for an hour on *February 5* simply makes no sense.

210.    Finally, in view of Credit Suisse's hundreds of millions of dollars in profit and investors' $1.8 billion loss, the decision to close XIV was clearly not "in the interest of investors," rather it was in Credit Suisse's interest to announce the Acceleration Event to lock in the lowest possible redemption value on XIV notes.  Had Credit Suisse acted in the "interests of investors,"

---

[24] https://www.bloomberg.com/news/articles/2018-02-14/credit-suisse-s-thiam-warns-volatility-is-a-double-edged-sword

it could have alerted them of an Acceleration Event as early as 4:09 p.m. on February 5, halted trading at that time, halted trading as soon as it knew at approximately 4:10 p.m. that XIVIV was failing to update in real time, notified investors XIVIV was inaccurate, or, alternatively, notified investors that the Calculation Agents had determined a Market Disruption Event had occurred. The deceptive nature of Defendant Thiam's *post hoc* explanations supports his concealment of the fraud.

211.     During the same February 14, 2018 *Bloomberg* interview, Thiam, alluding to his three-year restructuring plan, stated that "there will be further cost cuts in the business this year . . . ."[25]

212.     On March 23, 2018, Defendant Thiam was awarded 9.7 million Swiss francs ($10.2 million) in compensation for 2017, "as his strategic shift toward managing money for wealthy clients showed signs of paying off . . . ."[26]

213.     On April 25, 2018, Thiam gave another interview to Bloomberg.  He described his three-year restructuring plan as:  "this is the part we love and we want to grow" and "this is the part we don't want . . . and we said we will get rid of it, and that's almost done."[27]

214.     In July 2018, Credit Suisse made good on Thiam's promise to continue cuts when it announced the closing of two other VIX-related ETNs, VelocityShares VIX Medium Term ETN (VIIZ) and VelocityShares Daily 2x VIX Medium Term ETN (TVIZ).[28]

---

[25] https://www.bloomberg.com/news/articles/2018-02-14/credit-suisse-s-thiam-warns-volatility-is-a-double-edged-sword
[26] https://www.wsj.com/articles/credit-suisse-ceo-tidjane-thiam-was-paid-10-2-million-in-2017-1521790615
[27] https://www.bloomberg.com/news/articles/2018-04-25/thiam-s-wealth-management-drive-accelerates-as-new-assets-soar
[28] https://www.bloomberg.com/news/articles/2018-07-23/credit-suisse-closes-five-more-volatility-oil-exchange-notes

**P.      Defendants' Other False And Misleading Statements And Omissions**

215.    In addition to knowingly or recklessly disseminating the false and misleading Flatline Value as detailed in paragraphs 171-190, Defendants made several other false and misleading statements and omissions.

216.    On January 29, 2018, Credit Suisse filed a pricing supplement (No. VLS ETN-1/A48) (the "January Supplement") with the SEC pursuant to Rule 424(b)(2) and in conjunction with (i) the Registration Statement No. 333-218604-02 ("Registration Statement"), (ii) a prospectus supplement dated June 30, 2017 and (iii) a prospectus dated June 30, 2017 ("Prospectus") (collectively, the "Offering Documents"), to offer 16,275,000 XIV notes at a denomination and stated principal amount of $10 each.  The Registration Statement was signed by Defendants Thiam and Mathers.

217.    The January Supplement states:

> We expect to hedge our obligations relating to the ETNs by purchasing or selling short the underlying futures, listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or other instruments linked to the applicable underlying Index, certain exchange traded notes issued by Credit Suisse, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, and adjust the hedge by, among other things, purchasing or selling any of the foregoing, at any time and from time to time, and to unwind the hedge by selling any of the foregoing, perhaps on or before the applicable Valuation Date. We and, our affiliates, or third parties with whom we transact, may also enter into, adjust and unwind hedging transactions relating to other securities whose returns are linked to the applicable underlying Index.  Any of these hedging activities may adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures — and therefore the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. It is possible that we, our affiliates, or third parties with whom we transact could receive substantial returns with respect to these hedging activities while the value of your ETNs decline or become zero. Any profit in connection with such hedging

activities will be in addition to any other compensation that and our affiliates receive for the sale of the ETNs, which may create an additional incentive to sell the ETNs to you.

