FILED

2019 Aug-22  PM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **ERICH HALBERT**, *et al.*,     ) | |
|          ) | |
|     **Plaintiffs**,    ) | |
| **v.**          ) | |
|          ) | Civil Action Number |
| **CREDIT SUISSE AG**, *et al.*,    ) | **2:18-cv-00615-AKK** |
|          ) | |
|     **Defendants**.    ) | |

## MEMORANDUM OPINION

Erich, Sherri, and John Halbert bring this action against Credit Suisse, AG and Janus Index & Calculation Services, LLC for alleged violations of federal and state securities laws and common law causes of action stemming from a market-wide volatility spike on February 5, 2018. Doc. 45. The Halberts claim Credit Suisse sold them high-risk securities in the days leading up to this volatility spike, but failed to disclose that the Defendants intended to facilitate the collapse of these securities by hedging against them, and then profit off their collapse by redeeming the securities at a fraction of their earlier value. The Halberts also claim that, during a one-hour period when the value of the securities was rapidly falling, the Defendants disseminated misleadingly high estimates of the securities' value. The Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Doc. 52. For the reasons explained below, except for the Alabama Code §§ 8-6-19(a) and (c) claims premised on the alleged misrepresentation of the Intraday Indicative

Values and the breach of contract claim against Credit Suisse, and the negligent misrepresentation claim against Janus related to the Intraday Indicative Value, the motion, which is fully briefed and ripe for review, docs. 57, 58, is due to be granted.

# I. STANDARD OF REVIEW

## A. The Relevant Standards

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Id*. (citations and internal quotation marks omitted). By contrast with Rule 8(a)'s fairly liberal pleading standard, Federal Rule of Civil Procedure 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." Where a party raises claims of fraud, Rule 9(b)'s standard is satisfied if the pleading sets forth:

> (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud.

*FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (citations omitted). Additionally, claims of securities fraud must satisfy the requirement of the Private Securities Litigation Reform Act (PSLRA), which requires a complaint alleging "misleading statements and omissions" to

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4.

Federal Rule of Civil Procedure 12(b)(6) permits dismissal when a complaint fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. (citations and internal quotation marks omitted). A complaint states a facially plausible claim for relief "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). Ultimately, this inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

B. <u>What the Court Considers</u>

Generally, a district court "must convert a motion to dismiss into a motion for summary judgment if it considers materials outside the complaint." *Day v. Taylor*,

400 F.3d 1272, 1275-76 (11th Cir. 2005) (citation omitted); *see* Fed. R. Civ. P. 12(d). However, "the court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is . . . central to the plaintiff's claim and . . . undisputed," meaning "the authenticity of the document is not challenged." *Day*, 400 F.3d at 1276 (citation omitted). Similarly, if a "document's contents are alleged in a complaint," and the document is "central to the plaintiff's claim" and undisputed, the court may consider it. *Id*. In determining whether a document is central to the plaintiff's claims, courts consider whether the plaintiff "would have to offer the document to prove his case." *See Lockwood v. Beasley*, 221 F. App'x 873, 877 (11th Cir. 2006). Furthermore, the court may take judicial notice of an adjudicative fact "not subject to reasonable dispute" because it is either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

The Defendants have attached seven documents to their motion: (1) a sworn affidavit by defense counsel attesting to the authenticity of the other six documents; (2) the January 29, 2018 VelocityShares Pricing Supplement to the Prospectus Supplement dated June 30, 2017 and Prospectus dated June 30, 2017; (3) Credit Suisse's press release dated February 6, 2018; (4) a news article from *Reuters* published on April 30, 2018; (5) Credit Suisse's press release dated February 14,

2018; (6) data tables purportedly displaying the Intraday Indicative Value for the VelocityShares Daily Inverse VIX Short Term exchange traded notes on February 5, 2018 from 3:30:02 PM to 5:10:00 PM ET; and (7) data tables purportedly displaying the levels of the S&P 500 VIX Short-Term Futures Index ("VIX Futures Index") on February 5, 2018 from 3:30:02 PM to 5:10:04 PM. *See* docs. 52-1, 52-2, 52-3, 52-4, 52-5, 52-6, 52-7. The authenticity of all the documents is undisputed. *See* doc. 57.

The court finds that the January 29, 2018 Pricing Supplement is "central" to the Halberts' claims because their claims are based on purported misrepresentations and omissions made in this document. Moreover, the court takes judicial notice of the Pricing Supplement because "a court, when considering a motion to dismiss in a securities fraud case, may take judicial notice . . . of relevant public documents required to be filed with the SEC, and actually filed." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).

However, the remaining documents are neither "central" to the Halberts' claims nor properly subject to judicial notice. Although the February 6, 2018 press release, in which Credit Suisse announced the acceleration event and end of trading for the XIV ETNs, is referenced in the Amended Complaint, *see* doc. 45 ¶ 33, this document is not "central" because the Halberts would not have to "offer the document to prove [their] case" given there were no alleged misrepresentations in

the press release. *See Lockwood v. Beasley*, 221 F. App'x 873, 877 (11th Cir. 2006). Similarly, the February 14, 2018 press release and the *Reuters* article are not "central" to the Halberts' claims as they are not referenced anywhere in the Amended Complaint. Furthermore, with respect to the attached data tables, docs. 52-6, 52-7, the Defendants contend that the court can consider "the entirety of this data" and cite to cases in which courts have taken judicial notice of stock prices. *See* doc. 52 at 25 n.12; *see La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004), *abrogated on other grounds by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) (judicially noticing stock price on the "other days" during the relevant period where the complaint only listed stock price on certain days); *see In re ING Groep, N.V. ERISA Litig.*, 749 F. Supp. 2d 1338, 1344 (N.D. Ga. 2010) (noting that "general economic conditions, stock prices, and market trends" are subject to judicial notice). While the court does not disagree with the proposition that the historical levels of market indices and public estimates of securities' values may properly be the subject of judicial notice, the Defendants have not provided the necessary information in order for the court to take judicial notice of the proffered data. Namely, neither the exhibits themselves nor the affidavit purportedly authenticating the data provide the source of the data, precluding the court from finding that the data "can be accurately and readily determined from sources whose accuracy cannot reasonably be

questioned." *See* Fed. R. Evid. 201(b)(2); docs. 52-6, 52-7. Accordingly, the court does not consider these documents in ruling on the Defendants' motion.

## II. FACTUAL BACKGROUND

### A. Background on the Securities

This case arises from the sale and subsequent collapse of a security tied to market volatility.[1] The Chicago Board Options Exchange ("CBOE") Volatility Index, also known simply as the Volatility Index ("VIX"), is a measurement of the implied volatility of the Standard & Poor (S&P) 500 Index at points along the volatility forward curve. Doc. 45 ¶ 8. Investors can invest in the forward volatility of the S&P 500 Index by trading futures contracts—contracts in which the parties

---

[1] Through a footnote in their Amended Complaint, the Halberts seek to indiscriminately incorporate by reference 239 factual allegations from the amended class action complaint filed in *Set Capital LLC v. Credit Suisse*, No. 1:18-cv-02268-AT-SN (S.D.N.Y. Aug. 20, 2018), and have attached the excerpted allegations to their Amended Complaint. *See* doc. 45 at 2, n.1. As the Defendants note, courts in this circuit appear to follow the rule that "[a]llegations in pleadings in another action, even if between the same parties, cannot be incorporated by reference." Wright & Miller, 5A Fed. Prac. & Proc. Civ. § 1326 (3d ed. 2018); *see Texas Water Supply Corp. v. R.F.C.*, 204 F.2d 190, 196 (5th Cir. 1953) ("Rule 10(c), Federal Rules of Civil Procedure, permits references to pleadings and exhibits in the same case, but there is no rule permitting the adoption of a cross-claim in a separate action in a different court by mere reference."); *In re Smith*, 489 B.R. 875, 903 (Bankr. M.D. Ga. 2013) ("Although not explicit in Federal Rule 10(c), only pleadings in the same action can be adopted by reference—not pleadings in prior actions, including actions between the same parties."); *Muhammad v. Bethel-Muhammad*, No. CIV.A. 11-0690-WS-B, 2012 WL 1854315, at *3 (S.D. Ala. May 21, 2012) (denying plaintiff's attempt to incorporate by reference "evidence" filed in an earlier action into his Amended Complaint). Moreover, the Halberts have not directed the court to any contrary authority or otherwise responded to the Defendants' contention that this attempted incorporation is improper. *See* doc. 57. Therefore, the court rejects the Halberts' request. *See Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd.*, 801 F. Supp. 2d 211, 223 (S.D.N.Y. 2011) ("A pleading may not adopt other pleadings from a wholly separate action.").

agree to purchase and sell an underlying asset at a predetermined time and price—on the VIX Index. *See id.* ¶ 9. The S&P 500 VIX Short-Term Futures Index ER ("VIX Futures Index") reflects the outcome of holding long positions—the position of the party obligated to purchase the underlying asset—in VIX futures contracts in the short term. *See id.*

Investors could purchase exchange-traded notes (ETNs) tied to the VIX Futures Index. One such ETN, offered by Credit Suisse, was known as the Inverse VIX Short-Term ETNs ("XIV ETNs"). *Id.* ¶ 9-10; doc. 52-2 at 2. The XIV ETNs were designed to generally provide the opposite return of the VIX; meaning that as market volatility decreased, generally, the value of the XIV ETNs increased, and vice-versa. *See* doc. 45 ¶ 10; doc. 52-2 at 26. The XIV ETNs were liquid, tradeable, and available to unsophisticated investors. Doc. 45 ¶¶ 12-13. Like stock, their value was dictated by market supply and demand. *Id.* In 2017 and the beginning of 2018, the value of XIV ETNs consistently increased due to low volatility in the stock market, leading unsophisticated investors to purchase the XIV ETNs. *Id.* ¶ 24.

B. The Offering Documents

On January 29, 2018, Credit Suisse issued a pricing supplement pursuant to SEC Rule 424(b)(2) in conjunction with a registration statement, a prospectus, and a prospectus supplement (collectively "the Offering Documents"). *Id.* ¶ 16. The Offering Documents offered for sale six series of ETNs linked to market volatility,

one of which was the XIV ETNs. *See id*. ¶ 10; doc. 52-2 at 2. Between February 2 and 5, 2018, the Halberts purchased 5,590 XIV ETNs, of the 16,275,500 XIV ETNs Credit Suisse offered at a principal amount of $10 each. *Id*. Credit Suisse collected a daily investor fee on these XIV ETNs, "generat[ing] millions of dollars for Credit Suisse." *Id*. ¶ 15.

The Offering Documents explained that Credit Suisse and Janus would publish two public estimates of the value of the XIV ETNs at certain times: an Intraday Indicative Value, updated every fifteen seconds, and a Closing Indicative Value at the close of each day. *Id*. ¶¶ 13-14; doc. 52-2 at 5,7. Furthermore, the Documents explained that Credit Suisse had the option to accelerate the XIV ETNs upon the occurrence of "any event that adversely affects [Credit Suisse's] ability to hedge or [its] rights in connection with the ETNs, including . . . if, at any point, the Intraday Indicative Value is equal to or less than twenty percent (20%) of the prior day's Closing Indicative Value." Docs. 45 ¶ 19; 52-2 at 8.