We, our affiliates, or third parties with whom we transact may also engage in trading in the underlying futures, or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or instruments whose returns are linked to the applicable underlying Index, certain exchange traded notes issued by Credit Suisse, or the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures for our or their proprietary accounts, for other accounts under our or their management or to facilitate transactions, including block transactions, on behalf of customers. Any of these activities could adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures — and, therefore, the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. We may also issue, and we, our affiliates, or third parties with whom we transact may also issue or underwrite, other ETNs or financial or derivative instruments with returns linked to changes in the level of the applicable underlying Index or the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures. By introducing competing products into the marketplace in this manner, we, our affiliates, or third parties with whom we transact could adversely affect the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date.

218.    The foregoing statements in paragraph 217 were false and misleading and omitted the following material facts.  At the time the foregoing statements were made, the Credit Suisse Defendants knew that during the next VIX spike—which the Credit Suisse Defendants knew was certain to occur— the Credit Suisse Defendants planned to profit from their hedging and trading activity in the underlying futures and other instruments by creating a liquidity squeeze in the VIX futures market that would inflate the value of VIX futures, thereby wiping out the value of XIV

and triggering an Acceleration Event. At the time the foregoing statements were made, the Credit

Suisse Defendants had designed the product to fail during the next VIX spike by continuing to

issue additional XIV notes despite knowing that such growth would exacerbate liquidity issues in

the VIX futures market known to the Credit Suisse Defendants, and that the Credit Suisse

Defendants would profit from the resulting collapse of XIV by pocketing the difference in the

purchase price of the XIV notes and the redemption value after the Credit Suisse Defendants

announced an Acceleration Event.

219.    The January Supplement also states:

**There may be conflicts of interest between you, us, the Redemption Agent, and the Calculation Agents**

. . .

As noted above, we, our affiliates, or third parties with whom we transact, including JHD, may engage in trading activities related to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other instruments linked to the applicable underlying Index, certain exchange traded notes issued by Credit Suisse, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures. ***These trading activities may present a conflict between your interest in your ETNs and the interests we, our affiliates, or third parties with whom we transact, including JHD, will have in our or their proprietary accounts, in facilitating transactions, including block trades, for our or their customers and in accounts under our or their management. These trading activities, if they influence the level of the applicable underlying Index, could be adverse to your interests as a beneficial owner of your ETNs.***

(Emphasis added).

220.    The bold and italicized statements in paragraph 219 were false and misleading and

omitted material facts concerning the conflict between XIV investors' interests and those of Credit

Suisse. At the time the foregoing statements were made, the Credit Suisse Defendants knew with

***certainty*** that their trading activities in VIX futures presented a conflict of interest in XIV that was

adverse to the interests of XIV's investors, because the Credit Suisse Defendants knew: (1) that during the next VIX spike—which the Credit Suisse Defendants knew was certain to occur—the Credit Suisse Defendants planned to profit from their hedging and trading activity in the underlying futures and other instruments by creating a liquidity squeeze in the VIX futures market that would inflate the value of VIX futures, thereby wiping out the value of XIV and triggering an Acceleration Event.; and (2) the Credit Suisse Defendants had designed the product to fail during the next VIX spike by continuing to issue additional XIV notes despite knowing that such growth would exacerbate known liquidity issues in the VIX futures market, and that the Credit Suisse Defendants would profit from the resulting collapse of XIV by pocketing the difference in the purchase price of the XIV notes and the redemption value after the Credit Suisse Defendants announced an Acceleration Event.

221. The January Supplement also states the following regarding XIV's Intraday Indicative Value

> *The "Intraday Indicative Value" for each series of ETNs is designed to approximate the economic value of such series of ETNs at a given time.* It is calculated using the same formula as the Closing Indicative Value, except that instead of using the closing level of the applicable underlying Index, the calculation is based on the most recent intraday level of such Index at the particular time. *The Intraday Indicative Value of the ETNs will be calculated every 15 seconds on each Index Business Day during the period when a Market Disruption Event has not occurred or is not continuing and disseminated over the Consolidated Tape, or other major market data vendor.*
>
> . . .
>
> *The value of each Index will be published by Bloomberg in real time* and after the close of trading on each Index Business Day . . . *The intraday level of each of the Indices is calculated in real time by S&P on each S&P 500 VIX Futures Business Day . . . applying real time prices of the relevant VIX futures contracts.*
> . . .
>
> *Investors can compare the trading price of the ETNs (if such concurrent price is available) against the Intraday Indicative Value to determine whether the ETNs*

*are trading in the secondary market at a premium or a discount to the economic value of the ETNs at any given time.*

(Emphasis added).