Finally, the Offering Documents contained various disclosures, including that Credit Suisse "expect[s] to hedge [its] obligations relating to the ETNs" and "may also engage in trading in the underlying futures, or . . . futures contracts," both of which "could adversely affect . . . the market value of [investors'] ETNs . . ." Doc. 45 ¶ 18 (quoting doc. 52-2 at 34). The Offering Documents also stated, *inter alia*, that it was "possible that [Credit Suisse] . . . could receive substantial returns with

respect to these hedging activities while the value of [investors'] ETNs decline or become zero." *Id.*

C. <u>The February 5, 2018 Volatility Spike and Collapse of the XIV ETNs</u>

A week after Credit Suisse issued additional XIV ETNs, market volatility spiked and the value of XIV ETNs, which totaled approximately $1.9 billion, collapsed, *see* doc. 45 ¶ 22, due to heavy trading in March VIX futures, which caused VIX futures prices to dramatically increase because of "liquidity issues in the VIX futures market due to volatility in the market," *id.* ¶ 36. Before 4:00 p.m. E.T. on February 5, 2018, the average VIX futures price increased 34.5% "from the previous day." Doc. 45 ¶ 37.  By 4:09 p.m., that average price had increased to over 80% of the previous day's closing value. *Id.* And, by 4:15 p.m., VIX futures prices were 96% greater than "the day before." *Id.* ¶ 28.

As to be expected, the value of XIV ETNs dropped dramatically during the same period. At the closing bell at 4:00 p.m., the XIV ETN was trading at a value of $99.00. Doc. 45 ¶ 25. At 4:30 p.m., the trading price of XIV ETNs was $70.01 and, by 4:45 p.m., the price had dropped to $42.81 per share. *Id.* ¶ 30. By 6:28 p.m., the price of XIV ETNs was $10.16 per note, a decrease of 89.74% from its "closing value" that day. *Id.* ¶ 32.

During this period, the Intraday Indicative Value did not accurately track the decline in the XIV ETN's value. *See id.* ¶ 26. From 4:10 p.m. until 5:09 p.m., the

Intraday Indicative Value was approximately $24.70, but, at 5:10 p.m., it had dropped to $4.22. *See id*. ¶¶ 26, 31; doc. 52-6 at 17-18, 53. However, from 4:10 p.m. until 5:09 p.m., the "actual" value of one ETN was between $4.22 and $4.40. Doc. 45 ¶ 26.

The following morning, Credit Suisse announced an Acceleration Event that would end trading on the XIV ETNs by February 20, 2018. *Id*. ¶ 33. Consequently, the Halberts sold their XIV ETNs for a fraction of their purchase price. *Id* ¶¶ 33, 46. And, Credit Suisse subsequently accelerated the XIV ETNs, redeeming them for "pennies on the dollar," and ended trading on the securities. *Id*. ¶¶ 33, 41. Allegedly, had Credit Suisse not accelerated the XIV ETNs, their value would have risen to $30.88 per ETN within a month, over five times their value at redemption. *Id*. ¶ 45. Unlike Credit Suisse which announced that it experienced no trading losses from the XIV ETNs despite holding a "significant amount of short-volatility financial products," the investors lost approximately $1.8 billion in total. *Id*. ¶¶ 43-44.

D. The Alleged Fraudulent Misrepresentations and Conduct

Allegedly, the Defendants "knew, or should have known," that the increased value of XIV ETNs over the previous year had attracted unsophisticated investors. *Id*. ¶ 24. Credit Suisse was "actively manipulating" the value of the XIV ETNs by "liquidating its holdings in various financial products to avoid a loss," *id*. ¶ 27, and planned to "hedge" against the XIV ETNs so that their value would plummet, to

11

allow Credit Suisse to profit by accelerating and redeeming these lower-valued securities, *see id.* ¶¶ 47-48, 38-39. Moreover, the Offering Documents failed to disclose Credit Suisse's intentions with respect to the XIV ETNs, the attendant conflicts of interest between Credit Suisse and investors, and the full extent of the risk that the value of the XIV would plummet. *See id.* ¶¶ 52, 62. And, because the market for XIV ETNs was an efficient public market that digested all publicly available information, *see* doc. 45 ¶ 60, the allegedly misleading statements in the Offering Documents "artificially inflate[d]" the value of the XIV ETNs, *see id.* ¶¶ 47-48.

Credit Suisse purportedly engaged in "hedging activities" that caused the sudden increase in VIX futures prices. *See id.* ¶¶ 37-38. Additionally, from 4:10 to 5:09 p.m. on the day at issue, the Defendants failed to "update" the Intraday Indicative Value while "the value of the underlying VIX futures were rapidly changing." *Id.* ¶ 26. The Defendants knew, or should have known, that the VIX Futures Index, on which the Intraday Indicative Value depended, was "not updating every 15 seconds to 'apply[] real time prices of the relevant VIX futures contracts,'" and yet never attempted to notify or warn investors of this failure. *Id.* ¶¶ 26-27. The failure to update the Intraday Indicative Value increased the likelihood of an Acceleration Event because, if the Defendants had done so, the Closing Indicative Value would have only been 77% of the previous day's value. *Id.* ¶ 41. Instead, the

Intraday Indicative Value dropped to 20% or less than of the previous day's Closing Indicative Value,[2] thereby giving Credit Suisse an option, but not an obligation, to declare an Acceleration Event pursuant to the Offering Documents. *See id*. ¶¶ 19, 34. It consequently exercised this option, allowing Credit Suisse to "realize[] an enormous profit" by redeeming the outstanding XIV ETNs. *See id*. ¶ 46.

Based on these alleged fraudulent acts and misrepresentations, the Halberts plead violations of Section 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b), negligence, wantonness, fraudulent misrepresentation, negligent misrepresentation, and fraudulent suppression. They also plead claims against Credit Suisse for violations of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, violations of the Alabama Blue Sky Law, Ala. Code § 8-6-19(a)(2) and (c), and breach of contract.

## III. ANALYSIS

The Defendants have moved to dismiss the federal securities claims for failure to sufficiently allege misrepresentation, scienter, and loss causation. *See* doc. 52, 58. They also contend that the state securities law and common law claims fail as a matter of law. *See id*. The opinion is divided as follows. In Section A, the court, first, finds that the Halberts have adequately alleged standing for their Section 10(b) claims premised on the allegedly false Intraday Indicative Values on February 5,

---

[2] Although the Halberts do not specifically allege this fact, the Amended Complaint, read in its entirety, implies that the Intraday Indicative Value on February 5, 2018 was, at some point, 20% or less than the previous day's Closing Indicative Value. *See* doc. 45 ¶¶ 20, 26, 28, 34.

2018. Second, the court finds that, the Halberts adequately alleged material misstatements or omissions under Section 10(b) premised on the allegedly false Intraday Indicative Values, but not with respect to the alleged omissions in the Offering Documents and, therefore, their Section 11 claims also fail. Third, the court finds that the Halberts have not alleged scienter for their Section 10(b) claims. Because the Halberts' claims fail on the issues of misrepresentation and scienter, the court does not reach the issue of loss causation.

Next, in Section B, the court finds that the Halberts have pled violations of Alabama Code §§ 8-6-19(a)(2) and (c), based on the allegedly false Intraday Indicative Values. Finally, in Section C the court finds that the Halberts have pled breach of contract against Credit Suisse and negligent misrepresentation against Janus, and that the rest of their common law claims fail.

## A. __The Federal Securities Law Claims__

The Halberts assert securities claims under Section 10(b) of the Exchange Act, and SEC Rule 10b-5, as well as under Section 11 of the Securities Act.

### 1. Overview of the Federal Securities Laws

Section 10(b) of the Exchange Act of 1934 makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange Commission] may prescribe . . ." 15

U.S.C. § 78j. SEC Rule 10b-5, promulgated under Section 10(b), further makes it

"unlawful for any person"

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to
> state a material fact necessary in order to make the statements
> made, in the light of the circumstances under which they were
> made, not misleading, or
> (c) To engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any person,
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Rule 10b-5 creates two types of claims under Section 10(b):

misrepresentation/nondisclosure claims pursuant to Rule 10b-5(b), and scheme

liability/market manipulation claims pursuant to Rule 10b-5(a) and (c). *See IBEW

Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x

850, 858 (11th Cir. 2016) ("A scheme liability claim [under § 10(b)] is different and

separate from a nondisclosure claim."); *Ala. Farm Bureau Mut. Cas. Co. v. Am. Fid.

Life Ins. Co.*, 606 F.2d 602, 608 (5th Cir. 1979) (recognizing scheme liability claims

under § 10(b) and Rule 10b-5).[3] To establish a misrepresentation claim under Rule

10b-5(b), plaintiffs must allege: "(1) the existence of a material misrepresentation or

omission, (2) made with scienter, (3) in connection with the purchase or sale of a

security, (4) on which the plaintiff relied, and (5) which was causally connected to

---

[3] Under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), decisions of
the former Fifth Circuit rendered prior to October 1, 1981 are binding on courts in the Eleventh
Circuit.

(6) the plaintiff's economic loss." *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783, 789 (11th Cir. 2010). Scheme liability claims, on the other hand, require a showing of conduct that "can be fairly viewed as 'manipulative or deceptive' within the meaning of the statute." *Ala. Farm Bureau*, 606 F.2d at 608 (quoting *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 473-74 (1977)). In other words, plaintiffs must allege "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1273 (11th Cir. 2016) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976)). Basically, a plaintiff must show that defendants engaged in an activity "designed to 'create an unnatural and unwarranted appearance of market activity.'" *See id.* (citation omitted). And, significantly, "[m]isleading statements and omissions only create scheme liability in conjunction with 'conduct beyond those misrepresentations or omissions.'" *IBEW*, 660 F. App'x at 858 (internal citation omitted)).[4]

By contrast, Section 11(a) of the Securities Act of 1933 "provides a cause of action to purchasers of securities where: 'any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or

---

[4] The Eleventh Circuit has not expressly set forth the elements of a "scheme liability" or "market manipulation" claim under Rule 10b-5(a) and (c), although it has indicated that such claims require a showing of scienter. *See Galectin Therapeutics*, 843 F.3d at 1273 (defining "manipulation" as including "*intentional or willful* conduct . . .*" (emphasis added)); 15 U.S.C. § 78u-4(b)(2)(A).

omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Oxford Asset Mgmt. Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002) (quoting 15 U.S.C. § 77k(a)). A "registration statement" includes a prospectus and any supplements. *See Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1265 (11th Cir. 2013). "A registration statement can be misleading either by containing an untrue statement or by omitting facts that are necessary to prevent other statements from being misleading." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) (citing 15 U.S.C. § 77k(a)). There is no state of mind element to a Section 11 claim, and liability is "virtually absolute, even for innocent misstatements." *Id*. (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). For Section 11 claims premised on material omissions, plaintiffs must allege:

> 1) the [registration statement] contained an omission; 2) the omission was material; 3) defendants were under a duty to disclose the omitted material information; and 4) that such information existed at the time the [relevant part of the registration statement] became effective.

*Oxford Asset Mgmt.*, 297 F.3d at 1189. Finally, where, as here, "the [alleged] facts underlying the misrepresentation at stake in the [Section 11] claim are said to be part of a fraud claim, as alleged elsewhere in the complaint[,] . . . plaintiffs must plead with particularity." *See Wagner*, 464 F.3d at 1278.

2.  Standing under Section 10(b)

As an initial matter, the Defendants contend that the Halberts lack standing to assert their Section 10(b) claim with respect to the alleged misrepresentations of the Intraday Indicative Value on February 5, 2018 because they failed to allege that they purchased or sold the XIV ETNs during the one-hour window when Defendants purportedly misrepresented the value. Doc. 52 at 9-10; 58 at 2-3. In support of this contention, the Defendants cite *O & G Carriers, Inc. v. Smith*, in which the Southern District of New York held that, because "the alleged fraud . . . took place *after* [the plaintiffs] had invested, the alleged fraud was not 'in connection with' the purchase or sale of a security," as required by Section 10(b). *See* 799 F. Supp. 1528, 1539 (S.D.N.Y. 1992). However, although the Halberts do not specifically allege that they bought and sold XIV ETNs within the one-hour period when the Intraday Indicative Value allegedly failed to update, they do allege that they bought and sold XIV ETNs on February 5 and 6, 2018. *See* doc. 45 ¶ 46. Moreover, the Halberts allege that they purchased the XIV ETNs "in reliance on the integrity of the market," *id*. ¶ 63, which, they allege, was an efficient market that was affected by "the misstated Intraday Indicative Values," *id*. ¶ 60. Their contentions are sufficient to allege a "fraud-on-the-market theory" of reliance, *see* doc. 45 ¶ 60, which entitles the Halberts to a rebuttable presumption of reliance on the allegedly false Intraday Indicative Values based on the theory that "the market price of shares traded on well-developed

18

markets reflects all publicly available information, and, hence, any material misrepresentations[.]" *See Meyer v. Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988)); *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008) ("[U]nder the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public.").