222.    The Credit Suisse Defendants knew or recklessly disregarded that the bold and italicized statements in paragraph 221 regarding XIV's Intraday Indicative Value approximating the economic value of XIV, being calculated every 15 seconds based on real-time prices of the relevant VIX futures contracts, and investors' ability to compare the trading price of XIV against the Intraday Indicative Value at any given time became false and misleading and omitted material facts when the Calculation Agents failed to update XIV's Intraday Indicative Value between 4:09:48 p.m. and 5:09:04 p.m. on February 5, 2018.  During this time, the Credit Suisse Defendants had a duty to update the statements rendered false and misleading and Janus had a duty to publish accurate and timely Intraday Indicative Values.

223.    The January Supplement further states:

**Daily rebalancing of the Indices may impact trading in the underlying futures contracts**

The daily rebalancing of the futures contracts underlying the Indices may cause the Issuer, our affiliates, or third parties with whom we transact to adjust their hedges accordingly. ***The trading activity associated with these hedging transactions will contribute to the trading volume of the underlying futures contracts and may adversely affect the market price of such underlying futures contracts and in turn the level of the applicable underlying Index.***

(Emphasis added).

224.    The January Supplement additionally states:

**Daily rebalancing of the leverage amount may impact trading in the underlying futures contracts**

The daily rebalancing of the leverage amount of each ETN back to its target may cause us, our affiliates, or third parties with whom we transact to adjust their hedges accordingly. ***The trading activity associated with these hedging transactions will***

*contribute to the trading volume of the underlying futures and may adversely affect the market price of such underlying futures.*

(Emphasis added).

225.    The foregoing statements in paragraphs 223 and 224 were false and misleading and omitted material facts concerning the known effect of Credit Suisse's hedging transactions during the next volatility spike.  At the time the foregoing statements were made, the Credit Suisse Defendants knew that during the next VIX spike—which the Credit Suisse Defendants knew was certain to occur— the Credit Suisse Defendants planned to hedge their significant exposure in XIV notes, resulting in a liquidity squeeze in the VIX futures market.  The Credit Suisse Defendants also knew that this liquidity squeeze would consequently increase the value of the SPVXSP, resulting in significant losses to investors by not only wiping out the value of the XIV notes, but by also causing an Acceleration Event.  Furthermore, at the time the foregoing statements were made, the Credit Suisse Defendants knew or recklessly disregarded that XIV would fail during the next VIX spike and that their continued issuance of additional XIV notes would contribute to XIV's failure by exacerbating liquidity issues in the VIX futures.  By failing to disclose to investors the certainty of these events upon the next volatility spike, these statements were rendered false and/or materially misleading.

226.    Moreover, the January Supplement states:

### SUPPLEMENTAL USE OF PROCEEDS AND HEDGING

We intend to use the net proceeds from this offering for our general corporate purposes, which may include the refinancing of our existing indebtedness outside Switzerland. We may also use some or all of the net proceeds from this offering to hedge our obligations under the ETNs of the applicable series.

One or more of our affiliates before and following the issuance of the ETNs of any series may acquire or dispose of the futures contracts underlying the applicable Index, or listed or over-the-counter options contracts in, or other derivatives or synthetic instruments related to, the applicable underlying Index or the S&P 500® Index or the VIX Index to hedge our obligations under the ETNs of such series. In the course of pursuing such a hedging strategy, the price at which

such positions may be acquired or disposed of may be a factor in determining the levels of the applicable underlying Index. ***Although we and our affiliates have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying Index, there can be no assurance that the level of the applicable underlying Index will not be affected.***

(Emphasis added).

227.    The foregoing bold and italicized statements above in paragraph 226 were false and misleading because the Credit Suisse Defendants knew that, during the next VIX volatility spike, their hedging activities would have a material impact on the SPVXSP.  Specifically, the Credit Suisse Defendants knew that during the next VIX spike—which the Credit Suisse Defendants knew was certain to occur—they planned to hedge Credit Suisse's significant exposure in XIV notes, resulting in a liquidity squeeze in the VIX futures market.  The Credit Suisse Defendants also knew that this liquidity squeeze would consequently inflate the value of VIX futures, and increase the value of the SPVXSP, resulting in significant losses to investors by not only wiping out the value of the XIV notes due to their innate inverse nature, but by also causing an Acceleration Event.