The Defendants further contend that the Halberts have merely alleged impermissible "holding" claims—that the allegedly false Intraday Indicative Values on February 5, 2018 induced them to hold, rather than to buy or sell, their XIV ETNs. *See* doc. 58 at 7-8. In *Blue Chip Stamps v. Manor Drug Stores*, the Supreme Court affirmed the standing rule created by *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 464 (2d Cir. 1952), which permits only purchasers and sellers of securities, and parties to contracts to purchase and sell securities, to bring suit under Rule 10b-5. 421 U.S. 723, 731-32 (1975). This rule bars, in part, plaintiffs who "are actual shareholders in the issuer who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material. . . ." *Blue Chip Stamps*, 421 U.S. at 737-38. In citing this rule and contending that the Halberts have plead impermissible "holder" claims, the Defendants rely on assertions from the Halberts' responsive brief, rather than the allegations in the Amended Complaint. *See* doc. 58 at 2-3. In ruling on a motion to dismiss, however, the court's review is limited to the allegations in the complaint, incorporated

exhibits, central and undisputed extrinsic documents, and judicially-noticed documents and facts. *See U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015) (describing what district courts may consider on motion to dismiss under Rule 12(b)(6)). The court cannot, and does not, consider unpleaded allegations in the parties' briefs. *See id*. Accordingly, at this stage of the proceedings, the Halberts have adequately alleged standing for their Section 10(b) claim premised on the allegedly false Intraday Indicative Values on February 5, 2018.

3. <u>Material Misrepresentations under Section 10(b) and Section 11</u>

To state a claim under Section 11 of the Securities Act, or a misrepresentation claim under Section 10(b) and Rule 10b–5(b) of the Exchange Act, "a complaint must allege the misstatement or omission of a material fact." *In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350, 1365 (N.D. Ga. 2005). A statement is misleading under the securities laws "if in the light of the facts existing at the time of the [statement] . . . [a] reasonable investor, in the exercise of due care, would have been misled by it." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011) (quoting parenthetically *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 863 (2d Cir. 1968)). "In other words, if no reasonable investor could conclude public statements, taken together and in context, were misleading, the issue is appropriately resolved as a matter of law." *In re BellSouth*, 355 F. Supp. 2d at 1365 (citation omitted) (analyzing Section 11 and Section 10(b) misrepresentation claims

together). The alleged misleading misrepresentations must also be material—i.e., that "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *S.E.C. v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (articulating this standard for Section 10(b) claims); *see Oxford Asset Mgmt.*, 297 F.3d at 1189 (applying this standard under Section 11). "The trier of fact usually decides the issue of materiality." *Oxford Asset Mgmt.*, 297 F.3d at 1189. "Only if the lack of importance of the omission is so plain that reasonable minds cannot differ thereabout is it proper for the court to pronounce the omission immaterial as a matter of law." *Id*.

### a. Alleged Omissions Concerning Hedging and Plan to Collapse and Accelerate the XIV ETNs

The Halberts allege that Credit Suisse and Janus made materially misleading statements in the Offering Documents concerning Credit Suisse's anticipated hedging and its conflict of interests with investors in the XIV ETNs. To support this contention, the Halberts quote in their Amended Complaint the allegedly misleading statements from the Offering Documents,[5] and argue that, under Section 11 and

---

[5] The language the Halberts quote reads:

> Trading and other transactions by [Credit Suisse], our affiliates, or third parties with whom we transact, in securities or financial instruments related to the ETNs and the applicable underlying Index may impair the value of your ETNs. We expect to hedge our obligations relating to the ETNs by purchasing or selling short the underlying futures, listed or over-the-counter options, futures contracts, swaps, or other derivative instruments . . . and adjust the hedge by, among other things,

Section 10(b), the quoted statements in the Offering Documents were materially

misleading.[6] The Halberts maintain the Defendants failed to disclose that they knew

---

> purchasing or selling any of the foregoing, at any time and from time to time, and
> to unwind the hedge by selling any of the foregoing, perhaps on or before the
> applicable Valuation Date. We . . . may also enter into, adjust and unwind hedging
> transactions relating to other securities whose returns are linked to the applicable
> underlying Index. Any of these hedging activities may adversely affect the level of
> the applicable underlying Index — directly or indirectly . . . and therefore the
> market value of your ETNs and the amount we will pay on your ETNs on the
> relevant Early Redemption Date, Acceleration Date or the Maturity Date. It is
> possible that we . . . could receive substantial returns with respect to these hedging
> activities while the value of your ETNs decline or become zero. Any profit in
> connection with such hedging activities will be in addition to any other
> compensation that [sic] and our affiliates receive for the sale of the ETNs, which
> may create an additional incentive to sell the ETNs to you. We . . . may also engage
> in trading in the underlying futures, or listed or over-the-counter options, futures
> contracts, swaps, or other derivative instruments . . . Any of these activities could
> adversely affect the level of the applicable underlying Index — directly or
> indirectly . . . . and, therefore, the market value of your ETNs and the amount we
> will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date
> or the Maturity Date. We may also issue . . . other ETNs or financial or derivative
> instruments with returns linked to changes in the level of the applicable underlying
> Index or the underlying futures or listed or over-the-counter options, futures
> contracts, swaps, or other derivative instruments . . . By introducing competing
> products into the marketplace in this manner, we . . . could adversely affect the
> market value of your ETNs and the amount we will pay on your ETNs on the
> relevant Early Redemption Date, Acceleration Date or the Maturity Date.

Doc. 45 ¶ 18 (quoting doc. 52-2 at 34). Additionally, the Amended Complaint quotes the Offering
Documents' assertion that Credit Suisse had the right to accelerate outstanding ETNs upon the
occurrence of an "Acceleration Event," defined as including "if, at any point, the Intraday
Indicative Value is equal to or less than twenty percent (20%) of the prior day's Closing Indicative
Value." *Id.* ¶ 19 (quoting doc. 52-2 at 28).

[6] The Halberts also assert in their response brief, that "the Credit Suisse Defendants falsely stated
that they 'have no reason to believe that our . . . hedging activities will have a material impact on
the level of the [VIX Futures] Index . . . .'" Doc. 57 at 9 (quoting doc. 52-2 at 60). However, the
Halberts did not make this allegation in their Amended Complaint. *See* doc. 45. "[A] party may
not insert new claims and allegations by way of a brief in opposition to a motion to dismiss."
*Weakley v. Eagle Logistics*, No. 3:16-cv-00205-HGD, 2017 WL 2929375, *2 (N.D. Ala. Mar. 2,
2017). Moreover, under Rule 9(b) and PSLRA, a plaintiff must identify each allegedly misleading
or false statement in the complaint. *See FindWhat*, 658 F.3d at 1296; 15 U.S.C. § 78u-4.

Credit Suisse's hedging would inevitably cause the XIV ETNs to collapse during the next volatility spike due to inadequate market liquidity and the number of outstanding XIV ETNs, and that Credit Suisse intended to profit from this collapse by subsequently accelerating and redeeming the XIV ETNs and, thus, had an active conflict of interest with investors in the XIV ETNs. *See* doc. 45 ¶¶ 21, 52, 62.[7]

To analyze claims about purported misstatements or omissions, the court must assess the Section 11 claim "information [as it] existed at the time the [registration statement] became effective," *see Oxford Asset Mgmt.*, 297 F.3d at 1189, or in the case of a Section 10(b) claim, whether a reasonable investor would find the alleged misstatement misleading "in the light of the facts existing at the time of the [statement]," *FindWhat*, 658 F.3d at 1305. In that respect, here, the Halberts' assertion that Credit Suisse knew its hedging would cause the XIV ETNs to crash

---

[7] More specifically, under Section 11, the Halberts allege that the cited statements from the Offering Documents were materially misleading by failing to adequately disclose that: (1) Credit Suisse knew that the XIV ETNs would crash; (2) Credit Suisse knew it would engage in hedging, and that this hedging would cause the XIV ETNs to crash due to poor liquidity in the market; and (3) that the Defendants knew Credit Suisse would profit off the Halberts by "selling [the XIV ETNs] at a premium it intended to redeem cheaply" through an Acceleration Event. Doc. 45 ¶ 52. Under Section 10(b), the Halberts allege the Offering Documents were materially misleading because they failed to disclose that: (1) the Defendants knew the XIV ETNs were "designed to collapse in the next volatility spike because the product had grown too large and there was inadequate liquidity to hedge the product without causing it to collapse," and (2) Credit Suisse "planned to profit" by engaging in hedging that would cause the XIV ETNs to crash. *See id.* ¶ 62. Finally, the Halberts allege that, under both Section 11 and Section 10(b), the statements were materially misleading because the Defendants failed to disclose that: (1) the Defendants knew Credit Suisse "was actively manipulating the XIV by liquidating its holdings in various financial products to avoid a loss," and was doing so "to the detriment of investors," *id.* ¶ 21; and (2) that Credit Suisse and the Halberts had "an active and ongoing conflict of interest," *id.* ¶¶ 52, 62.

during the next volatility spike, due to the size of the XIV ETNs and the inadequate liquidity of the market, is merely speculative, and lacks "any of the factual allegations that are required to support such a conjecture." *See City of St. Clair Shores Police v. Nationstar Mortg. Holdings Inc.*, No. 15-61170-CIV, 2016 WL 4705718, *8 (S.D. Fla. June 21, 2016) (holding that plaintiffs failed to sufficiently allege under Section 11 that defendant knew, at the time of the offering, that it would suffer a loss in the future). Under Rule 9(b), plaintiffs must plead "the manner in which [the alleged statements] misled the plaintiffs." *See FindWhat*, 658 F.3d at 1296. Moreover, where, as here, allegations regarding misleading omissions are made "on information and belief," *see* doc. 45 ¶¶ 38, 66, the PSLRA requires, for Section 10(b)(5) claims, that "the complaint . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4. However, the Halberts fail to allege facts indicating what the alleged "liquidity issues" were, how or why the Defendants were aware of them, or how the Defendants knew that hedging in a market with "liquidity issues" and 16,275,000 outstanding XIV ETNs would inevitably cause the value of the XIV ETNs to plummet. And, to the extent that such information was public knowledge, "Defendants [did not] have a duty to include forecasts 'based on a range of historical VIX volatility[]' . . . [because] historical volatility data [and]

the volatility trends are publicly available . . . ." *See In re TVIX Securities Litigation*, 25 F. Supp. 3d 444, 451-52 (S.D.N.Y. 2014).[8]

Similarly, the Halberts' allegations that the Defendants knew Credit Suisse intended to profit off the collapse of the XIV ETNs are speculative at best. The allegations "appear[] to be based on a retrospective analysis"—i.e. that, because Credit Suisse engaged in "hedging activities" and the XIV ETNs collapsed, Credit Suisse must have intended, at the time it issued the Offering Documents, to depress the value of the XIV ETNs through hedging in order to declare an Acceleration Event. *See In re TVIX*, 25 F. Supp. 3d at 451-52. Such allegations that a defendant knew and should have disclosed that volatility-linked notes "would become worthless in two years," for example, are insufficient to sustain a claim, *see id*., and courts have rejected securities claims that were based on "a backward-looking assessment that interprets, in the context of later events, the statements that [p]laintiff has identified . . . as untrue or misleading at the time they were made," *see Belmont Holdings Corp. v. Sun Trust Banks, Inc.*, No. 1:09-cv-1185-WSD, 2010 WL 3545389, *6 (N.D. Ga. Sept. 10, 2010). In other words, the Halberts have not plausibly alleged that the Defendants knew that they would profit off the Halberts by hedging and accelerating the XIV ETNs during a volatility spike, and have failed

---

[8] *See also In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003) ("Section[] 11 . . . do[es] not require the disclosure of publicly available information . . .").

to plead a material omission based on a failure to disclose Credit Suisse's alleged

plan to profit off the collapse of the XIV ETNs.