228.    Furthermore, at the time the foregoing statements were made, the Credit Suisse Defendants knew or recklessly disregarded that XIV would fail during the next VIX spike and that their continued issuance of additional XIV notes would contribute to XIV's failure by exacerbating liquidity issues in the VIX futures.  By failing to disclose to investors the certainty of these events upon a volatility spike, these statements were rendered false and/or materially misleading.  Furthermore, the Credit Suisse Defendants' statements concerning their opinions and beliefs that they "have no reason to believe that their hedging activities will have a material impact" were materially false and misleading as they were not honestly believed, lacked a reasonable basis, and

misrepresented and failed to disclose the known or recklessly disregarded aforementioned adverse effects of Credit Suisse's hedging activities during the next volatility spike.

### Q. Additional Allegations of Defendants' Scienter

229.     The Credit Suisse Defendants, Janus, and JIC all knew or recklessly disregarded that the Flatline Value was materially false and/or misleading within seconds after its issuance.

230.     Credit Suisse's entity, CSI, and Janus's entity, JIC, were the Calculation Agents responsible for calculating and disseminating the Intraday Indicative Values and determining whether a Market Disruption Event was occurring or had occurred.  As such, they were not only intimately familiar with the calculation of the Intraday Indicative Values, but were also instrumental in all parts of XIV's functioning including the calculation and dissemination of these values.

231.     The XIV was a product created and marketed by Janus.  As previously discussed, Janus through its entities, JIC and JHD, was intimately involved in marketing XIV, placing XIV notes, and undertaking the duties and responsibilities of the Calculation Agents.  As such, Janus was intimately aware of all aspects of XIV.

232.     Given that the January Supplement states that "JIC or its affiliate is responsible for computing and disseminating the Intraday Indicative Value," JIC knew that at the time the Calculation Agents stopped updating the Intraday Indicative Value that it would be materially false and/or misleading at each 15-second interval thereafter until an accurate value was disseminated.

233.     Janus, by owning and controlling JIC, was in possession of real-time information concerning the inputs necessary to compute the Intraday Indicative Value.  Given its role as a Calculation Agent, JIC had access to this information and knew, or at minimum, recklessly disregarded, that the Flatline Value was false.  As the owner and controlling entity of JIC, Janus knew or recklessly disregarded the falsity or misleading nature of the Flatline Value.

234.    Moreover, the January Supplement states that other than limited circumstances, all decisions would be made jointly by the Calculation Agents.  As stated in the January Supplement:

> ***JIC will have the sole ability to calculate and disseminate the Closing Indicative Value***, make determinations regarding an Index Business Day, and determinations of splits and reverse splits. ***All other determinations will be made by the Calculation Agents jointly.***

(Emphasis added).

235.    As such, CIS and JIC would be involved in any decision not to update the Intraday Indicative Value or to make the determination that a Market Disruption Event was occurring or had occurred.

236.    As entities owned and operated by Credit Suisse and Janus, respectively, CIS and JIC knew or recklessly disregarded that the Intraday Indicative Value was not being updated the materially false and / or misleading Flatline Value.

237.    Additionally, Credit Suisse is a sophisticated global financial institution that issued XIV, and was familiar with all aspects of XIV.  This familiarity is further established by the content of the January Supplement.

238.    In the January Supplement, Credit Suisse repeatedly stated that it may hedge its exposure to XIV.  Notably and importantly, Credit Suisse was not "materially impacted" by the events of February 5, 2018, and actually profited from its positions.  Given that investors lost significant amounts of money during the time the Intraday Indicative Value was not updating, the fact that Credit Suisse profited from the same events indicates that Credit Suisse knew or recklessly disregarded that the Flatline Value issued on behalf of its XIV was false 15 seconds immediately after its issuance, and was false at each 15-second interval until the Intraday Indicative Value began updating at 5:09:05 p.m.

239. Moreover, Credit Suisse, as alleged herein, was actively trading in the after-hours market the very same futures that impacted the SPVXSP. Given Credit Suisse's own trades and the information that it receives as a sophisticated financial institution and market participant, it knew or recklessly disregarded the falsity of the Flatline Value.