Finally, as Credit Suisse contends, the claims fail also because the Offering

Documents disclosed Credit Suisse's anticipated hedging, conflicts of interest, and

potential acceleration.[9] Relying on *Dandong v. Pinnacle Performance Limited*, the

Halberts contend that these disclosures are "inadequate to . . . put the reasonable

investor on notice of the alleged fraud." *See* No. 1:10-cv-8086 (LBS), 2011 WL

---

[9] Among other things, the Offering Documents stated:

> Trading and other transactions by us[] . . . may impair the value of your ETNs. We
> expect to hedge our obligations relating to the ETNs . . . Any of these hedging
> activities may adversely affect the level of the applicable underlying Index —
> directly or indirectly . . . and therefore the market value of your ETNs and the
> amount we will pay on your ETNs . . . It is possible that we . . . could receive
> substantial returns with respect to these hedging activities while the value of your
> ETNs decline or become zero. Any profit in connection with such hedging activities
> will be in addition to any other compensation that [sic] and our affiliates receive for
> the sale of the ETNs, which may create an additional incentive to sell the ETNs to
> you. . . Any of these activities could adversely affect the level of the applicable
> underlying Index — directly or indirectly . . . . and, therefore, the market value of
> your ETNs and the amount we will pay on your ETNs . . . We may also issue . . .
> other ETNs or financial or derivative instruments with returns linked to changes in
> the level of the applicable underlying Index or the underlying futures or listed or
> over-the-counter options, futures contracts, swaps, or other derivative instruments
> . . . By introducing competing products into the marketplace in this manner, we . .
> . could adversely affect the market value of your ETNs and the amount we will pay
> on your ETNs . . .

Doc. 52-2 at 34. Also, the Offering Documents emphasized the risk of "significant losses," stating
that "[p]aying a premium purchase price over the indicative value of the ETNs could lead to
significant losses in the event . . . such ETNs are accelerated (including at our option, which we
have the discretion to do at any time) . . .," *id*. at 3, and warned of the likelihood of acceleration:

> If the price of the underlying futures contracts increases by more than 80% in a day,
> it is extremely likely that the Inverse ETNs will depreciate to an Intraday Indicative
> Value or Closing Indicative Value equal to or less than 20% of the prior day's
> Closing Indicative Value and will be subject to acceleration . . .

*Id*. at 38.

5170293, *13 (S.D.N.Y. Oct. 31, 2011). However, in *Dandong*, unlike here, the plaintiff-investors plausibly alleged a failure to disclose critical information: that the defendant-underwriters had restructured traditionally low-risk credit-linked notes into high-risk securities tied to synthetic credit default obligations. *See id.* at *11. By contrast, the Offering Documents here were transparent about the nature of Credit Suisse's hedging activities, the potential adverse consequences for investors, and the significant risks of acceleration and loss. "Defendants are not required to 'predict the precise manner in which risks will manifest themselves.'" *See TVIX Sec. Litig.*, 25 F. Supp. 3d at 457 (quoting *In re AES Corp. Sec. Litig.*, 825 F. Supp. 578, 588 (S.D.N.Y. 1993)). Accordingly, the disclosures rendered the statements at issue not misleading as a matter of law. *See In re BellSouth*, 355 F. Supp. 2d at 1365.[10]

### b. Alleged Misstatements and Omissions Concerning the Intraday Indicative Value

#### i. Whether Credit Suisse Can Be Held Liable for the Allegedly False Intraday Indicative Values

The Halberts also plead that the Defendants made alleged misrepresentations of the Intraday Indicative Value. Credit Suisse argues, as an initial matter, that it

---

[10] Consistent with these findings, in *Set Capital, et al. v. Credit Suisse Group AG, et al.*, a parallel class action arising out of the same events and alleging substantially similar claims, the Magistrate Judge recently issued a Report and Recommendation finding,

> [T]he Offering Documents accurately disclosed every risk that allegedly caused Plaintiffs' investment losses. Thus, their claims arising from misstatements and omissions in those documents—including the entirety of their Section 11 claims—should be dismissed.

No. 1:18-cv-2268-AT-SN (S.D.N.Y. Aug. 16, 2019), ECF No. 124 at 26 (citation omitted).

cannot be held liable for misrepresentations of the Intraday Indicative Value on February 5, 2018 because it did not "make" such statements, which it claims were made by Janus. Doc. 52 at 22. In support of this contention, Credit Suisse cites *Janus Capital Group v. First Derivative Traders*, where the Supreme Court held that, under Rule 10b-5,

> the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. . . . One who prepares and publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.

564 U.S. 135, 142-43 (2011). However, under *Janus*'s definition, there is a factual issue as to whether Credit Suisse, Janus, or both had "ultimate authority" over the alleged misrepresentations in this case. As the Defendants note, the Offering Documents state that "[Janus] or its affiliates are responsible for computing and disseminating the Closing Indicative Value and Intraday Indicative Value," which implies that Janus alone had "ultimate authority" over representations of the Intraday Indicative Value. Doc. 52-2 at 67. However, the Halberts point to additional language in the Offering Documents that appears to undermine this inference:

> Credit Suisse International ("CSI") . . . and [Janus Index & Calculation Services ("JIC")] will serve as the Calculation Agents. The Calculation Agents will, in their reasonable discretion, make all calculations and determinations regarding the value of the ETNs . . . CSI will have the sole ability to make determinations with respect to reduction of the Minimum Redemption Amount, certain Acceleration Events, and

calculation of default amounts. JIC will have the sole ability to calculate and disseminate the Closing Indicative Value, make determinations regarding an Index Business Day, and determinations of splits and reverse splits. All other determinations will be made by the Calculation Agents jointly.

Doc. 52-2 at 59. Based on this language and the Amended Complaint, and drawing all reasonable inferences in favor of the Halberts, it is plausible that both Janus and Credit Suisse held "ultimate authority" over publications of the Intraday Indicative Value and, therefore, that Credit Suisse was the "maker" of the alleged misrepresentations for purposes of Section 10(b) liability. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 3058563, at *9 (N.D. Cal. July 19, 2017) (finding plaintiff adequately alleged that two defendants "had 'ultimate authority' over [an] Offering Memorandum, because they were both able to and did control the content of the Memorandum.").

>    ii. *Whether the Intraday Indicative Values on February 5, 2018*
>        *Were Materially False and Misleading*[11]

The Halberts allege that the Intraday Indicative Values were representations

of the estimated "economic value" of the XIV ETNs, in light of the Offering

Documents' statements that the Intraday Indicative Value would provide an

"estimate" of the "economic value" of the XIV ETNs. *See* doc. 45 ¶¶ 20, 26, 61, 69;

52-2 at 7. The Defendants challenge this assertion, contending that the Halberts have

failed to sufficiently allege that the Intraday Indicative Values constituted "false or

misleading" statements because the Amended Complaint does not allege that the

Defendants calculated the Intraday Indicative Value in a manner "inconsistent with

either the formula disclosed by the Offering Documents, or the publicly available

VIX Futures Index, on which the Intraday Indicative Value was based." Doc. 52 at

23. However, drawing all reasonable inferences in favor of the Halberts, it is evident

that they allege that the Intraday Indicative Values were false and misleading

because they did not reflect the "actual" value of the XIV ETNs from 4:10 to 5:09

p.m., which was allegedly between $4.22 and $4.40, despite the Offering

---

[11] Notably, the Halberts allege, "on information and belief," that the Defendants "manipulated or failed to update" the Intraday Indicative Value "on occasions other than February 5, 2018." Doc. 45 ¶ 42. To the extent that the Halberts seek to state separate claims based on these "other occasions," they have failed to plead such claims with sufficient particularity under Federal Rule of Civil Procedure 9(b) and 15 U.S.C. § 78u-4. *See FindWhat*, 658 F.3d at 1296 (requiring that plaintiffs plead "precisely what statements or omissions were made" and when); 15 U.S.C. § 78u-4 ("[I]f an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.")

Documents' statements that the Intraday Indicative would "approximate" the "economic value" of the XIV ETNs. *See* doc. 45 ¶¶ 26, 61, 69; 52-2 at 7. Moreover, the Halberts also allege that the Intraday Indicative Values were false and misleading because they were "not updating every 15 seconds to 'apply[] real time prices of the relevant VIX futures contracts,'" despite the Offering Documents' statements the Intraday Indicative Value would be calculated "based on the most recent intraday level of [the underlying Index] at the particular time," which in turn would be "calculated in real time by S&P . . . applying real time prices of the relevant VIX futures contracts." Doc. 52-2 at 7, 40.[12] Thus, based on the pleadings, whether the Intraday Indicative Values on February 5, 2018 were false or misleading does not necessarily depend on their consistency with the disclosed formula or the VIX Futures Index.

Next, the Defendants appear to contend that the Intraday Indicative Values during the relevant period were not materially false or misleading because the Offering Documents stated that the "trading price of the ETNs in the secondary

---

[12] The Halberts contend in response that, if the S&P failed to update the VIX Futures Index, the Defendants had a duty to declare a "Market Disruption Event" pursuant to the Offering Documents. Doc. 57 at 16-17. However, although the Halberts allege that the Defendants failed to "take steps to warn investors or prevent the harm that arose from" the failure of the VIX Futures Index, *see* doc. 45 ¶ 27, they do not allege that the Defendants had a duty to declare a "Market Disruption Event," which is a specific condition defined in the Offering Documents, *see* doc. 52-2 at 57. Because "[a] party may not insert new claims and allegations by way of a brief in opposition to a motion to dismiss," the court does not consider this allegation in ruling on the present motion. *See Weakley*, 2017 WL 2929375 at *2.

market is not the same as the Indicative Value of the ETNs" and "may vary significantly from the Indicative Value of such ETNs . . . because the market value reflects supply and demand." *See* doc. 52 at 21 (quoting doc. 52-2 at 18). However, this contention, again, does not address the Halberts' allegations that the Intraday Indicative Values were inaccurate because they differed from the "actual" or "economic" value of the XIV ETNs, as opposed to the "trading price" of the XIV ETNs in the secondary market. *See* doc. 45 ¶¶ 21, 26. Furthermore, the Offering Documents appear to draw a distinction between the "economic" value of the XIV ETNs and their "trading price," stating:

> Investors can compare the trading price of the ETNs . . . against the Intraday Indicative Value to determine whether the ETNs are trading in the secondary market at a premium or a discount to the economic value of the ETNs at any given time.

Doc. 52-2 at 7 (emphasis omitted). Accordingly, what the "actual" or "economic" value of the XIV ETNs was during the relevant period is an issue that the court cannot resolve based solely on the pleadings.