240. Specifically, Credit Suisse knew of the extreme departure in volatility on February 5, 2018. Given volatility's import to XIV, its hedging positions, and its other investments and books, Credit Suisse was closely following the volatility in the market and the financial instruments derived therefrom. Furthermore, Credit Suisse was closely tracking its own liabilities and hedges related to XIV as the events transpired throughout the trading day and in afterhours trading. Simply put, even if Credit Suisse did not know that the Flatline Value being disseminated in the market was false and/or misleading as a result of it being quoted as the current Intraday Indicative Value posted in the market, Credit Suisse recklessly disregarded this information.

241. Moreover, Credit Suisse, as the owner of its affiliate and major subsidiary, CIS, was receiving real-time information concerning the inputs necessary to compute the Intraday Indicative Value. Given its role as a Calculation Agent, CIS had access to this information and knew, or at minimum, recklessly disregarded that the Flatline Value was false. Even if it was JIC that ran the Flatline Value calculation and issued the information to the market, as a Calculation Agent, CIS would have had access to the relevant underlying financial information and would rely upon it making determinations as a Calculation Agent, such as if a Market Disruption Event was occurring or had occurred. Because both Calculation Agents would have to make the determination to stop updating the Intraday Indicative Value and to leave the Flatline Value posted, each of the Calculation Agents made the materially false and/or misleading Flatline Value statement at each

15-second interval after its initial posting.  Therefore, at a minimum, Credit Suisse and CIS recklessly disregarded that the Flatline Value was materially false and/or misleading.

242.    Alternatively, to the extent the Calculation Agents determined that a Market Disruption Event occurred or was continuing, as discussed above, the omission of this language rendered the Flatline Value misleading.  As stated in the January Supplement, it was the Calculation Agents' role to determine if such a Market Disruption Event occurred.  As stated in the January Supplement, "The Calculation Agents for your ETNs will have discretion in making various determinations that affect your ETNs, including . . . the occurrence and effects of an Acceleration Event and the existence and effects of Market Disruption Events."  Thus, if the Intraday Indicative Value stopped updating because the Calculation Agents jointly determined a Market Disruption Event was occurring, the Calculation Agents knew and/or recklessly disregarded that the Flatline Value was materially false and/or misleading every 15 seconds that it was posted as the current value with no disclosure to the market that a Market Disruption Event was occurring or, alternatively, that the Flatline Value should not be relied upon. JIC, CIS, Credit Suisse and Janus each knew or recklessly disregarded that the Flatline Value was materially false and/or misleading, and are therefore liable for such misstatements.

243.    The Credit Suisse Defendants also knew, or at the very least recklessly disregarded, that the statements set forth above in the January Supplement were materially false and/or misleading.

244.    As members of the CARMC, Defendants Thiam and Mathers knew of the previous liquidity issues in the end-of-day VIX futures market after sharp VIX spikes.  Defendant Mathers, who has been CFO, and thus on the CARMC and head of the VARMC, since 2010, specifically had knowledge of, or at the very least recklessly disregarded, the liquidity issues arising during

the August 2011, August 2015, and June 2016 VIX spikes.  Defendant Thiam, who has been CEO since July 1, 2015, specifically had knowledge of, or at the very least recklessly disregarded, the liquidity issues arising during the August 2015 and June 2016 VIX spikes.

245.    Both Thiam and Mathers, by virtue of their positions as CEO and CFO, respectively, knew (1) of the July 2016 Announcement regarding Credit Suisse's ability to demand swaps in exchange for sales of XIV notes to meet its hedging strategy, and (2) that the reason for the July 2016 Announcement was because of the liquidity issues experienced during the previous VIX spikes.  Further, Thiam and Mathers knew of the July 2016 Announcement and the reasons for the announcement by virtue of their roles on the CARMC, which specifically was tasked with recommending risk limits for Credit Suisse and allocating divisional risk limits for the asset class containing XIV.

246.    By virtue of their roles on the CARMC, Defendants Thiam and Mathers also knew, or at the very least recklessly disregarded, that XIV had grown far too large to be adequately hedged by the underlying VIX futures market, and that Credit Suisse's hedging activities during the next VIX spike would cause XIV to collapse.  According to its 2016 Annual Report, Credit Suisse "estimate[d] losses associated with unusually severe market movements," "including stressed VaR, position risk and scenario analysis."  As head of the VARMC, Defendant Mathers specifically knew, or at least recklessly disregarded, that XIV's VaR exceeded the maximum VaR for Credit Suisse's entire equities asset class.   As the CEO of Credit Suisse, Thiam was immediately notified of any breach of risk limits.