Finally, the Defendants contend that "express warnings" in the Offering Documents show that the Intraday Indicative Values were not materially false or misleading statements. *See* doc. 52 at 24-25. Specifically, the Offering Documents stated that the Defendants do not "GUARANTEE[] THE ACCURACY AND/OR THE COMPLETENESS OF THE INDICES OR ANY DATA INCLUDED THEREIN OR ANY CALCULATIONS MADE WITH RESPECT TO THE

ETNS." Doc. 52-2 at 48 (capitalization in original). The Offering Documents also stated that "[p]ublished underlying Index levels from the Index Sponsor may occasionally be subject to delay or postponement[,]" and that "such delays or postponements will affect the current underlying Index level and therefore the Intraday Indicative Value of [the] ETNs." Doc. 52-2 at 49. However, whether the Offering Documents' warnings were sufficient to render the alleged inaccuracy of the Intraday Indicative Values on February 5, 2018 "immaterial" is an issue about which "reasonable minds . . . [could] differ," *see Oxford Asset Mgmt.*, 297 F.3d at 1189, especially in light of the Defendants' alleged failure to inform investors that the Intraday Indicative Values or the VIX Futures Index was not accurate during the alleged time period.

### iii. *Omissions in Offering Documents Concerning Intraday Indicative Value*

The Halberts allege also that "Credit Suisse's statements [in the Offering Documents] were false because it failed to disclose that the Intraday Indicative Value was not an accurate gauge of the XIV's economic value." Doc. 45 ¶ 21. As an initial matter, the Defendants contend that the Halberts cannot plead a Section 11 claim premised on the allegedly false Intraday Indicative Values because liability cannot attach to alleged misrepresentations that occurred after the Pricing Supplement (which contained the alleged misrepresentations) "became effective" on January 29, 2018. *See* docs. 52 at 22-23; 58 at 9-10; 15 U.S.C. § 77k(a). Indeed, liability can

33

attach under Section 11 for material misstatements or omissions only if the omitted "information existed at the time the [registration statement] became effective." *See Oxford Asset Mgmt.*, 297 F.3d at 1189; *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 673 (11th Cir. 2010) (finding that registration could not "misrepresent or omit" material information when it became effective "well before [the] alleged wrongdoing took place."). Here, in addition to allegedly false values on February 5, 2018, the Halberts allege, "on information and belief," that the Defendants "manipulated or failed to update the Intraday Indicative Value on occasions other than February 5, 2018." Doc. 45 ¶ 42. But, the court cannot reasonably infer from this allegation that the Intraday Indicative Values were, or had previously been, inaccurate on January 29, 2019, at the time that the Pricing Supplement became effective. And, because "[t]he securities laws do not require clairvoyance in the preparation of offering documents . . .," the alleged omission is not actionable under Section 11. *See Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008).

Furthermore, this claim also fails under Section 10(b) because it lacks sufficient particularity. The PSLRA requires plaintiffs alleging misstatements or omissions under Section 10(b) to "specify each statement alleged to have been misleading." 15 U.S.C. § 78u-4. The Halberts fail to quote or cite the precise statements that were rendered "false" by the alleged omission concerning the

Intraday Indicative Value, instead alleging, "The active XIV Pricing Supplement represented that Credit Suisse would publish an estimate of the current economic value of XIV notes every 15 seconds based on real time XIV futures prices." Doc. 45 ¶ 20. This contention is insufficient because Rule 10b-5(b) claims only concern omissions that are "necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading[.]" *See* 17 C.F.R. § 240.10b-5(b). Accordingly, the Halberts' Section 10(b) claim premised on this alleged omission fails.

### 4. Scienter under Section 10(b)

"[W]ith respect to each act or omission" alleged to violate Section 10(b), a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The relevant inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007). In this circuit, scienter under Section 10(b) and Rule 10b-5 requires a showing, "for each defendant with respect to each violation," of either an "intent to deceive, manipulate, or defraud," or "severe recklessness." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008). Moreover,

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even

> inexcusable negligence, but an extreme departure from the standards of
> ordinary care, and that present a danger of misleading buyers or sellers
> which is either known to the defendant or is so obvious that the
> defendant must have been aware of it.

*Id.* "While allegations of motive and opportunity may be relevant to a showing of severe recklessness, . . . such allegations, without more, are not sufficient to demonstrate the requisite scienter in [the Eleventh Circuit]." *Bryant v. Avado Brands*, 187 F.3d 1271, 1285-86 (11th Cir. 1999).

Furthermore, to plead corporate scienter, the complaint must adequately allege facts giving rise to a strong inference that "*somebody* responsible for the allegedly misleading statements must have known about the fraud." *Mizzaro*, 544 F.3d at 1238. Finally,

> [A] court must consider plausible, nonculpable explanations for the
> defendant's conduct, as well as inferences favoring the plaintiff. The
> inquiry is inherently comparative: How likely is it that one conclusion,
> as compared to others, follows from the underlying facts? . . . The
> inference that the defendant acted with scienter need not be
> irrefutable, *i.e.,* of the "smoking-gun" genre, or even the "most
> plausible of competing inferences[.]" . . . Yet the inference of scienter
> must be more than merely "reasonable" or "permissible"—it must be
> cogent and compelling, thus strong in light of other explanations. A
> complaint will survive, we hold, only if a reasonable person would
> deem the inference of scienter cogent and at least as compelling as any
> opposing inference one could draw from the facts alleged.

*Tellabs*, 551 U.S. at 323-24. Accordingly, the court follows a three-step process: "(1) it accepts as true all allegations in the complaint; (2) it considers the complaint holistically along with the other sources ordinarily examined in ruling on a Rule

12(b)(6) motion to dismiss; and (3) it considers plausible opposing inferences." *Damian v. Montgomery Cty. Bankshares, Inc.*, 981 F. Supp. 2d 1368, 1380–81 (N.D. Ga. 2013).

Drawing all reasonable inferences in favor of the Halberts, the Halberts allege three distinct Section 10(b) claims against each defendant: (1) misrepresentations in the Offering Documents concerning Credit Suisse's anticipated hedging, its plan to profit by collapsing and accelerating the XIV ETNs, and the accuracy of Intraday Indicative Values, in violation of Rule 10b-5(b);[13] (2) the allegedly false Intraday Indicative Values on February 5, 2018 in violation of Rule 10b-5(b); and (3) the Defendants' fraudulent scheme to manipulate the XIV ETNs' value by hedging and failing to update the Intraday Indicative Value in violation of Rule 10b-5(a) and (c). *See* doc. 45. As to these contentions, the Defendants generally contend that the Halberts have failed to plead scienter under Section 10(b). Therefore, although the Defendants do not separately address the Halberts' scheme liability/market manipulation claims under Rule 10b-5(a) and (c), *see* doc. 52,[14] the court will

---

[13] Although the court has already determined that the Halberts have failed to adequately allege misrepresentations in the Offering Documents, *see supra* III.A.3.a, b.iii, and therefore it need not analyze scienter for this claim, it will nevertheless analyze scienter with respect to this claim in the interest of completeness.

[14] The Defendants do contend that the Halberts have failed to show loss causation from the alleged "fraudulent scheme to artificially inflate and/or maintain the price of XIV" because the Offering Documents disclosed that Credit Suisse would hedge against the XIV ETNs. Doc. 52 at 33 (quoting doc. 45 ¶ 48). Thus, the Halberts were on notice that the Defendants moved to dismiss all their Section 10(b) claims.

consider whether the Halberts have alleged scienter for these claims. *See Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1206 n.10 (S.D. Fla. 2015) (finding that, although the defendants "did not specifically argue that the allegations of the Complaint do not state a plausible claim of scheme liability, they argued that the Complaint does not state a strong inference of scienter," and therefore, the court's findings on scienter applied to the scheme liability claims). Finally, because "all the claims arise from the same set of facts and allegations" and, therefore, an analysis of scienter for each claim requires consideration of the same aggregate of allegations, *see Sharette v. Credit Suisse Intern.*, 127 F. Supp. 3d 60, 93 (S.D.N.Y. 2015), the court will analyze scienter for the three Section 10(b) claims collectively against each defendant. *See id*.

### a. Credit Suisse

The Halberts attempt to plead scienter for their Section 10(b) claims against Credit Suisse by alleging, in part: (1) Credit Suisse had the motive and opportunity to profit by hedging against the XIV ETNs in order to cause an Acceleration Event, and ultimately did profit by doing so, *id*. ¶¶ 15, 17, 22, 24, 34, 35, 38, 41, 43; (2) Credit Suisse knew that a volatility spike was imminent, and that hedging would cause the XIV ETNs to crash due to insufficient market liquidity and the large number of outstanding XIV ETNs, *id*. ¶¶ 17, 62; (3) Credit Suisse knew or should have known the Intraday Indicative Values did not reflect the actual value of the

XIV ETNs for approximately one hour on February 5, 2018, which made an Acceleration Event more likely, *id*. ¶¶ 26-27, 41.

### i. *Motive and Opportunity*

The Halberts' multiple factual assertions indicate that Credit Suisse had both a motive and opportunity to make misrepresentations in the Offering Documents. The Halberts allege that: (1) the consistently increasing trading price of XIV ETNs during the year before February 5, 2018 had attracted unsophisticated customers, *id*. ¶ 24; (2) that Credit Suisse sold 16 million XIV ETNs days before a massive volatility spike, *id*. ¶ 17; (3) that Credit Suisse collected a daily investor fee on these ETNs that generated "millions of dollars" for Credit Suisse every year, *id*. ¶ 15; (4) by February 5, 2018, the outstanding value of the XIV ETNs was approximately $1.9 billion, presenting a large liability to Credit Suisse, *id*. ¶ 22; (5) hedging against the XIV ETNs, thereby causing the XIV ETNs to crash, was cheaper than redeeming the full price notes, *see id*. ¶ 35; (6) Credit Suisse profited by accelerating the XIV ETNs, at its discretion, *id.* ¶ 34; (7) Credit Suisse suffered no trading losses in the XIV ETNs from the events of February 5, 2018, *id*. ¶¶ 41, 43. These allegations, taken collectively, indicate that Credit Suisse had a motive and the opportunity to use hedging to cause the XIV ETNs to crash, and to profit by accelerating the XIV ETNs.  However, evidence of motive and opportunity alone is not sufficient to establish scienter. *See Bryant*, 187 F.3d at 1285-86. The court must also consider

whether the Halberts have alleged sufficient circumstantial evidence to establish "a strong inference of scienter." *See id*.

         ii.    *Knowledge Concerning Market Conditions and the Effects of Hedging*

A review of the Amended Complaint shows that the Halberts' allegations concerning Credit Suisse's knowledge of market volatility and the effects of hedging are either ambiguous or unsupported by particularized factual allegations. For instance, the Halberts allege that Credit Suisse knew, at the time of the January 29, 2018 offering, that a volatility spike was imminent. *See* doc. 45 ¶ 17. However, the sole alleged basis for this knowledge is the occurrence of a volatility spike a year and a half before the February 5, 2018 spike, which falls short of establishing that Credit Suisse knew that a volatility spike was imminent. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.").[15] Additionally, the Halberts plead that Credit Suisse knew that hedging during the volatility spike on February 5, 2018 would cause the XIV ETNs to collapse because

---

[15] Similarly, in *Set Capital*, where the plaintiffs alleged that "it was a statistical certainty that the VIX and VIX futures would spike," Magistrate Judge Netburn noted, "That allegation . . . defies economic reason; for a market as large and liquid as the S&P 500, no market movements are certain." *Set Capital*, No. 1:18-cv-2268-AT-SN (S.D.N.Y. Aug. 16, 2019) (citing *Strougo v. Barclays PLC*, 312 F.R.D. 307, 317-18 (S.D.N.Y. 2016) ("In an efficient market, stock returns follow what is known as a 'random walk,' meaning that investors cannot use past stock price movements to predict the next day's stock price movement." (citation omitted)).

of poor market liquidity but, again, fail to allege how any Credit Suisse representative "responsible for the allegedly misleading statements must have known about the fraud," or why poor liquidity would render the collapse inevitable. *See Mizzaro*, 544 F.3d at 1238; doc. ¶ 36, 40. Such "omissions and ambiguities count against inferring scienter." *Tellabs*, 551 US at 326.