247.    Thiam's response to nearly $2 billion in investor losses further supports his scienter. Defendant Thiam stated: "Really it's a matter for regulators whether they need to stop retail

investors from investing in [products like XIV].”[29]  In other words, Thiam knew he was selling a dangerous product that was structured and being used in a manner at odds with Credit Suisse's characterizations, but saw no problem in profiting at investors' expense.

248.    Indeed, Thiam actively attempted to conceal the fraud through a series of evasive explanations.  On February 14, 2018, Defendant Thiam stated that Credit Suisse closed XIV because "there is no prospect of recovery. . . .  Once you hit that bottom, the structure of the product means there is no recovery."[30]  But this was patently false.  Had Credit Suisse not liquidated XIV, its value would have stabilized rapidly.  By March 6, 2018, XIV would have been worth approximately $30.88.  Instead, Credit Suisse paid investors $5.99 per share based on XIV's Closing Indicative Value on February 15, 2018—80.6% less.

249.    On February 14, 2018, Defendant Thiam was interviewed by *Bloomberg*, and stated that, with respect to XIV, the decision to announce an Acceleration Event "was actually to protect investors.  The product stopped trading, it was quasi-impossible to price, and we needed to give certainty to the market at the market open.  So before the morning—and *we* went through a long process, *we* don't make these decisions lightly, there are people involved from every aspect of the business, from compliance to the front office—and they collectively—I don't make these types of decisions—they collectively reached a decision which was in the interest of investors, which was to close it.  But there are quite a few products like that in the market, because they serve a useful purpose.  They allow market participants to manage their risk better."[31]

---

[29] https://www.cnbc.com/2018/03/19/credit-suisse-vix-etn-lawsuits-tidjane-thiam-says-bank-not-at-fault.html
[30] https://www.bloomberg.com/news/articles/2018-02-14/credit-suisse-s-thiam-warns-volatility-is-a-double-edged-sword.
[31] *Id.*

250.    These assertions, too, were patently false, further supporting Thiam was actively concealing that the real reason to announce an Acceleration Event was for Credit Suisse to profit at its investors' expense.  XIV had not "stopped trading."  To the contrary, investors bought approximately $700 million in XIV notes during aftermarket trading on February 5, 2018.  Nor was XIV "quasi-impossible to price."  Neither Credit Suisse nor Janus offered any explanation for the freeze in updating XIVIV on February 5, 2018.  To the extent the freeze occurred because XIV became "quasi-impossible to price," this was due to Credit Suisse's own actions.  In any event, the liquidity squeeze it engineered rapidly subsided and XIVIV began to update again beginning at 5:09:05 p.m., so Thiam's claim that Credit Suisse closed XIV on *February 6* because it was "quasi-impossible to price" for an hour on *February 5* simply makes no sense.

251.    Finally, in view of Credit Suisse's hundreds of millions in profit and investors' $1.8 billion loss, the decision to close XIV was clearly not "in the interest of investors," but rather it was in Credit Suisse's interest to announce the Acceleration Event to lock in the lowest possible redemption value on XIV notes.  Had Credit Suisse acted in the "interests of investors," it could have alerted them of an Acceleration Event as early as 4:09:48 p.m. on February 5, halted trading at that time, halted trading as soon as it knew at 4:10 p.m. that XIVIV was failing to update in real time, notified investors XIVIV was inaccurate, or, alternatively, notified investors that the Calculation Agents had determined a Market Disruption Event had occurred.  The deceptive nature of Defendant Thiam's *post hoc* explanations supports his concealment of the fraud.

252.     During the same February 14, 2018 *Bloomberg* interview, Thiam, alluding to his three-year restructuring plan, stated that "there will be further cost cuts in the business this year . . . ."[32]

253.     On March 23, 2018, Defendant Thiam was awarded 9.7 million Swiss francs ($10.2 million) in compensation for 2017, "as his strategic shift toward managing money for wealthy clients showed signs of paying off . . . ."[33]

254.     On April 25, 2018, Thiam gave another interview to *Bloomberg*.  He described his three-year restructuring plan as:  "this is the part we love and we want to grow" and "this is the part we don't want . . . and we said we will get rid of it, and that's almost done."