### iii.   *Failure of the Intraday Indicative Values on February 5, 2018*

The Halberts also contend that Credit Suisse's failure to update the Intraday Indicative Value on February 5, 2018 "at the exact time [Credit Suisse] started hedging" provides circumstantial evidence of scienter. Doc. 57 at 13 (citing doc. 45 ¶¶ 26-27). But, the Halberts again rely on conclusory allegations that Credit Suisse (and Janus) "knew, or should have known," that the economic value of the XIV ETNs differed during the alleged period on February 5, 2018, and that the VIX Futures Index "was not updating every 15 seconds to 'apply[] real time prices of the relevant VIX futures contracts." Doc. 45 ¶¶ 26, 27. Although the Halberts allege that Janus was responsible for calculating the Intraday Indicative Value, *id.* ¶ 14, and Credit Suisse was responsible for publishing it, *id.* ¶ 13, they do not allege how Credit Suisse would have known that the VIX Futures Index had stopped "applying real time prices of the relevant VIX futures contracts," *see id.* ¶ 27. "[I]t is not enough to make conclusory allegations that the Defendants had access to the 'true facts' in order to demonstrate scienter, particularly where the complaint fails to allege 'which

defendant knew what, how they knew it, or when.'" *In re Coca-Cola Enterprises Inc. Sec. Litig.*, 510 F. Supp. 2d 1187, 1201 (N.D. Ga. 2007) (citation omitted). Moreover, although the Halberts allege that if the Intraday Indicative Value had been updated during the alleged time period, a liquidation event "likely would not have occurred because the closing indicative value would have only been 77% of the previous days' [sic] value," they also fail to allege any facts explaining or supporting this allegation. *See* doc. 45 ¶ 41. Thus, the Halberts' conclusory allegations concerning the failure of the Intraday Indicative Value on February 5, 2018 do not permit a strong inference that Credit Suisse intended to deceive the Halberts or was severely reckless by failing to update the Intraday Indicative Value.

### iv.   *Comparison to Plausible Nonculpable Inferences*

The Halberts' allegations also give rise to plausible nonculpable inferences that are more compelling: (1) that Credit Suisse merely reacted to market-wide volatility on February 5, 2018 by engaging in the hedging activities disclosed in the Offering Documents, without intending to crash the XIV ETNs or otherwise manipulate their value, and (2) that any inaccuracy of the Intraday Indicative Values on February 5, 2018 was due to a nonobvious failure of the VIX Futures Index, of which Credit Suisse was not aware. *See* doc. 52-2 at 23, 60; *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 120 (S.D.N.Y. 2018) (rejecting inference of scienter where counterclaim defendants' "shorting" of stock plausibly

"represented legitimate hedging against [their] very large long position"). Moreover, that Credit Suisse explicitly warned investors of the risk that its hedging could adversely affect the value of the XIV ETNs further undermines the inference of scienter. Ultimately, the court cannot conclude that the inference of scienter is as "cogent and at least as compelling as [the] opposing inferences one could draw from the facts alleged." *Tellabs*, 551 U.S. at 323-24.

### b. Janus

With respect to Janus, the Halberts allege: (1) that Janus was responsible for calculating and disseminating the Intraday Indicative Values, doc. ¶ 14; (2) that Janus knew or should have known that VIX Futures Index was not updating every 15 seconds during the relevant period on February 5, 2018, but failed to alert investors to this fact, *id*. ¶ 27; (3) on information and belief, that Janus had manipulated or failed to update the Intraday Indicative Value on other occasions, *id*. ¶ 42; (4) that Janus "knew or recklessly disregarded" that such values were materially inflated, "false and misleading," *id*. ¶ 61; (5) that Janus knew the allegedly false values would be disseminated to the investing public, *id*.; and (6) that Janus and Credit Suisse executed a "fraudulent scheme to artificially inflate and/or maintain the price of XIV," *id*. ¶ 48. These allegations fall short of implying scienter.

       *i.*   *Motive, Opportunity, and Knowledge*

The Halberts make no allegations suggesting that Janus, like Credit Suisse, purportedly had a motive to defraud investors. *See* doc. 45. For instance, the Halberts have not alleged that Janus, like Credit Suisse, stood to profit from the collapse and acceleration of the XIV ETNs, or that it shared in the profits allegedly earned by Credit Suisse from its hedging and acceleration of the XIV ETNs. And, the Halberts fail to even allege that Janus knew that there was poor market liquidity, that a volatility spike was imminent, or that Credit Suisse's hedging would cause the XIV ETNs to crash. *Cf.* doc. 45 ¶¶ 40, 62 (making these allegations about Credit Suisse). Nor do the Halberts even allege that Janus was aware that Credit Suisse "planned to profit and collapse the XIV through its hedging activities." *See id.* ¶ 62. Put simply, the allegations concerning Janus' alleged misrepresentations fall short because the Halberts fail to allege "what [Janus] obtained as a consequence of the [alleged] fraud." *See FindWhat*, 658 F.3d at 1296 (citations omitted).

       *ii.*   *Failure of the Intraday Indicative Values on February 5, 2018*

While it is plausible, given Janus' role as a "Calculation Agent," that Janus employees may have known that the VIX Futures Index had stopped updating, the absence of any other factual allegations suggesting that Janus employees possessed such knowledge weakens this inference. The Halberts do not allege how Janus employees knew or should have known that, at 4:10 p.m., Credit Suisse had begun

to trade heavily in VIX futures contracts, thereby allegedly causing a drop in the "actual" value of XIV ETNs. *See* doc. 45 ¶ 38. And, the Halberts have not alleged that Janus calculated or controlled the VIX Futures Index, so it is unclear how Janus would have known that it had failed to "apply[] real time VIX futures prices." *See id*. ¶ 27. Moreover, the Halberts have not alleged facts indicating that this failure presented "a danger of misleading buyers or sellers that . . . [was] so obvious that the defendant must have been aware of it." *See Mizzaro*, 544 F.3d at 1238. To put it plainly, "[c]onclusory allegations that do no more than state that [defendant] 'would have known,' 'knew and ignored' or 'recklessly failed to know' are insufficient to state a claim under PSLRA or Rule 9(b)." *In re Recoton Corp. Securities Litigation*, 358 F. Supp. 2d 1130, 1147 (M.D. Fla. 2005).

ii.   *Comparison to Plausible Nonculpable Inferences*

Finally, the Halberts allegations against Janus give rise to more compelling, non-culpable inferences: (1) that, assuming that Credit Suisse intended to cause the XIV ETNs to collapse by hedging against them, Janus employees were not aware of this activity; and (2) that Janus employees were not aware the VIX Futures Index was not accurately incorporating the prices of VIX futures contracts for the one-hour period on February 5, 2018, and so unknowingly calculated and disseminated a misleading Intraday Indicative Value. In light of these competing inferences, the court cannot conclude that the Halberts have stated "with particularity facts giving

rise to a strong inference that [Janus] acted" with the "intent to deceive, manipulate, or defraud," or with "severe recklessness." *See* 15 U.S.C. § 78u-4(b)(2).

5. Summary

To close, while the Halberts have adequately pleaded false or misleading statements against the Defendants premised on the Intraday Indicative Values on February 5, 2018, they failed to adequately allege material omissions in the Offering Documents and scienter for any of their claims under Section 10(b) of the Exchange Act. In particular, the Halberts' allegations do not give rise to "a strong inference of scienter" against either Credit Suisse or Janus for their misrepresentation claims under Rule 10b-5(b) or their market manipulation claims under Rule 10b-5(a) and (c). And, the Halberts have failed to adequately plead violations of Section 11 of the Securities Act based on the alleged misrepresentations in the Offering Documents. Therefore, the Defendants' motion is due to be granted as to the federal securities law claims.

**B. Alabama Blue Sky Law**

The Defendants contend that the Halberts also fail to plead a valid claim against Credit Suisse under the Alabama Blue Sky Law, Alabama Code § 8-6-19. The Halberts allege that Credit Suisse violated Section 8-6-19(a)(2) based on the alleged omissions in the Offering Documents and the allegedly false Intraday

Indicative Values. *See* doc 45 ¶¶ 68.[16] Alternatively, the Halberts allege that Credit Suisse violated Section 8-6-19(c) by "materially aid[ing] the unlawful sale of a security within the meaning of Alabama's Blue Sky Law." *Id*. ¶ 71.

1. Alabama Code § 8-6-19(a)(2)

To plead a violation of Section 8-6-19(a)(2), a plaintiff must plausibly allege "(1) a sale or an offer to sell a security (2) by means of a false statement or omission (3) of material fact and (4) the ignorance of the buyer as to the untruth or omission." *Blackmon v. Nexity Fin. Corp.*, 953 So. 2d 1180, 1191 (Ala. 2006).[17] Section 8-6-19 is a "strict liability" statute: "[t]here need be no showing of 'reckless disregard' for the truth of a representation or that such representations were 'knowingly' made." *Banton v. Hackney*, 557 So. 2d 807, 826 (Ala. 1989). However, "the seller of the

---

[16] The Defendants assert for the first time in their reply brief that the Halberts lack standing to allege Blue Sky Law violations premised on the allegedly false Intraday Indicative Values on February 5, 2018, because Alabama law has "expressed disapproval for claims premised on 'holder' liability." *See* doc. 58 at 8. "District courts, including this one, ordinarily do not consider arguments raised for the first time on reply." *See Pennsylvania Nat. Mut. Cas. Ins. Co. v. J.F. Morgan Gen. Contractors, Inc.*, 79 F. Supp. 3d 1245, 1256 (N.D. Ala. 2015) (quoting parenthetically *White v. ThyssenKrupp Steel, USA, LLC*, 743 F. Supp. 2d 1340, 1357 (S.D. Ala. 2010)). Moreover, even if the court were to consider this contention, the Defendants have not cited any case, and the court is not aware of any authority, applying the *Blue Chip Stamps* rule under Alabama Code § 8-6-19(a)(2). *See* doc. 58 at 8.

[17] Ala. Code § 8-6-19(a)(2) states, in part: "(a) [a]ny person who: . . . (2) [s]ells or offers to sell a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not could not have known of the untruth of omission[.]" Ala. Code § 8-6-19(a)(2) (1975).

security in question may have a defense of 'due care,' i.e., that he did not know and in the exercise of reasonable care could not have known of the alleged false representations of material fact. . . . The defendant's state of mind is not otherwise relevant." *Id.* at 826-827. Finally, where, as here, a claim under this provision is premised on fraudulent misrepresentations, the claim "must be pleaded with particularity under Rule [9](b)" of the Alabama Rules of Civil Procedure, which is virtually identical to Federal Rule of Civil Procedure 9(b). *See DGB, LLC v. Hinds*, 55 So. 3d 218, 232 (Ala. 2010).

Credit Suisse contends that, because the alleged misrepresentations are not actionable under Section 11 of the Securities Act or Section 10(b) of the Exchange Act, the Halberts cannot state a claim under § 8-6-19(a)(2). *See* doc. 52 at 34. Indeed, in applying Section 8-6-19, the Alabama Supreme Court has relied on federal securities law, explaining:

> [S]ince there are few Alabama cases construing the Alabama securities laws, federal cases should be reviewed to aid in the proper interpretation of the corresponding sections of Alabama statutory law inasmuch as the sections are virtually identical.