255.     In July 2018, Credit Suisse made good on Thiam's promise to continue cuts when it announced the closing of two other VIX-related ETNs, VelocityShares VIX Medium Term ETN (VIIZ) and VelocityShares Daily 2x VIX Medium Term ETN (TVIZ).[34]

256.     Notably, the frauds alleged herein are consistent with Credit Suisse's long history of placing its own profits ahead of its investors.  On January 28, 2017, the Department of Justice ("DOJ") announced a $5.28 billion settlement with Credit Suisse stemming from its sales of residential mortgage-backed securities ("RMBS").  The DOJ charged that Credit Suisse disregarded its own risk controls and procedures so it could sell, at a significant profit, investments it knew would fail.  Principal Deputy Associate Attorney General Bill Baer stated that "Credit Suisse claimed its mortgage backed securities were sound, but in the settlement announced today

---

[32] https://www.bloomberg.com/news/articles/2018-02-14/credit-suisse-s-thiam-warns-volatility-is-a-double-edged-sword
[33] https://www.wsj.com/articles/credit-suisse-ceo-tidjane-thiam-was-paid-10-2-million-in-2017-1521790615
[34] https://www.bloomberg.com/news/articles/2018-07-23/credit-suisse-closes-five-more-volatility-oil-exchange-notes

the bank concedes that it knew it was peddling investments containing loans that were likely to fail[.]"  More recently, in November 2017, the New York Department of Financial Services announced it had fined Credit Suisse $135 million for its conduct in the foreign exchange business, in which Credit Suisse undertook efforts "directed at maximizing profits or minimizing losses in Credit Suisse's trading book, to the detriment of customers and a competitive marketplace[.]"  The consent order is replete with evidence showing that Credit Suisse executives not only knew of, but promoted front-running and the rejection of clients' orders so that Credit Suisse could profit to the detriment of its investors.

### R.    Loss Causation And Economic Loss

257.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of XIV notes, and operated as a fraud or deceit on Class Period purchasers of XIV notes by failing to disclose and misrepresenting the adverse facts detailed herein.  As Defendants' prior misrepresentations, omissions, and fraudulent conduct were disclosed and became apparent to the market, the price of XIV declined significantly as the prior artificial inflation came out of XIV's price.

258.    As a result of their purchases of XIV notes during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.* damages, under the federal securities laws.

259.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Bank's interests in, and plans for, XIV.  When the truth about XIV was revealed to the market, the price of XIV declined significantly.  This decline removed the inflation from the price of XIV securities, causing real economic loss to investors who had purchased XIV notes during the Class Period.

260.    The economic loss, *i.e.* damages, suffered by Lead Plaintiffs and the other Exchange Act Class members was a direct result of Defendants' fraudulent scheme to artificially inflate and/or maintain the price of XIV and the subsequent decline in the value of the notes when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

261.    Furthermore, as alleged herein, during the Class Period, the Credit Suisse Defendants engaged in practices intended to mislead investors by artificially affecting the prices of XIV notes.  The Credit Suisse Defendants employed devices, schemes, and artifices to defraud, and/or engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of XIV notes during the Class Period.

262.    Lead Plaintiffs and the Exchange Act Class have suffered damages from the Credit Suisse Defendants' manipulative acts in that, in reliance on an assumption of an efficient market free of manipulation, they purchased XIV notes.  Lead Plaintiffs and the Exchange Act Class would not have purchased XIV notes at the prices they paid, or at all, if they had been aware of the Credit Suisse Defendants' manipulative conduct which artificially affected the prices of XIV notes.

263.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their purchases of XIV notes during the Class Period.

**S.     Applicability Of Presumption Of Reliance—Fraud On The Market Doctrine And *Affiliated Ute* Allegations**

264.    Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

265.    In the alternative, Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for XIV notes was an efficient market for the following reasons, among others:

    a.   XIV notes actively traded on the NASDAQ, a highly efficient, electronic stock market;

    b.   As a regulated issuer, Credit Suisse filed periodic public reports with NASDAQ;

    c.   Credit Suisse regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d.   Credit Suisse and XIV were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

**T.**     **No Safe Harbor**

266.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pled in this Consolidated Complaint.

267.    Either the statements complained of herein were not forward-looking statements, but rather were historical statements or statements of purportedly current facts and conditions at the time the statements were made, or to the extent there were any forward-looking statements, Credit Suisse's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

268.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary

language identifying important facts that could cause actual results to differ materially from those in the statements.

269.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, Defendants are liable for those false or misleading statements because, at the time each such statement was made, the speaker knew the forward-looking statement was false or misleading, and the forward-looking statement was authorized and/or approved by an executive officer of Credit Suisse who knew that the forward-looking statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

Redacted