*See Altrust Fin. Servs., Inc. v. Adams*, 76 So. 3d 228, 236 (Ala. 2011) (quoting *Buffo v. State*, 415 So. 2d 1158, 1161-62 (Ala. 1982)). Moreover, in applying Section 8-6-19(a)(2), the Alabama Supreme Court has explicitly relied on the same standard for materially misleading statements or omissions under Sections 12(a)(2) and 11 of the Securities Act, and Section 10(b) of the Exchange Act. *See Blackmon v. Nexity Fin.*

*Corp.*, 953 So. 2d 1180, 1191 (Ala. 2006) (applying the standard for a materially misleading statement under §§ 12(a)(2), 10(b), and 11). Accordingly, because the same standards for determining materially misleading statements or omissions are applicable under both federal securities law and Section 8-6-19(a)(2), the court finds that the Halberts fail to plead materially misleading statements and omissions relating to Credit Suisse's hedging and the alleged scheme under Section 8-6-19(a)(2) for the same reasons it fails to plead such misrepresentations under Section 11 of the Securities Act and Section 10(b) of the Exchange Act. *See supra* III.A.3.a, b.iii. Therefore, the court will not repeat its analysis here.

On the other hand, with respect to the alleged misrepresentations of the Intraday Indicative Values on February 5, 2018, the court finds that the Halberts have adequately alleged materially misleading or false statements. *See supra* III.A.3.b.ii. The Halberts may maintain this claim against Credit Suisse because it sold the XIV ETNs to the Halberts, and Section 8-6-19(a)(2) "extends liability to one who 'sells or offers to sell' a security." *See Foster v. Jesup and Lamont Securities Co., Inc.*, 482 So. 2d 1201, 1204 (Ala. 1986). And, because Section 8-6-19(a)(2) is a strict liability statute, the Halberts' failure to allege scienter under Section 10(b) does not defeat their claims. *See Banton*, 557 So. 2d at 826. Therefore, as to the Section 8-6-19(a)(2) claim premised on the alleged misrepresentation of Intraday Indicative Values, the motion to dismiss is due to be denied.

49

2.  Alabama Code § 8-6-19(c)

The Halberts also allege, in the alternative, that Credit Suisse violated Section 8-6-19(c) by "materially aid[ing] in the unlawful sale of a security." Doc. 45 ¶ 71. Section 8-16-19(c) imposes secondary liability on certain persons who "materially aid[] in the conduct giving rise to . . . liability" under subsection (a) or (b).[18] As discussed, the Halberts have adequately alleged a violation of Section 8-16-19(a)(2) based on the allegedly false Intraday Indicative Values, and, therefore, have alleged a predicate violation under Section 8-6-19(c). Moreover, the Defendants offer no argument as to why the Halberts' allegations are insufficient to plead that Credit Suisse "materially aid[ed] in the conduct giving rise to . . . liability" under Section 8-6-19(a)(2). *See* doc. 52 at 34. Thus, the motion to dismiss the 8-6-19(c) claim also fails.

---

[18] Section 8-6-19(c) states,

(c) Every person who directly or indirectly controls a person liable under subsections (a) or (b) of this section, including every partner, officer, or director of such a person, every person occupying a similar status or performing similar functions, every employee of such a person who materially aids in the conduct giving rise to the liability, and every dealer or agent who materially aids in such conduct is also liable jointly and severally with and to the same extent as the person liable under subsection (a) or (b), unless he is able to sustain the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

Ala. Code § 8-6-19(c).

## C. **State Common Law Claims**

The Halberts plead that Credit Suisse's alleged failure to update the Intraday Indicative Value was a breach of contract, and that the Defendants' failure to update the Intraday Indicative Value also gives rise to claims for negligence, wantonness, negligent misrepresentation, fraudulent misrepresentation, and fraudulent suppression.

### a. Breach of Contract

As an initial matter, the court must determine whether the Halberts are correct that the Offering Documents constitute "a binding contract between Credit Suisse and the Halberts who purchased the XIV." Doc 45 ¶ 81. "The basic elements of a contract are an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement." *See Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 673 (Ala. 2001). The Halberts, however, do not identify what they believe were the offer and acceptance in this case. Assuming the Offering Documents constituted the purported "offer" and the Halberts purchase of the XIV ETNs constituted the purported "acceptance," the contract formed would be a unilateral one in which "one party makes an offer (or promise) which invites performance by another, and performance constitutes both acceptance of that offer and consideration." *SouthTrust Bank v. Williams*, 775 So. 2d 184, 188 (Ala. 2000) (citation omitted).

Credit Suisse contends, first, that the Offering Documents do not constitute a valid contract because "public disclosures made pursuant to the federal securities laws are made to an undefined and potentially unlimited class of investors and not a 'limited group.'" *See* doc. 58 at 18 (quoting *Wallace v. Systems & Computer Technology Corp.*, No. Civ. A. 95-CV-6303, 1997 WL 602808, *23 (E.D. Pa. Sept. 23, 1997) (rejecting plaintiff-investors negligent misrepresentation claim)). To the extent Credit Suisse contends that an SEC-mandated registration statement or prospectus cannot reflect the terms of a contract, although the court is not aware of any Alabama court that has addressed this issue, federal courts have found that "SEC filings themselves [can] reflect contractual obligations[.]"[19]

Also, the Offering Documents—specifically, the Pricing Supplement on January 29, 2019—reasonably constitute an offer to potential purchasers of ETNs, a group limited by the number of ETNs issued. *See Walker v. Walker*, 144 So. 3d 359, 364 (Ala. Civ. App. 2013) ("Under Alabama law, 'whether parties have entered a contract is determined by reference to the reasonable meaning of the parties' external

---

[19] *See Northstar Fin. Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1054 (9th Cir. 2015), *as amended on denial of reh'g and reh'g en banc* (Apr. 28, 2015) (finding that the mailing of a proxy statement, annual representations, and adoption of investment policies by mutual fund formed a contract between shareholders on one hand and mutual fund and trust on the other, and that plaintiffs had adequately plead breach of contract); *Lapidus v. Hecht*, 232 F.3d 679, 683 (9th Cir. 2000) (finding plaintiffs could bring direct statutory action against investment trust and advisors for alleged violations of contractual rights as shareholders, which were "spelled out in the registration statement [and prospectus] filed with the SEC.").

and objective actions.'"). The Pricing Supplement states, "We are offering six separate series of exchange traded notes," doc. 52-2 at 2, lists the number of ETNs issued and their principal amount, *see id*. at 2-3, and explains, "This pricing supplement, together with [the prospectus and prospectus supplement], contains the terms of the ETNs of any series[.]" *Id*. at 9. By purchasing the XIV ETNs, the Halberts manifested acceptance to the terms of the offer contained in the Pricing Supplement. *See Cook's Pest Control, Inc. v. Rebar*, 852 So. 2d 730, 738 (Ala. 2002) ("Conduct of one party to a contract from which the other may reasonably draw an inference of assent to an agreement is effective as acceptance." (citation omitted)). Thus, Credit Suisse has failed to show that the Offering Documents did not constitute the terms of a binding contract between it and the Halberts.

Next, relying on *Givianpour v. Citizens Trust Bank*, Credit Suisse seems to contend that the Halberts have not alleged any breach of a contractual duty because the Offering Documents gave the Defendants discretion over whether to update the Intraday Indicative Value. *See* No. 2:12-cv-00325, 2013 WL 839922, *4 (N.D. Ala. Mar. 6, 2013) (rejecting breach claim based on the defendants' foreclosure of properties "en masse" because the contract "granted the defendant the discretion to sell the properties en masse"). Indeed, a promise to perform "under conditions [the promisor] alone controls, would be illusory and would not constitute consideration for [the other party's] counter-promise." *Childersburg Bancorporation, Inc. v.*

*Peoples State Bank of Commerce*, 962 So. 2d 248, 260 (Ala. Civ. App. 2006). Notably, the Offering Documents state that the Defendants, as "Calculation Agents," "will, *in their reasonable discretion*, make all calculations and determinations regarding the value of the ETNs[.]" Doc. 52-2 at 59 (emphasis added). And, the Offering Documents reserve the decision of entering a "Market Disruption Event," thereby allowing the Defendants to suspend calculation of the Intraday Indicative Values, to "the determination of the Calculation Agents . . . ." *Id.* at 57. However, the Offering Documents also exclude certain events from the definition of "Market Disruption Event," thereby cabining the Defendants' discretion. *See* doc. 52-2 at 57. When faced "[w]ith a choice between a valid construction and an invalid construction, the court has a duty to accept the construction that will uphold, rather than destroy, the contract." *Voyager Life Ins. Co. v. Whitson*, 703 So. 2d 944, 948 (Ala. 1997). Therefore, the court finds that the Halberts have sufficiently plead mutuality of obligation and the existence of a contractual duty to calculate and disseminate the Intraday Indicative Value.

For these reasons, the motion to dismiss the breach of contract claim is due to be denied.

### b. Negligence and Wantonness

The Halberts allege negligence and wantonness claims against Credit Suisse and Janus based on their alleged failure to update the Intraday Indicative Value on

February 5, 2018. *See* doc. 45 ¶¶ 73-78. The Alabama Supreme Court has explained

that, "under certain circumstances, for the breach of a contract there may be available

either an action of assumpsit or [an action] in tort." *Ex parte Certain Underwriters*

*at Lloyd's of London*, 815 So. 2d 558, 562–63 (Ala. 2001). The Court explained:

> [I]f there is [a] failure or refusal to perform a promise the action is in
> contract; if there is a negligent performance of a contractual duty or the
> negligent breach of a duty implied by law, such duty being not
> expressed in the contract, but arising by implication of law from the
> relation of the parties created by the contract, the action may be either
> in contract or [in] tort. In the latter instance, whether the action declared
> is in tort or [in] contract must be determined from the gist or gravamen
> of the complaint. Basically, the line of division between [an action in
> contract and an action in] tort in such instances is [the line between]
> nonfeasance and misfeasance. If there is a defective performance there
> is a breach of contract and [there may also be] a tort.

*Id*. (alterations in original) (quoting *Hamner v. Omaha Ins. Co.*, 270 So. 2d 87, 90-

91 (Ala. Civ. App. 1972)). Thus, even "[a] negligent *failure* to perform a contract

express or implied . . . is . . . a breach of the contract." *Vines v. Crescent Transit Co.*,

85 So. 2d 436, 439-40 (1955) (citation omitted). However, federal courts sitting in

Alabama, including this one, "have consistently concluded that when the duty

allegedly breached is the duty created by the contract itself as opposed to the general

duty of care owed to everyone, the court must treat the claim as a breach of contract

and not as a tort." *Citizens Bank & Tr. v. LPS Nat. Flood, LLC*, 51 F. Supp. 3d 1157,

1170 (N.D. Ala. 2014) (collecting cases).

Here, the Halberts allege a contractual breach based on Credit Suisse's "fail[ure] to perform [its obligations under the Offering Documents] when it did not keep up the Intraday Indicative Value as promised." Doc. 45 ¶ 81. Basically, drawing all reasonable inferences in their favor, the Halberts allege that Credit Suisse breached the Offering Documents by failing to calculate the Intraday Indicative Value every 15 seconds based on a VIX Futures Index that incorporated "real time prices of the relevant VIX futures contracts." *See* doc. 45 ¶¶ 20, 26-27. Relatedly, with respect to their negligence and wantonness claims, the Halberts allege also that Credit Suisse breached its duty "to regularly update the Intraday Indicative Value." Doc. 45 ¶¶ 75, 78. However, the Halberts have failed to identify any source of this duty other than the Offering Documents. *See* doc. 52 at 35; 57 at 17-18. Thus, because "the duties and breaches alleged by [the Halberts] . . . would not exist but for the contractual relationship between the parties[,] . . . the proper avenue for seeking redress . . . is a breach of contract claim, not a wantonness [or negligence] claim." *See U.S. Bank Nat'l Ass'n v. Shepherd*, 202 So. 3d 302, 314 (Ala. 2015). Accordingly, the negligence and wantonness claims against Credit Suisse fail. *See Water Works Bd. of City of Birmingham v. Ambac Fin. Grp., Inc.*, 534 F. App'x 817, 821 (11th Cir. 2013) (dismissing negligence claim under Alabama law because "the only possible source for [the alleged] duty would be in the contract").

Similarly, the Halberts allege that Janus breached its duty to "regularly update the Intraday Indicative Value." Doc. 45 ¶¶ 75, 78. The Halberts fail to identify any source of this duty other than the Offering Documents. *See id*. However, they do not allege that Janus had a contractual obligation to update the Intraday Indicative Value. *See* doc. 45 ¶¶ 80-81. Therefore, because Alabama law does not impose an independent duty on Janus to "regularly update" the Intraday Indicative Value, the negligence and wantonness claims against Janus also fail.

### c. Misrepresentation and Suppression Claims

The Halberts allege negligent and fraudulent misrepresentation claims, and fraudulent suppression claims, against Credit Suisse and Janus. To establish a prima facie case of fraudulent or negligent misrepresentation, a plaintiff must show: (1) that the representation was false, (2) that it concerned a material fact, (3) that the plaintiff reasonably relied on the false representation, and (4) that actual injury resulted from that reliance. *Boswell v. Liberty Nat'l Life Ins. Co.*, 643 So. 2d 580, 581 (Ala. 1994) (stating the elements for fraudulent misrepresentation); *Dodd v. Nelda Stephenson Chevrolet, Inc.*, 626 So. 2d 1288, 1291 (Ala. 1993) (stating the same elements for innocent misrepresentation); *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997) (holding misrepresentation claims require a showing of

"reasonable reliance").[20] A fraudulent suppression claim requires "(1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement by the plaintiff to act; (4) action by the plaintiff to his or her injury." *Aliant Bank, a Division of USAmeribank v. Four Star Investments, Inc.*, 244 So. 3d 896, 930 (Ala. 2017). Moreover, "a cause of action for fraud is made out both where a misrepresentation is made willfully to deceive and where made by mistake and innocently." *Stinson v. Adams*, 376 So. 2d 1108, 1111 (Ala. Civ. App. 1979) (citing Alabama Code § 6-5-101). The Halberts' misrepresentation claims are based on both the allegedly false Intraday Indicative Values on February 5, 2018, and the alleged omissions in the Offering Documents. *See* doc. 45 ¶¶ 82-88. Additionally, the Halberts allege fraudulent suppression based on Credit Suisse's failure to disclose its hedging activities and purported intent to cause an acceleration event, and because it failed to disclose that the Intraday Indicative Value was inaccurate. *See id*. ¶¶ 21, 90.

---

[20] Notably, for negligent misrepresentations relied upon by third parties not in privity of contract with the person making the misrepresentation, *i.e.* Janus, the plaintiffs must satisfy the Restatement (Second) of Torts § 552, by showing, in part, that Janus "fail[ed] to exercise reasonable care or competence in obtaining or communicating the information." Restatement (Second) of Torts § 552 (1977).

i.    *Misrepresentations of Intraday Indicative Values on February 5, 2018*

"[T]o assert a fraud claim that stems from the same . . . general facts as one's breach-of-contract claim, the fraud claim must be based on representations independent from the promises in the contract and must independently satisfy the elements of fraud." *Hunt Petroleum Corp. v. State*, 901 So. 2d 1, 10–11 (Ala. 2004) (Houston, J., concurring). Here, Credit Suisse's alleged misrepresentations concerning the Intraday Indicative Values on February 5, 2018, *see* doc. 45 ¶¶ 84, 90, are not "independent of the promises in the contract" that were allegedly breached. *See Hunt*, 901 So. 2d at 10-11. The Halberts allege that the Intraday Indicative Values were materially false and misleading on February 5, 2018 because they did not reflect the "economic value" of the XIV ETNs during the alleged time period. *See* doc. 45 ¶¶ 84, 26. These misrepresentations were allegedly a result of Credit Suisse's breach of its contractual duty to calculate and disseminate, or "update," the Intraday Indicative Value. *See id.* ¶¶ 84, 81. Accordingly, the alleged misrepresentation claims against Credit Suisse that are premised on the Intraday Indicative Values are duplicative and, consequently, fail.

However, these same claims premised on the Intraday Indicative Values against Janus are not duplicative because, again, Janus was allegedly not a party to the contract. Moreover, as discussed *supra* III.A.3.b.ii, the Halberts have adequately alleged that the Intraday Indicative Values from 4:10 p.m. to 5:09 p.m. were

materially misleading or false, and that Janus purportedly failed to exercise reasonable care. Under Alabama law, "[a] 'material fact' [is] any fact which is likely to induce reliance on the part of the injured party, and the materiality of a particular fact is a jury question." *Soniat v. Johnson-Rast & Hays*, 626 So. 2d 1256, 1259 (Ala. 1993), *holding modified by Ex parte Farmers Exch. Bank*, 783 So. 2d 24 (Ala. 2000). That (a) the VIX Futures Index stopped "updating" from 4:10 to 5:09 p.m. on February 5, 2018, and (b) the "actual" value of the XIV ETNs during this period were substantially lower than the disseminated Intraday Indicative Value are alleged facts which could have plausibly induced the Halberts to sell their XIV ETNs or not to buy additional XIV ETNs. *See* doc. 45 ¶¶ 26, 46. Therefore, as to Janus, the motion to dismiss this claim is due to be denied.

### ii.    *Omissions and Nondisclosures in the Offering Documents*

The Halberts also allege that the Defendants made misrepresentations based on "the false statements in the registration statement," *see* doc. 45 ¶ 84, and failed to disclose facts concerning Credit Suisse's hedging activities and "its intent to cause an acceleration event," *id*. ¶ 90. Although these alleged omissions were contained in the Offering Documents, they are not the basis for the Halberts' breach of contract claim, *see id*. ¶ 80, and, thus, are not duplicative of their contract breach claims against Credit Suisse. *See Hunt*, 901 So. 2d at 10-11. Nevertheless, the Defendants

60

contend that these misrepresentation claims must fail because the Halberts have not alleged that either Defendant had a duty to disclose.

Where plaintiffs allege material omissions or concealment, "[a]n essential element of fraudulent-misrepresentation and fraudulent-suppression claims is a duty to disclose." *See Nesbitt v. Frederick*, 941 So. 2d 950, 955 (Ala. 2006) (citation omitted). "A duty to communicate can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information, but mere silence in the absence of a duty to disclose is not fraudulent." *Flying J Fish Farm v. Peoples Bank of Greensboro*, 12 So. 3d 1185, 1192 (Ala. 2008) (citations omitted). Courts consider the following factors in assessing whether alleged circumstances create a duty of disclosure: "(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances." *Bethel v. Thorn*, 757 So. 2d 1154, 1162 (Ala. 1999) (citations omitted). However, even "[a] defendant who has no duty to disclose arising from his relationship with the plaintiff may nevertheless be liable for fraudulent concealment if he knowingly takes action to conceal a material fact that has been requested of him by the plaintiff and does so with the intent to deceive or mislead the plaintiff." *Ex parte Farmers Exch. Bank*, 783 So. 2d 24, 28 (Ala. 2000).

Credit Suisse did not have a confidential or fiduciary relationship with the Halberts. Rather, the relationship was a contractual one based on the Offering Documents, and, as the Defendants note, this relationship was an arms-length business transaction. *See* doc. 45; 52 at 35. Generally, "[w]hen the parties to a transaction deal with each other at arm's length, with no confidential relationship, no obligation to disclose information arises when the information is not requested." *Aliant Bank, a Div. of USAmeribank v. Four Star Investments, Inc.*, 244 So. 3d 896, 931 (Ala. 2017). The Halberts have not alleged that they requested any information from Credit Suisse regarding its potential hedging activities, market conditions, conflicts of interest, or intent to accelerate the XIV ETNs. *See* doc. 45. Therefore, even if Credit Suisse knowingly concealed such information, no duty to disclose existed. *See Ex parte Farmers Exch. Bank*, 783 So. 2d at 28. And, although, generally, "[w]hen one party has superior knowledge of a fact that is unknown to the other party, and the lack of knowledge will induce the other party to act in a manner in which he otherwise might not act, the obligation to disclose is 'particularly compelling,'" *see Flying J Fish Farm*, 12 So. 3d at 1192 (citation omitted), here, the Halberts have failed to adequately allege that Credit Suisse omitted known risks regarding its anticipated hedging or alleged intent to collapse and accelerate the XIV ETNs, as discussed *supra* III.A.3.a. Moreover, "[s]uperior knowledge of a fact, without more, does not impose upon a party a legal duty to disclose such

information." *Id.* (citation omitted). Indeed, "in practically any transaction, particularly those involving specialized areas . . ., one party will have greater knowledge than the other. While that factor should be important, it should not be dispositive." *Id.* Therefore, in light of all these factors, Credit Suisse did not have a duty to disclose the alleged information to the Halberts, and the motion to dismiss this claim is due to be granted.

Similarly, Janus did not have a fiduciary, confidential, or even contractual relationship with the Halberts. And, the Halberts have failed to allege facts indicating that Janus employees knew of the alleged inevitability of the XIV ETNs' collapse or Credit Suisse's alleged intent to profit by hedging against and accelerating the XIV ETNs. *See supra* III.A.4. In other words, the Halberts have not alleged that Janus had "superior knowledge" of the relevant alleged facts that were unknown to the Halberts. *See Flying J Fish Farm*, 12 So. 3d at 1192. Consequently, Janus did not have a duty to disclose information to the Halberts, and its motion to dismiss this claim is due to be granted.

### iii.    Fraudulent Intent

Finally, the Defendants contend that the fraudulent misrepresentation claims are duplicative of the negligent misrepresentation claims because the Halberts have failed to allege fraudulent intent. *See* doc. 52 at 36. Although misrepresentation claims do not ordinarily require a showing of intent, "[w]hen, as here, punitive

damages are sought, fraud is statutorily defined to include intent." *Exxon Mobil Corp. v. Alabama Dep't of Conservation & Nat. Res.*, 986 So. 2d 1093, 1114 (Ala. 2007). For the purposes of recovering punitive damages, fraud is defined as

> An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury.

Ala. Code § 6-11-20(b)(1). For the same reasons that the Halberts have failed to adequately allege scienter, *see supra* III.A.4. the court finds that the Halberts have failed to plead fraudulent intent, i.e. that the Defendants' alleged misrepresentation of the Intraday Indicative Value on February 5, 2018 "was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury." *See* Ala. Code § 6-11-20(b)(1). Therefore, because the fraudulent misrepresentation claims premised on the allegedly false Intraday Indicative Values are duplicative of the negligent misrepresentation claims, the fraudulent misrepresentation claims fail.

### iv.    Summary

The Halberts have alleged negligent misrepresentation claims against Janus based on the allegedly false Intraday Indicative Values on February 5, 2018, but have failed to allege misrepresentation and suppression claims against either Credit Suisse or Janus premised on the alleged omissions in the Offering Documents.

## IV. CONCLUSION

The Halberts have failed to plead violations of Section 11 of the Securities Act or Section 10(b) of the Exchange Act. However, the Halberts have adequately plead violations of the Alabama Code § 8-6-19(a)(2) and (c) against Credit Suisse based on the allegedly false Intraday Indicative Values. Furthermore, the Halberts have adequately plead breach of contract against Credit Suisse and negligent misrepresentation against Janus, but the remainder of their state common law claims fail. The court will issue a separate order consistent with this opinion.

**DONE** the 22nd day of August, 2019.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE